UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCOTT BREIDING, AMY POLLUTRO, MIKAELA ORTSTEIN-OTERO, BENJAMIN ROSE, MARGARET LEWIS AND RICHARD LEWIS, ERIC LONG, PETER STEERS, ERIK ALLEN, BRADFORD KEITH, JOHN ODUM, and DAVID LEIGHTON, on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>      v.<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation,<br><br>                    Defendants. | C.A. No.<br><br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   DEFINITIONS ................................................................... 4

III.  JURISDICTION AND VENUE ............................................... 5

IV.   PARTIES ........................................................................ 6

    A.    Plaintiffs ................................................................ 6

    B.    Defendants ............................................................. 9

V.    FACTUAL ALLEGATIONS ................................................. 10

    A.    The New England Electricity Market ............................ 10

    B.    The New England Natural Gas Market ......................... 13

    C.    Defendants Possess Market Power in New England Through a Combination of Natural Gas and Electricity Businesses. ............................................................. 16

    D.    Defendants Unlawfully Abused Their Market Power by Artificially Restricting Natural Gas Supply and Artificially Raising Electricity Prices in the New England Energy Markets. ............................. 21

VI.   TOLLING OF STATUTE OF LIMITATIONS ............................ 33

VII.  CLASS ACTION ALLEGATIONS ......................................... 33

    A.    Eversource State Law Classes – Asserting State Law Claims Against Eversource ...................................................... 34

    B.    Avangrid State Law Classes – Asserting State Law Claims Against Avangrid ............................................................... 37

    C.    Eversource Federal Law Class – Asserting Federal Claims Against Eversource ...................................................... 40

    D.    Avangrid Federal Law Class – Asserting Federal Claims Against Avangrid ............................................................... 42

    E.    Federal Law Injunctive Class – Asserting Federal Claims Against Both Defendants ..................................................... 45

VIII.   VIOLATIONS ALLEGED ......................................................................................... 47

FIRST CLAIM FOR RELIEF (PLAINTIFFS' UNJUST ENRICHMENT CLAIM
        AGAINST EVERSOURCE UNDER MASSACHUSETTS LAW) ......................................... 47

SECOND CLAIM FOR RELIEF (PLAINTIFFS' ALTERNATIVE CLAIMS
        FOR UNJUST ENRICHMENT AGAINST EVERSOURCE UNDER
        LAWS OF INDIVIDUAL STATES) ......................................................................... 48

THIRD CLAIM FOR RELIEF (PLAINTIFFS' CLAIMS AGAINST
        EVERSOURCE UNDER STATE CONSUMER PROTECTION AND
        ANTITRUST LAWS) ........................................................................................... 49

FOURTH CLAIM FOR RELIEF (PLAINTIFFS' CLAIMS FOR UNJUST
        ENRICHMENT AGAINST AVANGRID UNDER LAWS OF
        INDIVIDUAL STATES) ....................................................................................... 52

FIFTH CLAIM FOR RELIEF (PLAINTIFFS' CLAIMS AGAINST AVANGRID
        UNDER STATE CONSUMER PROTECTION AND ANTITRUST
        LAWS) ............................................................................................................. 54

SIXTH CLAIM FOR RELIEF (EVERSOURCE PLAINTIFFS' AND
        AVANGRID PLAINTIFFS' CLAIMS FOR DAMAGES AND OTHER
        RELIEF UNDER FEDERAL ANTITRUST LAWS) ............................................... 56

SEVENTH CLAIM FOR RELIEF (PLAINTIFFS' CLAIM FOR INJUNCTIVE
        RELIEF UNDER FEDERAL ANTITRUST LAW) .................................................. 58

DEMAND FOR RELIEF ................................................................................................. 59

JURY TRIAL DEMANDED ............................................................................................ 61

010715-11 999464 V1

# I.      INTRODUCTION

1.      Defendants Eversource Energy and Avangrid, Inc. ("Defendants"), two of the
largest energy companies in New England, unlawfully abused their substantial market power to
manipulate both natural gas and electricity prices in the six-state region over a period of time
spanning at least from 2013 to 2016.  Through their natural gas businesses, Defendants each
engaged in an anti-competitive scheme to reduce regional natural gas supplies and increase
natural gas prices, particularly during the coldest months of the year.  Through their
manipulation of regional natural gas prices, Defendants were able to – and did – artificially
inflate and maintain the price of electricity paid by all consumers in New England.  As a result of
Defendants' covert interference with the natural operation of competitive forces in the
interdependent natural gas and electricity markets, New Englanders were overcharged by billions
of dollars on their electric bills.  Not since Enron's greedy heyday during the California energy
crisis, nearly two decades ago, have American energy markets been manipulated for private
profit at such expense to everyday electricity consumers.

2.      Defendants possess substantial market power – the ability to restrict supply and
elevate prices – through a combination of interests in both the natural gas and electricity
segments of the New England energy industry.  Specifically, Defendants possess market power
in the regional energy industry through (1) substantial natural gas distribution and sales
businesses, with the attendant ability to control natural gas transmission capacity along a critical
New England pipeline, and (2) substantial electricity distribution, sales, and generation
businesses, including the ownership of power plants that are not fueled by natural gas.  Abusing
this dual-segment market power, Defendants have regularly constrained natural gas transmission
capacity in the region by reserving far more transmission capacity than they know is necessary to
meet demand for their retail natural gas services.  Defendants' over-reserving of natural gas

pipeline capacity artificially inflates the price of natural gas in the real-time markets that serve many power plants in the region. Due to the unique nature of the regional energy market, Defendants' artificial inflation of natural gas prices also artificially inflates electricity prices throughout New England. By artificially increasing natural gas and electricity prices in the region, Defendants' electricity generating assets are used more and paid a higher price for the power they produce.

3.      But Defendants' anticompetitive scheme did not just increase the use of and price paid to their own power plants. Defendants' unlawful conduct also had an enormous and wide-ranging impact on the New England electricity market as a whole. Most important, Defendants' conduct artificially inflated and maintained electricity prices paid by *all* consumers in the entire six-state region. For at least three years, according to one study, consumers in the regional electricity market of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont paid a minimum of 20% more for electricity than they would have absent Defendants' abuse of their unique monopoly over regional natural gas transmission capacity. Defendants' abuse of their substantial market power caused an anticompetitive injury, in the form of higher electricity bills, to *all* New England electricity consumers.

4.      This consumer class action arises from the extensive economic damage that Defendants' market power abuses have inflicted upon New England residents. Plaintiffs Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Margaret and Richard Lewis, Eric Long, Peter Steers, Erik Allen, Bradford Keith, John Odum, and David Leighton ("Plaintiffs"), on behalf of themselves and the respective classes they represent, seek to make New England consumers whole – and to deter future abuses of market power by Defendants or others – through the efficient enforcement of federal and state law, including antitrust and

consumer protection statutes. Plaintiffs, all of whom are consumers of electricity in New England, now bring the following claims on behalf of themselves and classes of similarly situated consumers:

5. First, all Plaintiffs seek relief under state law on behalf of themselves and classes of similarly situated New England electricity consumers who purchased electricity for their own use and not for resale at least between mid-2013 and mid-2016. Plaintiffs bring claims against Eversource under Massachusetts law, on behalf of themselves and a class of electricity consumers in the six states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. Plaintiffs alternatively bring claims against Eversource under the laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont, on behalf of themselves and subclasses of electricity consumers in those five individual states. Plaintiffs separately bring claims against Avangrid under the laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont, on behalf of themselves and subclasses of electricity consumers in those five individual states. Plaintiffs seek all available and appropriate monetary and injunctive relief under state antitrust, unfair competition, and consumer protection laws, and under the common law of unjust enrichment, to recover damages, restitution, disgorgement, costs of suit, and reasonable attorneys' fees. Plaintiffs' state-law claims seek to remedy anticompetitive injuries suffered by them and members of the classes they represent who were forced to purchase electricity at artificially inflated prices as a result of Defendants' unlawful conduct.

6. Second, those Plaintiffs who purchased electricity from Defendants and/or their subsidiaries or affiliates (collectively, the "Customer Plaintiffs") seek damages and other relief under federal antitrust law for anticompetitive injuries sustained as a result of Defendants' unlawful conduct. Customers of Eversource, on behalf of themselves and a class of similarly

situated electricity consumers in Connecticut, Massachusetts, and New Hampshire, and customers of Avangrid, on behalf of themselves and a class of similarly situated electricity consumers in Connecticut and Maine, bring claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, restitution, disgorgement of profits, costs of suit, and reasonable attorneys' fees as a result of Defendants' violations of those antitrust statutes.

7.      Third, all Plaintiffs seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, on behalf of themselves and a single class of all electricity consumers in New England, as a means of ensuring that Defendants do not continue to inflict anticompetitive injuries on them or on other New England residents.

## II.      DEFINITIONS

8.      The exact time period of Defendants' anticompetitive conduct is unknown to Plaintiffs with precision, but that unlawful conduct began no later than August 1, 2013, continued through at least July 31, 2016, and ended or will end on the date the effects of Defendants' anticompetitive conduct end (the "Class Period").

9.      Plaintiffs Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Margaret and Richard Lewis, Eric Long, Peter Steers, Erik Allen, Bradford Keith, John Odum, and David Leighton ("Plaintiffs") resided and purchased electricity in the New England regional electricity market, for their own use and not for resale, during the Class Period.

10.     Plaintiffs Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Margaret and Richard Lewis, Eric Long, Peter Steers, Erik Allen, and Bradford Keith ("Customer Plaintiffs") are consumers who purchased electricity in the New England regional electricity market, for their own use and not for resale, from Defendants and/or their subsidiaries or affiliates during the Class Period.

- 4 -

11.     Plaintiffs Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Peter Steers, Erik Allen, and Bradford Keith ("Eversource Plaintiffs") are consumers who purchased electricity in the New England regional electricity market, for their own use and not for resale, from Eversource and/or its subsidiaries or affiliates during the Class Period.

12.     Plaintiffs Margaret and Richard Lewis and Eric Long ("Avangrid Plaintiffs") are consumers who purchased electricity in the New England regional electricity market, for their own use and not for resale, from Avangrid and/or its subsidiaries or affiliates during the Class Period.

13.     Plaintiffs John Odum and David Leighton ("Market Plaintiffs") are consumers who purchased electricity in the New England regional electricity market, for their own use and not for resale, from entities other than Defendants and/or their subsidiaries or affiliates during the Class Period.

### III.     JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over Customer Plaintiffs' federal antitrust claims, under Section 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act, under 28 U.S.C. §§ 1331 and 1337.  Customer Plaintiffs' federal antitrust claims arise under federal law, and specifically under federal statutes regulating commerce and trade.

15.     This court also has jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each Defendant conducts substantial business in the state of Massachusetts and because one Defendant, Eversource Energy, is a Massachusetts voluntary association with a headquarters in Boston.  Defendants purposefully availed themselves of the laws of the United States and Massachusetts insofar as they engaged in electric and/or natural gas utility business in the United States and in Massachusetts.

16.     The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  Plaintiffs' state law claims are so related to Customer Plaintiffs' claims under Section 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

17.     This Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(d).  The amount of damages incurred by Plaintiffs, as a result of Defendants' unlawful conduct, exceeds $5 million, exclusive of interest and costs, and various members of the Plaintiffs' respective state-law classes are citizens of a state different from any Defendant.

18.     Venue is proper in this District under Section 12 of the Clayton Act and under the federal venue statute, 28 U.S.C. § 1391, because each Defendant transacts business in this District and/or is a resident of this District, and because a substantial part of the events giving rise to this claim occurred in this District.

## IV.     PARTIES

### A.     Plaintiffs

19.     Plaintiff Scott Breiding is a resident of Somerville, Massachusetts.  Throughout the Class Period, Mr. Breiding purchased electricity from Eversource and/or its subsidiary, NSTAR Electric Company, for his own use and not for resale.  As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Breiding was forced to pay artificially inflated prices for electricity.

20.     Plaintiff Amy Pollutro is a resident of Boston, Massachusetts.  Throughout the Class Period, Ms. Pollutro purchased electricity from Eversource and/or its subsidiary, NSTAR Electric Company, for her own use and not for resale.  As a result of the unlawful,

anticompetitive, and unfair conduct described herein, Ms. Pollutro was forced to pay artificially inflated prices for electricity.

21.     Plaintiff Mikaela Ortstein-Otero is a resident of Amherst, Massachusetts. Throughout the Class Period, Ms. Ortstein-Otero purchased electricity from Eversource and/or its subsidiary, Western Massachusetts Electric Company, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Ortstein-Otero was forced to pay artificially inflated prices for electricity.

22.     Plaintiff Benjamin Rose is a resident of Roslindale, Massachusetts. During substantially all of the Class Period, Mr. Rose purchased electricity from Eversource and/or its subsidiary, NSTAR Electric Company, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Rose was forced to pay artificially inflated prices for electricity.

23.     Plaintiffs Margaret and Richard Lewis, husband and wife, are residents of Walpole, Maine. Throughout the Class Period, Mrs. and Mr. Lewis purchased electricity from Avangrid and/or its subsidiary, Central Maine Power Company, for their own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mrs. and Mr. Lewis were forced to pay artificially inflated prices for electricity.

24.     Plaintiff Eric Long is a resident of Lewiston, Maine. Throughout the Class Period, Mr. Long purchased electricity from Avangrid and/or its subsidiary, Central Maine Power Company, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Long was forced to pay artificially inflated prices for electricity.

010715-11 999464 V1

25.     Plaintiff Peter Steers is a resident of Vernon, Connecticut.  Throughout the Class Period, Mr. Steers purchased electricity from Eversource and/or its subsidiary, The Connecticut Light and Power Company, for his own use and not for resale.  As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Steers was forced to pay artificially inflated prices for electricity.

26.     Plaintiff Erik Allen is a resident of Middletown, Connecticut.  Throughout the Class Period, Mr. Allen purchased electricity from Eversource and/or its subsidiary, The Connecticut Light and Power Company, for his own use and not for resale.  As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Allen was forced to pay artificially inflated prices for electricity.

27.     Plaintiff Bradford Keith is a resident of Lyme, New Hampshire.  Throughout the Class Period, Mr. Keith purchased electricity from Eversource and/or its subsidiary, Public Service Company of New Hampshire, for his own use and not for resale.  As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Keith was forced to pay artificially inflated prices for electricity.

28.     Plaintiff John Odum is a resident of Montpelier, Vermont.  Throughout the Class Period, Mr. Odum purchased electricity from Green Mountain Power Corporation, an electric utility not owned by or affiliated with Defendants, for his own use and not for resale.  As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Odum was forced to pay inflated prices for electricity.

29.     Plaintiff David Leighton is a resident of South Royalton, Vermont.  Throughout the Class Period, Mr. Leighton purchased electricity from Green Mountain Power Corporation and/or its predecessor, Central Vermont Public Service Corporation, electric utilities not owned

by or affiliated with Defendants, for his own use and not for resale.  As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Leighton was forced to pay inflated prices for electricity.

**B.     Defendants**

30.     Defendant Eversource Energy ("Eversource") is a Massachusetts voluntary association.  Eversource maintains a headquarters in Boston, Massachusetts.  Eversource is a public utility holding company primarily engaged in the energy delivery business, at least in part through six wholly-owned subsidiaries: NSTAR Electric Company, NSTAR Gas Company, Western Massachusetts Electric Company, The Connecticut Light and Power Company, Public Service Company of New Hampshire, and Yankee Gas Services Company.  Collectively, Eversource and its subsidiaries serve more than 3.1 million electricity customers in 500 New England communities and more than half-a-million natural gas customers in 120 New England communities.  Eversource operates the largest energy delivery system in the region and it also owns a number of power plants in Massachusetts, New Hampshire, and Maine.  Eversource operations generate approximately $8 billion in revenue each year.

31.     Defendant Avangrid, Inc. ("Avangrid"), is a New York corporation headquartered in New Haven, Connecticut.  Through its wholly-owned subsidiary, Avangrid Networks, Inc., and at least in part through additional owned subsidiaries and/or affiliates, Avangrid owns electric generation, transmission, and distribution companies and natural gas distribution, transportation, and sales companies in New York, Maine, Connecticut, and Massachusetts.  Avangrid directly owns The Berkshire Gas Company ("BCG"), The United Illuminating Company, The Southern Connecticut Gas Company, Connecticut Natural Gas Corporation, Central Maine Power Company, and Maine Natural Gas Corporation.  Collectively, Avangrid serves more than 929,000 electricity customers and more than 400,000 natural gas customers in

- 9 -

New England.  Through another wholly-owned subsidiary, Avangrid Renewables Holdings, Inc., Avangrid owns electricity generating facilities in many states, including Massachusetts and New Hampshire.

## V.      FACTUAL ALLEGATIONS

### A.      The New England Electricity Market

32.      Much of the United States electricity market is divided into geographic regions intended to facilitate the efficient generation and transmission of electric power.  These regional markets are overseen by independent non-profit organizations known as Independent System Operators ("ISOs") or Regional Transmission Organizations ("RTOs").  ISOs work to facilitate an efficient market while also ensuring reliability for electricity consumers.

33.      The six New England states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont are organized into a single electricity market.  Although electric and natural gas companies in each state are regulated by public utility commissions, the overall electricity market in the region is overseen and facilitated by ISO New England ("ISO-NE").[1]  ISO-NE performs three primary roles: grid operation, market administration, and power system planning.[2]  The ISO-NE market serves 7.1 million retail electricity customers and an overall population of 14.7 million people.[3]

34.      The price New England consumers pay for electricity at any given time is dictated by several consistent factors.  Some factors are fixed for longer periods of time, like distribution

---

[1] A small portion of Northern Maine is not part of the ISO-NE market territory.  The electric market in that region is operated by the Northern Maine Independent System Administrator ("NMISA").

[2] ISO-NE, *Our Three Critical Roles*, https://www.iso-ne.com/about/what-we-do/three-roles.

[3] ISO-NE, *New England's Electricity Use*, https://www.iso-ne.com/about/key-stats/electricity-use.

charges imposed by "load serving entities" ("LSEs")[4] and approved from time to time by each state's public utility commission.  Other price factors fluctuate more frequently based on market conditions impacted by, for example, supply and demand.  In New England states, as elsewhere, one market-based driver of retail electricity costs is the wholesale price of electricity within ISO-NE.

35.     Wholesale electricity prices in New England are generally determined by ISO-NE in both "day ahead" and "real-time" markets.[5]  In the day ahead market, electricity generators and wholesale electricity buyers like LSEs plan significant electricity transactions a day in advance.  Wholesale electricity prices for the day ahead market are projected in advance, in hourly increments, by ISO-NE.[6]

36.     In the real-time market, electricity generators and wholesale electricity buyers conduct same-day transactions to account for last-minute changes in demand, prices, and other variables.  Wholesale electricity prices for the real-time market are projected on a rolling basis by ISO-NE, in five-minute increments, throughout the day.

37.     Due to the differing costs and engineering constraints of transmitting electricity to different geographic points within the region, individual wholesale electricity prices are determined by ISO-NE for each of eight different "wholesale load zones" – and, in fact, for over 1,000 different pricing nodes spread across the region.  There are three wholesale load zones in Massachusetts and one each for the other five New England states.  The individual wholesale

---

[4] LSEs are often retail electric utilities – i.e., the companies to which most electricity customers pay a monthly electric bill.

[5] ISO-NE, *Day-Ahead and Real-Time Energy Markets*, https://www.iso-ne.com/markets-operations/markets/da-rt-energy-markets.

[6] ISO-NE, *FAQs: Locational Marginal Pricing*, https://www.iso-ne.com/participate/support/faq/lmp.

electricity price established by ISO-NE for each wholesale load zone is called a "locational marginal price" ("LMP"). Although LMPs are influenced by several factors – including consumer demand, transmission constraints, and line losses – LMPs and wholesale energy prices throughout ISO-NE are primarily determined by a daily energy price uniformly paid to electricity generators.

38.     Each day, LSEs submit bids to ISO-NE that estimate the amount of electricity they will need to serve their customers during the next day. ISO-NE then estimates an overall amount of electricity demand for the entire region. Next, the ISO seeks supply and price bids from electricity generators, who offer to supply a certain amount of power at a certain price for the day in question. ISO-NE accepts the lowest-price bid first, and then the next lowest-price bid, and so on until all of the region's projected electricity demand is met by the total offered supply. This is known as an electricity "supply stack," or an "economic dispatch stack."

39.     Critically, the price of the last accepted bid in this "day ahead" auction, sometimes called the "clearing price," becomes the energy price paid to all of the generators whose bids were accepted for a particular day. In other words, the energy price of the supplier at the top of the supply stack (the highest accepted sales price bid) is paid to all suppliers in the stack. This daily energy price is then used to calculate wholesale electricity prices and LMPs throughout ISO-NE. And because wholesale electricity prices paid by LSEs are passed on to retail customers, the electricity price paid by consumers throughout ISO-NE is largely determined by the energy prices paid to electric generators in the ISO's daily supply stack.

40.     Nearly half of the electricity consumed in New England is generated by natural gas-fired power plants.[7] Because natural gas is the most important variable cost for those power

---

[7] ISO-NE, *Resource Mix*, https://www.iso-ne.com/about/key-stats/resource-mix.

plants, the price paid by plant owners for natural gas directly affects the sales price at which the plant is bid into the ISO-NE supply stack each day.  Because so many supply stack bidders are natural gas-fired power plants, the price of natural gas is a key determinant of each day's clearing price.  In 2016, for example, ISO-NE reports that "natural-gas-fired generators set the real-time price about 75% of the time and set the day-ahead price more often than any other type of physical resource."[8]  In turn, the price of natural gas paid by power plant owners is a key determinant of wholesale and retail electricity prices in New England.

41.     Most natural gas-fired power plant owners calculate the cost of generating electricity from their plant, and in turn the sales price bid at which to sell electricity, according to the predicted "spot market" price of natural gas on the day of planned generation.  The spot market price of natural gas is the real-time price at which gas can be purchased by generators to burn if accepted into the supply stack and called upon by ISO-NE to generate electricity.  Thus, there is a direct economic relationship between the spot market price of natural gas and the price at which gas-fired power plant operators bid to sell wholesale electricity.  Because so much of New England's electricity is generated by natural gas-fired power plants, the spot price of natural gas heavily influences both the wholesale and retail price of electricity.  This is why Defendants were able to use their natural gas market power – their ability to restrict natural gas supply and increase the spot market price of natural gas – to manipulate the price of electricity throughout New England for at least three years between 2013 and 2016.

**B.     The New England Natural Gas Market**

42.     Natural gas is delivered to and distributed within New England by pipeline.  The principal arterial natural gas pipeline in New England is the Algonquin Gas Transmission

---

[8] ISO-NE, *Markets*, https://www.iso-ne.com/about/key-stats/markets.

Pipeline.  The Algonquin pipeline is owned by Spectra Energy Partners, Defendant Eversource, and National Grid, another New England utility company.  The Algonquin pipeline is operated by Enbridge, Inc., a Canadian oil and gas pipeline company.  Enbridge is also the parent company of Spectra Energy Partners.

43.     Both Defendants have substantial natural gas utilities, known as Local Distribution Companies ("LDCs"), primarily engaged in the supply of natural gas to retail customers for cooking and, in the winter, for home heating.  (In the natural gas market, LDCs are essentially the equivalent of LSEs in the electricity market; Defendants are unique in that both operate large LSEs and large LDCs within the New England market.)

44.     To operate their LDCs, Defendants have contractual rights to order and use natural gas transmission capacity on the Algonquin pipeline.  Both Defendants have contracts that allow them to make daily orders of natural gas pipeline capacity in advance, one day before the capacity will be used.  If Defendants do not use the full capacity they have ordered, or if they use more capacity than they have ordered, they can be charged penalties by the pipeline operator. Because they operate LDCs, however, Defendants have unique, legacy contracts allowing them to adjust their pipeline capacity orders at various times during the day on which that capacity was ordered, including in the last few hours of the day – just before the previously-ordered capacity would otherwise have been used.

45.     Because the amount of natural gas available to power plants and other industrial users in New England is limited by pipeline capacity on any given day, the volumes ordered by Defendants and other LDCs with contractual transmission capacity rights affect how much additional capacity the pipeline operator can offer to other natural gas sellers and buyers on any given day.  If day-ahead orders submitted by LDCs for natural gas transmission fill up the

available daily transmission capacity of the Algonquin pipeline, other natural gas sellers and buyers cannot obtain transmission capacity for that day.

46.      When, at the last minute, Defendants adjust their day-ahead transmission capacity orders downward, there is not enough time to allow other natural gas sellers and buyers to fill the suddenly increased pipeline transmission capacity through new transactions.  As such, even on a day when there may be sufficient demand for a pipeline's entire transmission capacity, that capacity may go partially unused if excess capacity was created through last-minute downward order adjustments by LDCs.

47.      LDCs and their retail customers pay for natural gas through long-term "priority" contracts for natural gas supply.  Power plants and other industrial users of natural gas, by contrast, typically purchase natural gas in real time, or one day ahead, on the spot market.

48.      The price of natural gas on the spot market in New England is typically determined by the real-time price at which it can be purchased at various points along the Algonquin Pipeline and then distributed to a particular delivery point.  The spot price of natural gas is largely a function of how much gas may be available for sale along the Algonquin Pipeline at the time it is needed.  In simple terms, the economics of supply and demand mean that the spot price of natural gas increases when the amount of available natural gas on the spot market is lower.  As explained above, higher spot market natural gas prices translate directly to higher wholesale and retail electricity costs in the ISO-NE market.  Again, this is why Defendants were able to use their natural gas market power – their ability to restrict natural gas supply and increase the spot market price of natural gas – to manipulate the price of electricity throughout New England for at least three years between 2013 and 2016.

**C.    Defendants Possess Market Power in New England Through a Combination of Natural Gas and Electricity Businesses.**

49.    Market power is the ability of a firm or firms to restrict supply below, or raise prices above, the corresponding levels of supply and price that would prevail under competition. The ultimate source of Defendants' substantial market power in the New England energy market is their ownership and control of subsidiaries and assets in three different energy market segments – retail natural gas, retail electric, and electric generation – as illustrated by the following figure:



50.    Each Defendant possesses substantial market power within the New England

energy market as a result of at least four factors.  This combination of factors allowed

Defendants to manipulate natural gas and electricity prices in New England by restricting the

supply of natural gas below the level that would have prevailed despite their conduct, and by increasing the price of both natural gas and electricity to a level that would have been lower absent Defendants' scheme to constrain natural gas supply.

51.     First, Defendants each operate LDCs that serve hundreds of thousands of natural gas customers in New England.  Eversource serves more than 500,000 natural gas customers, while Avangrid serves more than 400,000.  In order to provide this service, Defendants have developed substantial control over the natural gas transmission and distribution system within the region, either through ownership in or contractual rights to capacity along various pipelines – including the all-critical Algonquin Pipeline.

52.     Second, Defendants possess a large number of "no-notice" contracts for natural gas transmission capacity along the Algonquin Pipeline.  These no-notice contracts, which are only available to LDCs, give Defendants power to adjust prior orders of transmission capacity upward or downward without penalty.  Such adjustments can be made up to and within the last few hours of the day – just before the previously-ordered transmission capacity was to have been used.

53.     Third, Defendants each own and operate electricity generating assets within the ISO-NE territory that are not fueled by natural gas.  These power plants directly compete in the market against natural gas-fired power plants, and, as a result, they are more competitive in the market when the supply of natural gas is lower and the price of natural gas is higher.

54.     Fourth, Defendants each operate retail electric utilities that provide electricity to millions of residential, commercial, and industrial customers in New England.  The price of the electricity Defendants sell to their retail customers is driven, in large part, by the market-wide wholesale price of energy established within the ISO-NE market.  When the price of wholesale

electricity established within the ISO-NE market is higher, the price of electricity sold by

Defendants to their retail customers is also higher.

55.     In sum, Defendants are positioned to exercise significant control over the capacity

of a critical natural gas pipeline in New England.  Defendants thereby possess the ability to

reduce regional natural gas supply and increase the regional spot market price of natural gas to

levels that are different than the levels that would prevail under competition.  Defendants are

able to profit directly from artificially higher natural gas spot market prices in the form of

increased use of and higher prices paid to their non-gas-fired electric power plants.  That is

exactly what Defendants did in this case, as illustrated by the following figure:



**D.**     **Defendants Unlawfully Abused Their Market Power by Artificially Restricting Natural Gas Supply and Artificially Raising Electricity Prices in the New England Energy Markets.**

56.     Defendants' scheme to limit the availability of natural gas supply is simple: Defendants regularly reserved more pipeline capacity than they knew they needed, planning all the while to cancel their reservations at the last minute when it was too late for other market participants to use the newly-created capacity to meet unfilled natural gas demand. Defendants used their position of power over a key market supply conduit to alter the market's otherwise competitive balance between supply and demand.

57.     Relying on millions of publicly-available data points for a period between mid-2013 and mid-2016, recent academic research demonstrates that Defendants routinely made day-ahead orders of natural gas that substantially exceeded the amount of gas they ultimately purchased.[9]  This research also shows that Defendants routinely reduced their orders for natural gas transmission capacity on the Algonquin Pipeline at the last minute, thereby precluding other buyers and sellers from using that capacity and effectively reducing the overall capacity of the pipeline.  Defendants' scheme effectively shrunk the gas pipe.

58.     By making downward adjustments of natural gas orders at the last minute, Defendants regularly restricted the amount of natural gas supply available along the Algonquin Pipeline over at least a three-year period.

59.     Throughout this period, Defendants' downward order adjustments reduced effective capacity on the Algonquin Pipeline by an average of 50,000 million British thermal units ("MMBtu") each day.  That is equal to approximately 14% of the natural gas that would

---

[9] Levi Marks, Charles F. Mason, Kristina Mohlin, and Matthew Zaragoza-Watkins, *Vertical Market Power in Interconnected Natural Gas and Electricity Markets* (October 11, 2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf.

otherwise have been available to natural gas-fired power plants served by the Algonquin pipeline.  On 37 days during this period, Defendants' downward order adjustments reduced effective pipeline capacity by more than 100,000 MMBtu – about 28% of the total daily amount of gas that would otherwise have been available to natural gas-fired power plants.

60.     Academic researchers have modeled the effect of this reduced natural gas supply on natural gas spot market prices and on electricity prices in the ISO-NE region.  Reduced natural gas supply, caused solely by the Defendants' last-minute downward order adjustments, resulted in spot market natural gas prices that were 38% higher than they would otherwise have been on average.  During the cold winter months, Defendants' conduct resulted in spot market natural gas prices that were nearly 70% higher than they otherwise would have been.

61.     These increased natural gas prices caused electricity prices to be 20% higher than they would otherwise have been during the same period.  Defendants' scheme to limit regional natural gas supply, through the systematic downward adjustment of daily natural gas capacity orders, resulted in a $3.6 billion overpayment of electricity costs by New England consumers.  Defendants' scheme caused sudden increases in wholesale electricity prices, and those price increases were passed on to retail consumers by LSEs throughout New England – including, for many New Englanders, LSEs that are owned and controlled by Defendants.  And then electric bills jumped.[10]

62.     Defendants' last-minute downward adjustment of natural gas pipeline capacity orders was not just a function of ordinary business practices within the energy market.  To the contrary, Defendants' anticompetitive scheme to restrict natural gas supply and raise electricity

---

[10] Katharine Q. Seelye, *Even Before Long Winter Begins, Energy Bills Send Shivers in New England*, N.Y. TIMES, Dec. 13, 2014, https://www.nytimes.com/2014/12/14/us/even-before-long-winter-begins-energy-bills-send-shivers-in-new-england.html?_r=0.

prices to artificial levels was an egregious – and heartless – abuse of their substantial market power.

63.     Defendants' anticompetitive behavior stands in stark contrast to the behavior of similarly-situated companies.  Defendants made far more last-minute adjustments, of a far greater size, than other gas companies using the Algonquin Pipeline.  On 351 days during the Class Period – nearly one out of every three days – Eversource made at least one downward capacity order adjustment that was more than three standard deviations larger than the average order adjustment of all natural gas companies using the Algonquin Pipeline.  On 1,031 days during the Class Period – nearly every day – Avangrid made at least one downward capacity order adjustment that was more than three standard deviations larger than the average order adjustment of all gas companies using the Algonquin Pipeline.

64.     Indeed, other firms with both a natural gas distribution business and electricity generating assets did not perform the same type of last-minute downward capacity order adjustments that Defendants performed to reduce effective natural gas capacity on the Algonquin Pipeline.  At least one other LDC with operations on the Algonquin Pipeline also held a large number of no-notice contracts for transmission capacity, but that company made only a small fraction of the last-minute capacity order adjustments made by Defendants during the Class Period.   While Defendants' last-minute order reductions averaged many *thousands* of MMBtu per affected pipeline "node" – particular geographic points where capacity orders are placed and later adjusted – the other company with many no-notice contracts made average downward adjustments of only 229 MMBtu at its most-adjusted node.

65.     To illustrate the uniquely anticompetitive nature of Defendants' conduct, the following two figures – created by the academic researchers who first identified Defendants'

conduct – show the typical natural gas transmission capacity order adjustments on the Algonquin pipeline:



As demonstrated by these figures, pipeline capacity order adjustments are typically made throughout the day before natural gas is to be used – i.e., as new information about the next day's likely gas demand becomes known.  The next two figures, however, show capacity order adjustments at a single pipeline node operated by Avangrid:



While some minor capacity order adjustments were made in advance at this node, the figures show a clear pattern of large downward adjustments at the last minute.  This pattern is very different than the pattern of typical Algonquin Pipeline users shown in the first set of figures.

66.     Defendants' conduct is not only unusual, but it is unjustified by legitimate needs of market participants.  Indeed, Defendants did not need to over-reserve natural gas pipeline capacity and adjust their orders downward at the last minute.  The same no-notice contracts that enabled Defendants' behavior would also have allowed them to order a smaller amount of capacity one day in advance and then gradually increase that order, if necessary, as information about the next day's projected demand evolved.

67.     In the alternative, Defendants could have sold any excess pipeline capacity on the secondary "capacity release market" in order to avoid incurring penalties from the pipeline operator.  Such sales may even have netted Defendants a small amount of revenues.  Although most of Defendants' last-minute downward adjustments of pipeline capacity orders took place in jurisdictions where LDCs are required to return almost all revenue from the sale of excess pipeline capacity to LDC customers, such sales would have provided a way for Defendants both to ensure sufficient capacity for themselves, and to ensure that excess pipeline capacity was available for other market participants, while earning at least some return.  The potential benefits of normal market behavior, however, were apparently outweighed by the incentives of Defendants' alternative behavior.

68.     As it turns out, Defendants had a powerful incentive to eschew normal market behavior: the ability to create substantial benefits for themselves by artificially raising and maintaining the energy price paid to electricity generators in the ISO-NE market.  Only LDCs can have no-notice contracts allowing the penalty-free downward adjustment of capacity orders.  And among New England energy companies engaged in LDC natural gas distribution as well as electricity generation and supply, Defendants are two of the top three electricity generators.

- 25 -

69.     By using their natural gas subsidiaries to restrict gas supply and increase the spot market price for natural gas, or to cut off available gas supplies to competing gas-fired power plants altogether, Defendants were able to artificially increase market demand for non-gas-fired power plants *and* increase the market price for that electricity.  Specifically, Defendants artificially inflated the price of natural gas on the spot market by artificially constraining pipeline capacity and depressing supply.  In turn, Defendants reduced the number of natural gas-fired power plants that could compete in the wholesale electricity market.  For those gas plants that still managed to compete in the electricity market, Defendants' conduct raised the supply price at which those plants offered their generation into the market.  This then raised the clearing price for generating resources in the ISO-NE supply stack and thereby increased the price of energy paid to all generating resources in the stack.  These higher energy prices then raised wholesale electricity prices as well as the retail prices paid by all consumers in New England.

70.     Indeed, the unique structure of the wholesale electricity market in New England allowed Defendants to unilaterally raise the price of energy paid not just to their own generating resources but to all generating resources in the region.  This is not a case where one party's market manipulation causes unsuspecting parties to raise their prices in pursuit of market parity.  This is a case, instead, where one party is able to manipulate the entire market due to its unique structure – that is, to singlehandedly affect the price paid to all sellers of a particular product, even when the manipulating party accounts for only a percentage of the product's market sales.  Because the market itself dictates a single market price, Defendants' interference with the natural competitive function of the market affected all market participants and all customers.  The nature of this electricity market means that any manipulation results in wide-ranging adverse impacts for consumers.

71.     At the same time, the unique nature of the electricity market provides a powerful incentive for market manipulation because, as here, the manipulation of just one market input can be used to unilaterally raise electricity prices throughout the market.  Again, wholesale electricity markets are not like other consumer markets where competing market participants pursue consumers by independently setting separate prices for the same product.  In the ISO-NE electricity market, wholesale electricity prices for the entire market are established by the market operator after a supposedly competitive auction.  But the rates established in this process can be manipulated by those with sufficient market power to do so.  That is what Enron did in California two decades ago, reaping enormous profits while forcing Californians to endure astronomical electricity prices and rolling blackouts.[11]

72.     Importantly, Defendants' market manipulation in this instance was more covert. Defendants did not manipulate regional wholesale and retail electricity rates through direct participation in the market – i.e., by submitting false bids for generation or conducting unlawful trading schemes – but instead through unlawful conduct in the upstream natural gas market that influenced the behavior of third-party electricity market participants.  In other words, by interfering with natural competitive forces in the natural gas market, Defendants caused natural gas power plant operators to behave differently than they otherwise would have in a competitive market.  Natural gas power plant operators did nothing wrong, as far as they knew, simply by responding to price signals in the natural gas market when submitting bids for generation into the electricity market.

---

[11] *See, e.g.*, Timothy Egan, *Tapes Show Enron Arranged Plant Shutdown*, N.Y. TIMES, Feb. 4, 2005, http://www.nytimes.com/2005/02/04/us/tapes-show-enron-arranged-plant-shutdown.html?_r=0.

73.     For the same reason, ISO-NE would have had no reason to suspect that the regional electricity market was being manipulated or that wholesale electricity rates established in its auctions were not reflective of true competitive market forces.  Defendants did not manipulate ISO-NE's procedures for calculating, establishing, or approving a rate, but instead manipulated a single input used by other market participants to determine whether and how to participate in the electricity market.  In so doing, Defendants manipulated information that was supplied to ISO-NE for use in setting a rate, but it did not interfere with the rate-setting process itself.  As far as ISO-NE or other electricity market participants were concerned, wholesale electricity rates, and therefore retail electricity rates, were established just as the market intended. In its oversight of the electricity market, therefore, ISO-NE did not consider or approve Defendants' anticompetitive conduct in the natural gas market.

74.     Still, Defendants' anticompetitive conduct in the natural gas market, and their corresponding influence on the behavior of electricity market participants, did manipulate the electricity rates established in the ISO-NE market.  Defendants' conduct was no less manipulative for being covert.  The unique structure of the wholesale electricity market in New England allowed Defendants, by artificially raising the cost of doing business for market participants before they even entered the market – i.e., by increasing the price of natural gas – to affect the rates established by the market without directly manipulating the market mechanism itself.  The market may have worked as intended, but, as a result of Defendants' unlawful manipulation of upstream market inputs through anticompetitive behavior, the rates established by the market were nonetheless artificially inflated.

75.     Compounding the impact of Defendants' conduct was especially cold weather in New England from 2013 to 2015.  Because natural gas is used directly for home heating as well

as for electricity generation, the so-called "polar vortex" during 2013 and 2014 was believed to have caused substantial spikes in electricity bills for New England consumers.[12]  In January 2014, daily natural gas spot market prices along the Algonquin Pipeline were 1100% higher than the average price under unconstrained conditions.[13]  In turn, New England wholesale electricity cost $5.05 billion in the three-month period from December 2013 through February 2014 – nearly the same cost for wholesale electricity incurred by the region during all twelve months of 2012.  Defendants have openly acknowledged the role of natural gas pipeline capacity constraints in creating this problem, but they have failed to identify or explain their own role in creating those capacity constraints.[14]

76.     The winter of 2014-2015 was largely the same, with retail electric customers enduring enormous increases in their regular power bills.  Some consumers spent money on energy upgrades to their homes as a way to mitigate high electricity bills, yet continued to see electric bills climb.  All the while, Defendants were artificially constraining natural gas capacity

---

[12] Clifford Krauss, *As Winter Takes Hold, Plunging Temperatures Test Utilities*, N.Y. TIMES, Jan. 8, 2014, https://www.nytimes.com/2014/01/09/business/energy-environment/as-winter-takes-hold-plunging-temperatures-test-utilities.html.

[13] United States Energy Information Agency, *Northeast and Mid-Atlantic power prices react to winter freeze and natural gas constraints*, January 21, 2014, https://www.eia.gov/todayinenergy/detail.php?id=14671.

[14] *See* Prepared Statement of Camilo Serna, Vice President of Strategic Planning and Policy for Eversource Energy, delivered to U.S. Department of Energy Quadrennial Energy Review Meeting, April 15, 2016, https://energy.gov/sites/prod/files/2016/04/f30/Panel%201%20Remarks%20by%20Camilo%20Serna%2C%20Vice%20President%20for%20Strategic%20Policy%20%26%20Planning%2C%20Eversource.pdf; United Illuminating, *News Release: UIL Holdings to Invest in Regional Energy Solution*, July 24, 2015, https://www.uinet.com/wps/portal/uinet/about/news%20information/news/072415%20ned%20investment/!ut/p/a0/04_Sj9CPykssy0xPLMnMz0vMAfGjzOJ9_D3dfZ3NPR09wwJNDTxNPI0C_YOcDQ0MTPULsh0VAfenORs!/.

in the region through their strategy of last-minute downward order adjustments.  Eversource collected $7.9 billion in revenue during 2015, with nearly $1.8 billion in profit.

77.     While Defendants were abusing their market power to manipulate the entire New England energy market, they stood to gain directly from that abuse of market power because they both own electricity generating resources not fueled by natural gas.  Higher power prices in the region, along with decreased competitiveness and availability of natural gas generation, created direct benefits for both Defendants.

78.     Both Defendants own renewable electricity resources such as hydroelectric, wind, and solar generating facilities.  These facilities have low variable operating costs because, unlike natural gas power plants, they employ fuels that are free.  When the variable cost of competing electricity generation resources like natural gas plants is higher, it is more likely that bids from renewable generating resources will be accepted in ISO-NE's day ahead and real-time wholesale electricity markets.  Not only that, but because all generating resources in ISO-NE's supply stack are paid the same energy price on a given day, renewable generating resources are more profitable when the day's clearing price is higher due to higher natural gas prices.  As a result, higher natural gas spot market prices caused by Defendants' constraint of natural gas supplies resulted in more usage and higher profits for Defendants' renewable electricity generating resources.

79.     Defendant Eversource also owns non-renewable electricity generating resources fueled by coal, oil, and biomass.  All three resources burn fuel with a variable cost, much like natural gas.  When the natural gas spot market price goes up, electricity generating resources fueled by coal, oil, and biomass become more competitive and more likely to be placed into the supply stack.  Alternatively, coal, oil, and biomass plants may be forced to run simply because

regional natural gas power plants do not have access to sufficient gas supply due to pipeline capacity constraints.  As ISO-NE has explained, high natural gas prices can cause natural gas-fired power plants not to operate, which then forces the ISO "to dispatch more expensive oil- and coal-fired plants," a market mechanism that results "in significant 'uplift' costs and reliability concerns."[15]  When New England electricity prices spiked during the infamous polar vortex, oil-fired power plants like Maine's Wyman Station, in which Eversource is a minority owner, accounted for more than 5% of generation in the region during the winter of 2013-2014, and produced more than eight times the amount of generation those assets produced in the winter of 2012-2013.[16]  Increased generation by Eversource's non-gas power plants, at greater economic margins, increased the value of those assets to Eversource.[17]

80.     Increased use of and prices paid to non-gas-fired power plants is not the only reward Defendants have tried to reap through the abuse of their market power.  Indeed, not satisfied solely with increasing their power production profits, Defendants have also used a condition of their own making – constrained natural gas supply and high electricity prices – to advocate for new construction of multi-billion-dollar gas pipeline infrastructure.  Eversource and Avangrid, like other utilities in the region, have for years blamed high electricity prices on insufficient natural gas pipeline infrastructure, and they have argued that additional pipelines are

---

[15] ISO-NE, *2014 Regional Electricity Outlook* (January 2014), https://www.iso-ne.com/static-assets/documents/aboutiso/fin/annl_reports/2000/2014_reo.pdf.

[16] John-Laurent Tronche, *US New England Oil-Fired Generation Averaging 16.2 GWh/day in 2014: ISO-NE*, PLATTS, March 26, 2014, https://www.platts.com/latest-news/electric-power/houston/us-new-england-oil-fired-generation-averaging-21386021.

[17] Under a settlement with the State of New Hampshire, Eversource recently announced an agreement to sell most of its electricity-generating assets.

needed to address the capacity shortage.[18]  Defendants and other utilities have worked to convince lawmakers and regulators that New England residents – rather than the utilities – should foot the bill for this new infrastructure.  That infrastructure has generated further profit for Defendants at the further expense of New Englanders.

81.     Now, on the heels of these revelations, state energy regulators in Connecticut and Massachusetts have announced investigations into Defendants' anticompetitive market power abuses.[19]  The Massachusetts Attorney General's office has likewise expressed concern and is reviewing available information about Defendants' conduct.  Connecticut Senator Richard Blumenthal has called on the Federal Energy Regulatory Commission ("FERC") to launch an investigation.  The New Hampshire Public Utilities Commission Office of Consumer Advocate has similarly called for a FERC investigation.

82.     Just as Enron's "smartest guys in the room" caused a massive energy crisis in California through creative market manipulation,[20] the rise of electricity costs in New England has in large part been created by Defendants' sophisticated scheme to artificially restrict natural gas supply, and to artificially boost electricity prices, through the abuse of their substantial market power.

---

[18] Access Northeast, *Our Solution: A Solution is Needed*, http://www.accessnortheastenergy.com/Our-Solution/.

[19] Robert Walton, *Massachusetts regulators to review allegations Eversource, Avangrid constrained pipelines*, UTILITY DIVE, October 25, 2017, https://www.utilitydive.com/news/massachusetts-regulators-to-review-allegations-eversource-avangrid-constra/508100/.

[20] Richard A. Oppel, Jr. and Jeff Gerth, *Enron Forced Up California Prices, Documents Show*, N.Y. TIMES, May 7, 2002, http://www.nytimes.com/2002/05/07/business/enron-forced-up-california-prices-documents-show.html.

## VI.   TOLLING OF STATUTE OF LIMITATIONS

83.     Plaintiffs and members of the classes they represent had no way of knowing that their electricity bills were exorbitantly high during the Class Period as a result of Defendants' conduct.  It took sophisticated academic research involving millions of data points and complicated modeling to discover Defendants' conduct and its impacts on electricity consumers in New England.  Within the time period of any applicable statutes of limitation, Plaintiffs and members of the classes they represent could not have discovered through the exercise of reasonable diligence that Defendants were engaged in the unlawful and unfair conduct alleged in this Complaint.

84.     Nor would Plaintiffs and members of the classes they represent have had any reason to suspect wrongdoing by Defendants.  Defendants repeatedly blamed electricity price spikes during the Class Period on insufficient natural gas pipeline infrastructure rather than on artificial restriction of existing pipeline capacity.  Indeed, Defendants used the public narrative of insufficient infrastructure to justify investment in new pipeline construction projects during the Class Period – projects that saddled, or may yet saddle, even more costs onto Plaintiffs and members of the classes they represent.  By blaming pipeline capacity shortages and electricity price increases on a lack of sufficient infrastructure, Defendants concealed a substantial reason for electricity price spikes during the Class Period – namely, their own abuse of market power in artificially restricting the natural gas transmission capacity of existing pipeline infrastructure.

## VII.   CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring state and federal law claims in this action on behalf of themselves and similarly situated classes of persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Excluded from all classes defined below are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and

any affiliate, legal representative, heir, or assign of any Defendant.  Also excluded are any federal or state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

**A.     Eversource State Law Classes – Asserting State Law Claims Against Eversource**

86.     Plaintiffs bring claims for damages and other relief under Massachusetts law against Eversource, on behalf of themselves and a class of similarly situated electricity consumers throughout New England (the "Unified State Law Class").  The Unified State Law Class is defined as follows: all consumers who purchased electricity during the Class Period, for their own use and not for resale, in the six-state ISO-NE market territory of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

87.     In the event that Massachusetts law is not applied to the state-law claims of all members of the Unified State Law Class, regardless of where they reside, Plaintiffs alternatively bring state-law claims against Eversource on behalf of themselves and state-specific subclasses (collectively, the "Separate State Law Classes"), under the relevant laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont.  The Separate State Law Classes are defined as follows:

a.     Connecticut State Law Class: all consumers who purchased electricity in Connecticut, for their own use and not for resale, during the Class Period.

b.     Maine State Law Class: all consumers who purchased electricity in the ISO-NE territory of Maine, for their own use and not for resale, during the Class Period.

c.     Massachusetts State Law Class: all consumers who purchased electricity in Massachusetts, for their own use and not for resale, during the Class Period.

d.     New Hampshire State Law Class: all consumers who purchased electricity in New Hampshire, for their own use and not for resale, during the Class Period.

e.   Vermont State Law Class: all consumers who purchased electricity in Vermont, for their own use and not for resale, during the Class Period.

88.     The persons in the Unified State Law Class and the Separate State Law Classes (collectively, the "Eversource State Law Classes") are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Eversource State Law Classes is easily ascertainable, as each class member can be identified by using readily obtainable records, including publicly available records and records in the possession of Defendants and/or their subsidiaries or affiliates.   Through their counsel, Plaintiffs are informed and believe that there are approximately seven million members of the Unified State Law Class and, collectively, well over six million members of the Separate State Law Classes.

89.     Plaintiffs' state-law claims against Eversource are typical of the claims of the Eversource State Law Classes in that Plaintiffs purchased electricity in the ISO-NE territory of New England, for their own use and not for resale, during the Class Period.  All members of the Eversource State Law Classes were damaged by the same wrongful conduct of Eversource, and the relief sought is common to all members of the Eversource State Law Classes.

90.     There are common questions of law and fact specific to the Eversource State Law Classes that predominate over any questions affecting individual members, including whether, during the Class Period:

a.   Eversource engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity along a key regional pipeline;

b.   Eversource engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

c.      Eversource's conduct in the natural gas segment of the New England energy market covertly interfered with natural competitive forces within the electricity segment of that market, causing operators of natural gas-fired power plants to withhold otherwise economic bids or to bid generation into the ISO-NE wholesale market at artificially high prices;

d.      Eversource's conduct in the natural gas segment of the New England energy market, and covert interference with market forces within the electricity segment of that market, caused artificially inflated wholesale and retail power prices throughout the region during the Class Period;

e.      Eversource's conduct injured Plaintiffs and all members of the Eversource State Law Classes, and, if so, the appropriate class-wide measure of damages for Plaintiffs and all members of the Eversource State Law Classes;

f.      Plaintiffs and all other members of the Eversource State Law Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

91.     These and other questions of law and fact are common to the Eversource State Law Classes, and predominate over any questions affecting only individual class members.

92.     Plaintiffs' claims are typical of the claims of members of the Eversource State Law Classes as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Eversource State Law Classes, and Plaintiffs challenge the practices and course of conduct engaged in by Eversource with respect to the Eversource State Law Classes as a whole.

93.     Plaintiffs will fairly and adequately protect the interests of the Eversource State Law Classes.  Plaintiffs have retained class counsel who are able and experienced class-action litigators.

94.     Resolution of Plaintiff's state-law claims against Eversource on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Eversource State Law Classes can justify the commitment of the large financial resources to vigorously prosecute a

lawsuit against Eversource.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Eversource and substantially impede or impair the ability of members of the Eversource State Law Classes to pursue their claims.  A class action also makes sense because Eversource's conduct, upon information and belief, including publicly-available data, is generally applicable to millions of individuals, thereby making injunctive relief appropriate with respect to the Unified State Law Class as a whole or, alternatively, to one or more of the Separate State Law Classes.

**B.      Avangrid State Law Classes – Asserting State Law Claims Against Avangrid**

95.      Plaintiffs bring claims for damages and other relief against Avangrid, on behalf of themselves and members of the Separate State Law Classes under the laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont.  The Separate State Law Classes, as previously defined in Paragraph 87, above, are as follows:

f.      Connecticut State Law Class: all consumers who purchased electricity in Connecticut, for their own use and not for resale, during the Class Period.

g.      Maine State Law Class: all consumers who purchased electricity in the ISO-NE territory of Maine, for their own use and not for resale, during the Class Period.

h.      Massachusetts State Law Class: all consumers who purchased electricity in Massachusetts, for their own use and not for resale, during the Class Period.

i.      New Hampshire State Law Class: all consumers who purchased electricity in New Hampshire, for their own use and not for resale, during the Class Period.

j.      Vermont State Law Class: all consumers who purchased electricity in Vermont, for their own use and not for resale, during the Class Period.

96.      The persons in the Separate State Law Classes are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the

precise number of such persons is unknown, the exact size of the Separate State Law Classes is easily ascertainable, as each class member can be identified by using readily obtainable records, including publicly available records and records in the possession of Defendants and/or their subsidiaries.   Through their counsel, Plaintiffs are informed and believe that, collectively, there are well over six million members of the Separate State Law Classes.

97.     Plaintiffs' state-law claims against Avangrid are typical of the claims of the Separate State Law Classes in that Plaintiffs purchased electricity in New England, for their own use and not for resale, during the Class Period.  All members of the Separate State Law Classes were damaged by the same wrongful conduct of Avangrid, and the relief sought is common to all members of the Separate State Law Classes.

98.     There are common questions of law and fact specific to the Separate State Law Classes that predominate over any questions affecting individual members, including whether, during the Class Period:

g.      Avangrid engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity along a key regional pipeline;

h.      Avangrid engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

i.      Avangrid's conduct in the natural gas segment of the New England energy market covertly interfered with natural competitive forces within the electricity segment of that market, causing operators of natural gas-fired power plants to withhold otherwise economic bids or to bid generation into the ISO-NE wholesale market at artificially high prices;

j.      Avangrid's conduct in the natural gas segment of the New England energy market, and covert interference with market forces within the electricity segment of that market, caused artificially inflated wholesale and retail power prices throughout the region during the Class Period;

      k.      Avangrid's conduct injured Plaintiffs and all members of the Separate State Law Classes, and, if so, the appropriate class-wide measure of damages for Plaintiffs and all members of the Separate State Law Classes;

      l.      Plaintiffs and all other members of the Separate State Law Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

99.    These and other questions of law and fact are common to the Separate State Law Classes, and predominate over any questions affecting only individual class members.

100.    Plaintiffs' claims are typical of the claims of members of the Separate State Law Classes as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Separate State Law Classes, and Plaintiffs challenge the practices and course of conduct engaged in by Avangrid with respect to the Separate State Law Classes as a whole.

101.    Plaintiffs will fairly and adequately protect the interests of the Separate State Law Classes.  Plaintiffs have retained class counsel who are able and experienced class-action litigators.

102.    Resolution of Plaintiff's state-law claims against Avangrid on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Separate State Law Classes can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Avangrid.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Avangrid and substantially impede or impair the ability of members of the Separate State Law Classes to pursue their claims.  A class action also makes sense because Avangrid's conduct, upon information and belief, including publicly-available data, is generally applicable to millions

of individuals, thereby making injunctive relief appropriate with respect to the Separate State Law Classes.

**C.      Eversource Federal Law Class – Asserting Federal Claims Against Eversource**

103.     Eversource Plaintiffs bring claims for damages and other relief under federal antitrust law against Eversource, on behalf of themselves and a class of similarly situated electricity consumers in New England ("Eversource Federal Law Class").  The Eversource Federal Law Class is defined as follows: all consumers who purchased electricity in the ISO-NE market territory from Eversource and/or its subsidiaries or affiliates, during the Class Period, for their own use and not for resale.

104.     The persons in the Eversource Federal Law Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Eversource Federal Law Class is easily ascertainable, as each class member can be identified by using records in the possession of Eversource and/or its subsidiaries or affiliates.  Through their counsel, Eversource Plaintiffs are informed and believe that there are well over three million members of the Eversource Federal Law Class.

105.     Eversource Plaintiffs' federal antitrust law claims against Eversource are typical of the claims of the Eversource Federal Law Class in that Eversource Plaintiffs purchased electricity in the ISO-NE market territory from Eversource and/or its subsidiaries, during the Class Period, for their own use and not for resale.  All members of the Eversource Federal Law Class were damaged by the same wrongful conduct of Eversource, and the relief sought is common to all members of the Eversource Federal Law Class.

106.     There are common questions of law and fact specific to the Eversource Federal

Law Class that predominate over any questions affecting individual members, including whether,

during the Class Period:

> m.     Eversource engaged in unfair and anticompetitive conduct in the natural
> gas segment of the New England energy market by restricting natural gas
> transmission capacity along a key regional pipeline;

> n.     Eversource engaged in unfair and anticompetitive conduct in the natural
> gas segment of the New England energy market by restricting natural gas
> supplies available for sale on the spot market for natural gas, and therefore
> increased the spot market price of natural gas in the region;

> o.     Eversource's conduct in the natural gas segment of the New England
> energy market covertly interfered with natural competitive forces within
> the electricity segment of that market, causing operators of natural gas-
> fired power plants to withhold otherwise economic bids or to bid
> generation into the ISO-NE wholesale market at artificially high prices;

> p.     Eversource's conduct in the natural gas segment of the New England
> energy market, and covert interference with market forces within the
> electricity segment of that market, caused artificially inflated wholesale
> and retail power prices throughout the region during the Class Period;

> q.     Eversource's conduct injured Eversource Plaintiffs and all members of the
> Eversource Federal Law Class, and, if so, the appropriate class-wide
> measure of damages for Eversource Plaintiffs and all members of the
> Eversource Federal Law Class;

> r.     Eversource Plaintiffs and all other members of the Eversource Federal
> Law Class are entitled to, among other things, injunctive relief, and if so,
> the nature and extent of such injunctive relief.

107.     These and other questions of law and fact are common to the Eversource Federal

Law Class, and predominate over any questions affecting only individual class members.

108.     Eversource Plaintiffs' claims are typical of the claims of members of the

Eversource Federal Law Class as they arise out of the same course of conduct and the same legal

theories as the claims of all members of the Eversource Federal Law Class, and Eversource

Plaintiffs challenge the practices and course of conduct engaged in by Eversource with respect to the Eversource Federal Law Class as a whole.

109.     Eversource Plaintiffs will fairly and adequately protect the interests of the Eversource Federal Law Class.  Eversource Plaintiffs have retained class counsel who are able and experienced class-action litigators.

110.     Resolution of Eversource Plaintiffs' claims for damages and other relief under federal antitrust law against Eversource on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Eversource Federal Law Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Eversource.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Eversource and substantially impede or impair the ability of members of the Eversource Federal Law Class to pursue their claims.  A class action also makes sense because Eversource's conduct, upon information and belief, including publicly-available data, is generally applicable to millions of individuals, thereby making injunctive relief appropriate with respect to the Eversource Federal Law Class as a whole.

### D.     Avangrid Federal Law Class – Asserting Federal Claims Against Avangrid

111.     Avangrid Plaintiffs bring claims for damages and other relief under federal antitrust law against Avangrid, on behalf of themselves and a class of similarly situated electricity consumers in New England ("Avangrid Federal Law Class").  The Avangrid Federal Law Class is defined as follows: all consumers who purchased electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries or affiliates, during the Class Period, for their own use and not for resale.

112.    The persons in the Avangrid Federal Law Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Avangrid Federal Law Class is easily ascertainable, as each class member can be identified by using records in the possession of Avangrid and/or its subsidiaries or affiliates.  Through their counsel, Avangrid Plaintiffs are informed and believe that there are more than 900,000 members of the Avangrid Federal Law Class.

113.    Avangrid Plaintiffs' federal antitrust law claims against Avangrid are typical of the claims of the Avangrid Federal Law Class in that Avangrid Plaintiffs purchased electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries or affiliates, during the Class Period, for their own use and not for resale.  All members of the Avangrid Federal Law Class were damaged by the same wrongful conduct of Avangrid, and the relief sought is common to all members of the Avangrid Federal Law Class.

114.    There are common questions of law and fact specific to the Avangrid Federal Law Class that predominate over any questions affecting individual members, including whether, during the Class Period:

a.    Avangrid engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity along a key regional pipeline;

b.    Avangrid engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

c.    Avangrid's conduct in the natural gas segment of the New England energy market covertly interfered with natural competitive forces within the electricity segment of that market, causing operators of natural gas-fired power plants to withhold otherwise economic bids or to bid generation into the ISO-NE wholesale market at artificially high prices;

- 43 -

d.   Avangrid's conduct in the natural gas segment of the New England energy market, and covert interference with market forces within the electricity segment of that market, caused artificially inflated wholesale and retail power prices throughout the region during the Class Period;

e.   Avangrid's conduct injured Avangrid Plaintiffs and all members of the Avangrid Federal Law Class, and, if so, the appropriate class-wide measure of damages for Avangrid Plaintiffs and all members of the Avangrid Federal Law Class;

f.   Avangrid Plaintiffs and all other members of the Avangrid Federal Law Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

115.   These and other questions of law and fact are common to the Avangrid Federal Law Class, and predominate over any questions affecting only individual class members.

116.   Avangrid Plaintiffs' claims are typical of the claims of members of the Avangrid Federal Law Class as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Avangrid Federal Law Class, and Avangrid Plaintiffs challenge the practices and course of conduct engaged in by Avangrid with respect to the Avangrid Federal Law Class as a whole.

117.   Avangrid Plaintiffs will fairly and adequately protect the interests of the Avangrid Federal Law Class.  Avangrid Plaintiffs have retained class counsel who are able and experienced class-action litigators.

118.   Resolution of Avangrid Plaintiffs' claims for damages and other relief under federal antitrust law against Avangrid on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Avangrid Federal Law Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Avangrid.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Avangrid and

substantially impede or impair the ability of members of the Avangrid Federal Law Class to

pursue their claims.  A class action also makes sense because Avangrid's conduct, upon

information and belief, including publicly-available data, is generally applicable to nearly a

million individuals, thereby making injunctive relief appropriate with respect to the Avangrid

Federal Law Class as a whole.

**E.     Federal Law Injunctive Class – Asserting Federal Claims Against Both Defendants**

119.    Plaintiffs bring claims for injunctive relief under federal antitrust law against

Defendants, on behalf of themselves and a class of all electricity consumers in New England

("Federal Law Injunctive Class").  The Federal Law Injunctive Class is defined as follows: all

consumers who purchased electricity in the ISO-NE market territory of New England, during the

Class Period, for their own use and not for resale.

120.    The persons in the Federal Law Injunctive Class are so numerous that individual

joinder of all members is impracticable under the circumstances of this case.  Although the

precise number of such persons is unknown, the exact size of the Federal Law Injunctive Class is

easily ascertainable, as each class member can be identified by using records in the possession of

Defendants and/or their subsidiaries.  Through their counsel, Plaintiffs are informed and believe

that there are approximately seven million members of the Federal Law Injunctive Class.

121.    Plaintiffs' federal antitrust law claims against Defendants are typical of the claims

of the Federal Law Injunctive Class in that Plaintiffs purchased electricity in the ISO-NE market

territory from Defendants and/or their subsidiaries, during the Class Period, for their own use and

not for resale.  All members of the Federal Law Injunctive Class were damaged by the same

wrongful conduct of Defendants, and the relief sought is common to all members of the Federal

Law Injunctive Class.

122.    There are common questions of law and fact specific to the Federal Law

Injunctive Class that predominate over any questions affecting individual members, including

whether, during the Class Period:

      a.      Defendants engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas transmission capacity along a key regional pipeline;

      b.      Defendants engaged in unfair and anticompetitive conduct in the natural gas segment of the New England energy market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas in the region;

      c.      Defendants' conduct in the natural gas segment of the New England energy market covertly interfered with natural competitive forces within the electricity segment of that market, causing operators of natural gas-fired power plants to withhold otherwise economic bids or to bid generation into the ISO-NE wholesale market at artificially high prices;

      d.      Defendants' conduct in the natural gas segment of the New England energy market, and covert interference with market forces within the electricity segment of that market, caused artificially inflated wholesale and retail power prices throughout the region during the Class Period;

      e.      Defendants' conduct injured Plaintiffs and all members of the Federal Law Injunctive Class and threatens further injury; and

      f.      Plaintiffs and all other members of the Federal Law Injunctive Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

123.    These and other questions of law and fact are common to the Federal Law

Injunctive Class, and predominate over any questions affecting only individual class members.

124.    Plaintiffs' claims are typical of the claims of members of the Federal Law

Injunctive Class as they arise out of the same course of conduct and the same legal theories as

the claims of all members of the Federal Law Injunctive Class, and Plaintiffs challenge the

practices and course of conduct engaged in by Defendants with respect to the Federal Law

Injunctive Class as a whole.

125.     Plaintiffs will fairly and adequately protect the interests of the Federal Law Injunctive Class.  Plaintiffs have retained class counsel who are able and experienced class-action litigators.

126.     Resolution of Plaintiffs' claims for injunctive relief under federal antitrust law against Defendants on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Federal Law Injunctive Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of members of the Federal Law Injunctive Class to pursue their claims.  A class action also makes sense because Defendants' conduct, upon information and belief, including publicly-available data, is generally applicable to millions of individuals, thereby making injunctive relief appropriate with respect to the Federal Law Injunctive Class as a whole.

## VIII.   VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF
### (PLAINTIFFS' UNJUST ENRICHMENT CLAIM AGAINST EVERSOURCE UNDER MASSACHUSETTS LAW)

127.     Plaintiffs incorporate by reference all of the preceding allegations.

128.     As a direct and proximate result of its unlawful conduct, Eversource was unjustly enriched to the unjust detriment of Plaintiffs and members of the Unified State Law Class. Specifically, Plaintiffs and members of the Unified State Law Class conferred a benefit on Eversource, which Eversource has recognized and appreciated, under circumstances in which it would be inequitable for Eversource to retain that benefit without payment.

129.     Plaintiffs, on behalf of themselves and members of the Unified State Law Class, seek all available and appropriate relief under Massachusetts law for Defendants' unlawful conduct and corresponding unjust enrichment.

**SECOND CLAIM FOR RELIEF**
**(PLAINTIFFS' ALTERNATIVE CLAIMS FOR UNJUST ENRICHMENT AGAINST EVERSOURCE UNDER LAWS OF INDIVIDUAL STATES)**

130.     Plaintiffs incorporate by reference all of the preceding allegations.

131.     In the event that the Court does not apply Massachusetts law to Plaintiffs' unjust enrichment claim against Eversource on behalf of all members of the Unified State Law Class, Plaintiffs alternatively allege separate unjust enrichment claims against Eversource under the laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont, on behalf of themselves and members of the Separate State Law Classes.  Specifically:

a.     As a direct and proximate result of Eversource's unlawful conduct, Eversource was unjustly enriched to the unjust detriment of all members of the Connecticut State Law Class.  Plaintiffs and members of the Connecticut State Law Class conferred a benefit on Eversource, which Eversource has accepted and did not pay for, to the detriment of the Plaintiffs and members of the Connecticut State Law Class, under circumstances in which it would be inequitable for Eversource to retain that benefit.

b.     Plaintiffs, on behalf of the Connecticut State Law Class, seek all available and appropriate relief under Connecticut law for Eversource's unlawful conduct and corresponding unjust enrichment.

c.     As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the Maine State Law Class.  Plaintiffs and members of the Maine State Law Class conferred a benefit on Eversource, which Eversource recognized and appreciated, under circumstances in which it would be inequitable for Eversource to retain that benefit without payment.

d.     Plaintiffs, on behalf of the Maine State Law Class, seek all available and appropriate relief under Connecticut law for Eversource's unlawful conduct and corresponding unjust enrichment.

- 48 -

e.     As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the Massachusetts State Law Class.  Plaintiffs and members of the Massachusetts State Law Class conferred a benefit on Eversource, which Eversource recognized and appreciated, under circumstances in which it would be inequitable for Eversource to retain that benefit without payment.

f.     Plaintiffs, on behalf of the Massachusetts State Law Class, seek all available and appropriate relief under Massachusetts law for Eversource's unlawful conduct and corresponding unjust enrichment.

g.     As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the New Hampshire State Law Class.  Plaintiffs and members of the New Hampshire State Law Class conferred a benefit on Eversource, which Eversource accepted, under circumstances in which it would be inequitable for Eversource to retain that benefit without payment.

h.     Plaintiffs, on behalf of the New Hampshire State Law Class, seek all available and appropriate relief under New Hampshire law for Eversource's unlawful conduct and corresponding unjust enrichment.

i.     As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the Vermont State Law Class.  Plaintiffs and members of the Vermont State Law Class conferred a benefit on Eversource, which Eversource accepted, under circumstances in which it would be inequitable for Eversource to retain that benefit without payment.

j.     Plaintiffs, on behalf of the Vermont State Law Class, seek all available and appropriate relief under Vermont law for Eversource's unlawful conduct and corresponding unjust enrichment.

## THIRD CLAIM FOR RELIEF
### (PLAINTIFFS' CLAIMS AGAINST EVERSOURCE UNDER STATE CONSUMER PROTECTION AND ANTITRUST LAWS)

132.   Plaintiffs incorporate by reference all of the preceding allegations.

133.   Eversource's unlawful conduct has violated the state consumer protection and/or antitrust laws of Connecticut, Maine, New Hampshire and Vermont, thereby giving rise to a cause or causes of action under those state laws.

134. Eversource's unlawful conduct has violated Connecticut's Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a *et seq*.  Plaintiffs, on behalf of themselves and the Connecticut State Law Class, allege as follows:

    a. During the Class Period, Eversource's unlawful conduct substantially affected Connecticut commerce and consumers, and it had a substantial impact on the public interests of Connecticut and its residents.

    b. As a direct and proximate result of Eversource's unlawful conduct, Plaintiffs and all members of the Connecticut State Law Class have been injured and are threatened with further injury.

    c. Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Connecticut, in violation of the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110b.

    d. Accordingly, Plaintiffs, on behalf of themselves and the Connecticut State Law Class, seek all relief that is available and appropriate, including any relief available under the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110g.

135. Eversource's unlawful conduct has violated Maine's antitrust laws, ME. STAT. TIT. 10, § 1101 *et seq*.  Plaintiffs, on behalf of themselves and the Maine State Law Class, allege as follows:

    a. During the Class Period, Eversource's unlawful conduct substantially affected Maine commerce and consumers, and it had a substantial impact on the public interests of Maine and its residents.

    b. As a direct and proximate result of Eversource's unlawful conduct, Plaintiffs and all members of the Maine State Law Class have been injured and are threatened with further injury to their property.

    c. Eversource's unlawful conduct has constituted or included monopolization and/or attempted monopolization, within and affecting Maine, in violation of the Maine antitrust laws, including ME. STAT. TIT. 10, § 1102.

    d. Accordingly, Plaintiffs, on behalf of themselves and the Maine State Law Class, seek all relief that is available and appropriate, including any relief available under the Maine antitrust laws, including ME. STAT. TIT. 10, § 1104.

136.     Eversource's unlawful conduct has violated New Hampshire's Consumer

Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq.*  Plaintiffs, on behalf of the New

Hampshire State Law Class, allege as follows:

      a.      During the Class Period, Eversource's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

      b.      As a direct and proximate result of Eversource's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

      c.      Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

      d.      Accordingly, Plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

137.     Eversource's unlawful conduct has violated the Vermont Consumer Fraud Act,

VT. STAT. ANN. tit. 9, § 2451 *et seq.*  Plaintiffs, on behalf of themselves and the Vermont State

Law Class, allege as follows:

      a.      During the Class Period, Eversource's unlawful conduct substantially affected Vermont commerce and customers, and it had a substantial impact on the public interests of Vermont and its residents.

      b.      As a direct and proximate result of Eversource's unlawful conduct, Plaintiffs and all members of the Vermont State Law Class have been injured in their business and property and are threatened with further injury.

      c.      Eversource's unlawful conduct has constituted or included unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, in violation of the Vermont Consumer Fraud Act, including VT. STAT. ANN. tit. 9, § 2453.

      d.      Accordingly, Plaintiffs, on behalf of themselves and the Vermont State Law Class, seek all relief that is available and appropriate, including any relief available under the Vermont Consumer Fraud Act.

138.     On November 14, Plaintiffs residing in Massachusetts, on behalf of themselves

and all members of the Unified State Law Class, mailed to Eversource a written demand for

relief pursuant to the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A, § 1 *et*

*seq*.  If Eversource does not respond or does not respond adequately to this written demand for

relief, Plaintiffs may amend this Complaint to include claims against Eversource under the

Massachusetts Consumer Protection Act on behalf of themselves and the Unified State Law

Class and/or the Massachusetts State Law Class.

139.     On November 14, Plaintiffs residing in Maine, on behalf of themselves and

members of the Maine State Law Class, mailed to Eversource a written demand for relief

pursuant to the Maine Unfair Trade Practices Act, ME. STAT. TIT. 5, § 205-A *et seq.*  If

Eversource does not respond or does not respond adequately to this written demand for relief,

Plaintiffs may amend this Complaint to include claims against Eversource under the Maine

Unfair Trade Practices Act on behalf of themselves and the Maine State Law Class.

### FOURTH CLAIM FOR RELIEF
### (PLAINTIFFS' CLAIMS FOR UNJUST ENRICHMENT AGAINST AVANGRID UNDER LAWS OF INDIVIDUAL STATES)

140.     Plaintiffs incorporate by reference all of the preceding allegations.

141.     Plaintiffs allege unjust enrichment claims against Avangrid under the laws of

Connecticut, Maine, Massachusetts, New Hampshire, and Vermont, on behalf of themselves and

members of the State Law Subclasses.  Specifically:

a.     As a direct and proximate result of Avangrid's unlawful conduct, Avangrid was unjustly enriched to the unjust detriment of all members of the Connecticut State Law Class.  Plaintiffs and members of the Connecticut State Law Class conferred a benefit on Avangrid, which Avangrid has accepted and did not pay for, to the detriment of the Plaintiffs and members of the Connecticut State Law Class, under circumstances in which it would be inequitable for Avangrid to retain that benefit.

- 52 -

b.      Plaintiffs, on behalf of the Connecticut State Law Class, seek all available and appropriate relief under Connecticut law for Avangrid's unlawful conduct and corresponding unjust enrichment.

c.      As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the Maine State Law Class.  Plaintiffs and members of the Maine State Law Class conferred a benefit on Avangrid, which Avangrid recognized and appreciated, under circumstances in which it would be inequitable for Avangrid to retain that benefit without payment.

d.      Plaintiffs, on behalf of the Maine State Law Class, seek all available and appropriate relief under Connecticut law for Avangrid's unlawful conduct and corresponding unjust enrichment.

e.      As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the Massachusetts State Law Class.  Plaintiffs and members of the Massachusetts State Law Class conferred a benefit on Avangrid, which Avangrid recognized and appreciated, under circumstances in which it would be inequitable for Avangrid to retain that benefit without payment.

f.      Plaintiffs, on behalf of the Massachusetts State Law Class, seek all available and appropriate relief under Massachusetts law for Avangrid's unlawful conduct and corresponding unjust enrichment.

g.      As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the New Hampshire State Law Class.  Plaintiffs and members of the New Hampshire State Law Class conferred a benefit on Avangrid, which Avangrid accepted, under circumstances in which it would be inequitable for Avangrid to retain that benefit without payment.

h.      Plaintiffs, on behalf of the New Hampshire State Law Class, seek all available and appropriate relief under New Hampshire law for Avangrid's unlawful conduct and corresponding unjust enrichment.

i.      As a direct and proximate result of Defendants' unlawful conduct, Defendants were unjustly enriched to the unjust detriment of all members of the Vermont State Law Class.  Plaintiffs and members of the Vermont State Law Class conferred a benefit on Avangrid, which Avangrid accepted, under circumstances in which it would be inequitable for Avangrid to retain that benefit without payment.

j.      Plaintiffs, on behalf of the Vermont State Law Class, seek all available and appropriate relief under Vermont law for Avangrid's unlawful conduct and corresponding unjust enrichment.

## FIFTH CLAIM FOR RELIEF
## (PLAINTIFFS' CLAIMS AGAINST AVANGRID UNDER STATE CONSUMER PROTECTION AND ANTITRUST LAWS)

142.    Plaintiffs incorporate by reference all of the preceding allegations.

143.    Avangrid's unlawful conduct has violated the state consumer protection and/or antitrust laws of Connecticut, Maine, New Hampshire and Vermont, thereby giving rise to a cause or causes of action under those state laws.

144.    Avangrid's unlawful conduct has violated Connecticut's Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a *et seq.*  Plaintiffs, on behalf of themselves and the Connecticut State Law Class, allege as follows:

        a.      During the Class Period, Avangrid's unlawful conduct substantially affected Connecticut commerce and consumers, and it had a substantial impact on the public interests of Connecticut and its residents.

        b.      As a direct and proximate result of Avangrid's unlawful conduct, Plaintiffs and all members of the Connecticut State Law Class have been injured and are threatened with further injury.

        c.      Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Connecticut, in violation of the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110b.

        d.      Accordingly, Plaintiffs, on behalf of themselves and the Connecticut State Law Class, seek all relief that is available and appropriate, including any relief available under the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110g.

145.    Avangrid's unlawful conduct has violated Maine's antitrust laws, ME. STAT. TIT. 10, § 1101 *et seq.*  Plaintiffs, on behalf of themselves and the Maine State Law Class, allege as follows:

        a.      During the Class Period, Avangrid's unlawful conduct substantially affected Maine commerce and consumers, and it had a substantial impact on the public interests of Maine and its residents.

- 54 -

  b.  As a direct and proximate result of Avangrid's unlawful conduct, Plaintiffs and all members of the Maine State Law Class have been injured and are threatened with further injury to their property.

  c.  Avangrid's unlawful conduct has constituted or included monopolization and/or attempted monopolization, within and affecting Maine, in violation of the Maine antitrust laws, including ME. STAT. TIT. 10, § 1102.

  d.  Accordingly, Plaintiffs, on behalf of themselves and the Maine State Law Class, seek all relief that is available and appropriate, including any relief available under the Maine antitrust laws, including ME. STAT. TIT. 10, § 1104.

146. Avangrid's unlawful conduct has violated New Hampshire's Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq.*  Plaintiffs, on behalf of the New Hampshire State Law Class, allege as follows:

  a.  During the Class Period, Avangrid's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

  b.  As a direct and proximate result of Avangrid's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

  c.  Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

  d.  Accordingly, Plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

147. Avangrid's unlawful conduct has violated the Vermont Consumer Fraud Act, VT. STAT. ANN. tit. 9, § 2451 *et seq.*  Plaintiffs, on behalf of themselves and the Vermont State Law Class, allege as follows:

  a.  During the Class Period, Avangrid's unlawful conduct substantially affected Vermont commerce and customers, and it had a substantial impact on the public interests of Vermont and its residents.

b.      As a direct and proximate result of Avangrid's unlawful conduct, Plaintiffs and all members of the Vermont State Law Class have been injured in their business and property and are threatened with further injury.

c.      Avangrid's unlawful conduct has constituted or included unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, in violation of the Vermont Consumer Fraud Act, including VT. STAT. ANN. tit. 9, § 2453.

d.      Accordingly, Plaintiffs, on behalf of themselves and the Vermont State Law Class, seek all relief that is available and appropriate, including any relief available under the Vermont Consumer Fraud Act.

148.    On November 14, Plaintiffs residing in Massachusetts, on behalf of themselves and all members of the Massachusetts State Law Class, mailed to Avangrid a written demand for relief pursuant to the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A, § 1 *et seq.*  If Avangrid does not respond or does not respond adequately to this written demand for relief, Plaintiffs may amend this Complaint to include claims against Avangrid under the Massachusetts Consumer Protection Act on behalf of themselves and the Massachusetts State Law Class.

149.    On November 14, Plaintiffs residing in Maine, on behalf of themselves and members of the Maine State Law Class, mailed to a written demand for relief pursuant to the Maine Unfair Trade Practices Act, ME. STAT. TIT. 5, § 205-A *et seq.*  If Avangrid does not respond or does not respond adequately to this written demand for relief, Plaintiffs may amend this Complaint to include claims against Avangrid under the Maine Unfair Trade Practices Act on behalf of themselves and the Maine State Law Class.

### SIXTH CLAIM FOR RELIEF
### (EVERSOURCE PLAINTIFFS' AND AVANGRID PLAINTIFFS' CLAIMS FOR DAMAGES AND OTHER RELIEF UNDER FEDERAL ANTITRUST LAWS)

150.    Eversource and Avangrid Plaintiffs incorporate by reference all of the preceding allegations.

151.     Defendants regularly engage in interstate commerce within the ISO-NE market territory.

152.     During the Class Period, Defendants each unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

153.     Defendants' unlawful conduct in the natural gas segment of the New England energy market had the effect of artificially constraining natural gas transmission capacity, artificially restricting natural gas supplies available on the natural gas spot market, and artificially increasing the spot market price of natural gas in the region.  This unlawful conduct allowed Defendants to covertly manipulate natural competitive forces in the electricity segment of the New England energy market, with the effect of artificially inflated wholesale and retail electricity prices throughout the ISO-NE market territory during the Class Period.  Defendants' conduct caused Eversource and Avangrid Plaintiffs, and members of the Eversource and Avangrid Federal Law Classes, to pay artificially high prices for electricity sold by Defendants and/or their subsidiaries.

154.     During the Class Period, Defendants' illegal conduct had a substantial effect on interstate commerce.

155.     As a direct and proximate result of Defendants' unlawful conduct, Eversource and Avangrid Plaintiffs, and members of the Eversource and Avangrid Federal Law Classes, have been injured in their business and property and are threatened with further injury.

156.     Defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control.  As a result, there is no realistic possibility that Defendants and/or their subsidiaries or affiliates will seek to

- 57 -

enforce the federal antitrust laws as against one another.  Because Eversource and Avangrid

Plaintiffs' federal antitrust claims against Defendants therefore do not pose a risk of multiple

recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal

law.

157.    Eversource and Avangrid Plaintiffs, on behalf of themselves and members of the

Eversource and Avangrid Federal Law Classes, seek all damages and other relief available under

the Sherman and Clayton Acts, including but not limited to treble damages, attorneys' fees, and

costs of suit, from both Eversource and Avangrid.

**SEVENTH CLAIM FOR RELIEF**
**(PLAINTIFFS' CLAIM FOR**
**INJUNCTIVE RELIEF UNDER FEDERAL ANTITRUST LAW)**

158.    Plaintiffs incorporate by reference all of the preceding allegations.

159.    Defendants regularly engage in interstate commerce within the ISO-NE market

territory.

160.    During the Class Period, Defendants unlawfully monopolized and/or attempted to

monopolize trade or commerce within and among the six New England states in violation of

Section 2 of the Sherman Act, 15 U.S.C. § 2.

161.    Defendants' unlawful conduct in the natural gas segment of the New England

energy market has had the effect of artificially constraining natural gas transmission capacity,

artificially restricting natural gas supplies available on the natural gas spot market, and

artificially increasing the spot market price of natural gas in the region.  This unlawful conduct

has allowed Defendants to covertly manipulate natural competitive forces in the electricity

segment of the New England energy market, with the effect of artificially inflated wholesale and

retail electricity prices throughout the ISO-NE market territory during the Class Period.

Defendants' conduct has caused and threatens to further cause Plaintiffs, and members of the

Federal Law Injunctive Class, to pay artificially high prices for electricity sold by Defendants and/or their subsidiaries.

162.     During the Class Period, Defendants' illegal conduct has had a substantial effect on interstate commerce.

163.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs, and members of the Federal Law Injunctive Class, have been injured in their business and property and are threatened with further injury.

164.     Defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control.  As a result, there is no realistic possibility that Defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another.  Because Plaintiffs' federal antitrust claims against Defendants therefore do not pose a risk of multiple recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal law.

165.     Plaintiffs, on behalf of themselves and members of the Federal Law Injunctive Class, seek injunctive relief under the Clayton Act, 15 U.S.C. § 26, including but not limited to an order enjoining Defendants from further engaging in the unlawful conduct described in this Complaint.

## DEMAND FOR RELIEF

As a result of Defendants' unlawful conduct, as alleged in this Complaint, Plaintiffs demand that this Court enter a judgment and determination on their behalf, and on behalf of the classes they represent, that:

A.     This action may proceed as a class action, with Plaintiffs as the designated class representatives and their counsel as class counsel for their respective classes;

- 59 -

B.    Defendants, through their unlawful conduct, have unjustly enriched themselves to the unjust detriment of Plaintiffs and members of their respective classes under circumstances in which it would be inequitable to allow Defendants to keep the benefit conferred upon them;

C.    Defendants' unlawful conduct has violated the consumer protection laws of Connecticut, Maine, New Hampshire, and Vermont, resulting in injury to Plaintiffs and members of their respective classes;

D.    Defendants have monopolized and/or attempted to monopolize trade or commerce among the several states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiffs and members of their respective classes have been injured in their businesses and property, and are threatened with further injury, as a result of Defendants' unlawful conduct;

E.    Plaintiffs and members of their respective classes are entitled to recover damages sustained by them, as well as restitution or disgorgement, as provided by the relevant federal and state antitrust and consumer protection laws, and by the law of unjust enrichment in the relevant states in which Plaintiffs reside, and that a joint and several judgment in favor of Plaintiffs and their respective classes be entered against the Defendants in an amount to be trebled in accordance with such laws;

F.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the monopolies and unfair business practices alleged herein;

G.    Plaintiffs and the members of their respective classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

H.      Plaintiffs and the members of their respective classes recover their costs of this suit, including reasonable attorneys' fees and costs as provided by law; and

I.      Plaintiffs and the members of their respective classes receive such other or further relief as may be just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  November 16, 2017            HAGENS BERMAN SOBOL SHAPIRO LLP

By    **/s/ Thomas M. Sobol**

Thomas M. Sobol (Bar No. 471770)
Kristie LaSalle (Bar No. 692891)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003
tom@hbsslaw.com
kristiel@hbsslaw.com

Steve W. Berman (*Pro Hac Vice* application forthcoming)
Emerson Hilton (*Pro Hac Vice* application forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
emersonh@hbsslaw.com

Jeff D. Friedman (*Pro Hac Vice* application forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com

*Counsel for Plaintiffs*