# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCOTT BREIDING, AMY POLLUTRO, MIKAELA ORTSTEIN-OTERO, BENJAMIN ROSE, MARGARET LEWIS AND RICHARD LEWIS, ERIC LONG, PETER STEERS, ERIK ALLEN, BRADFORD KEITH, JOHN ODUM, AND DAVID LEIGHTON, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation,<br><br>Defendants. | Case No. 1:17-cv-12274-DJC<br><br>Leave to file granted 1/26/18, ECF #21<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT EVERSOURCE ENERGY'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 3

ARGUMENT ....................................................................................................................... 8

I.      THE "FILED RATE DOCTRINE" BARS PLAINTIFFS' CLAIMS ................................. 8

II.     FEDERAL LAW PREEMPTS PLAINTIFFS' STATE LAW CLAIMS ......................... 11

III.    PLAINTIFFS' FEDERAL AND STATE ANTITRUST ALLEGATIONS DO NOT
        STATE COGNIZABLE CLAIMS .................................................................................. 15

        A.      The Complaint Does Not Make Out a Viable Claim of "Monopolization" or
                "Attempted Monopolization" ............................................................................. 15

        B.      The Complaint Does Not Allege That Eversource Possesses the Market Power
                Essential to Monopolize Any Market It Mentions ............................................ 16

        C.      Plaintiffs Lack Antitrust Standing ..................................................................... 17

IV.     THE COMPLAINT DOES NOT ALLEGE VIABLE STATE LAW CLAIMS ............. 21

        A.      Plaintiffs' Claims Are Exempt From the Connecticut and New Hampshire
                Consumer Protection Statutes ............................................................................ 21

        B.      The Complaint Does Not State Cognizable Claims Under The State Consumer
                Protection Statutes .............................................................................................. 23

        C.      The Complaint Does Not State a Cognizable "Unjust Enrichment" Claim .......... 24

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abrahams v. Young and Rubicam, Inc.*,
   692 A.2d 709 (Conn. 1997) ....................................................................................24

*In re Aluminum Warehousing Antitrust Litigation*,
   833 F.3d 151 (2d Cir. 2016)...................................................................................20

*Arkansas Louisiana Gas Co. v. Hall*,
   453 U.S. 571 (1981)................................................................................................9

*In re Asacol Antitrust Litigation*,
   233 F. Supp.3d 247 (D. Mass. 2017) (Casper, J.)............................................20, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................8

*Associated General Contractors of Cal., Inc. v. California State Council of
   Carpenters ("AGC")*,
   459 U.S. 519 (1983)..............................................................................................18

*Aviles v. Wayside Auto Body, Inc.*,
   49 F. Supp. 3d 216 (D. Conn. 2014).....................................................................23

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ............................................................................17

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)..............................................................................................15

*Cahmann v. Sprint Corp.*,
   133 F.3d 484 (7th Cir.1998) ...................................................................................3

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
   479 U.S. 104 (1986)..............................................................................................19

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
   79 F.3d 182 (1st Cir.1996)...............................................................................15, 17

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000)..............................................................................................12

*E. & J. Gallo Winery v. EnCana Corp.*,
   503 F.3d 1027 (9th Cir. 2007) ..............................................................................11

*Edwards v. North American Power & Gas, LLC*,
   No. 3:14-CV-1714 (VAB), 2016 WL 3093356 (D. Conn. June 1, 2016) ..............23

*Entergy Corp. v. Jenkins,*
    469 S.W.3d 330 (Tex. App. 2015) ........................................................................13

*Fernandes v. Havkin,*
    731 F. Supp. 2d 103 (D. Mass. 2010) ..................................................................24

*Fucile v. Visa USA, Inc.,*
    No. S1560-03 CNC, 2004 WL 3030037 (Vt. Sup. Ct. Dec. 27, 2004) ..................18

*Gautschi v. Auto Body Discount Center, Inc.,*
    660 A.2d 1076 (N.H. 1995) .................................................................................24

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,*
    508 F.2d 547 (1st Cir.1974) .................................................................................15

*Getty Petroleum Marketing., Inc. v. Capital Terminal Co.,*
    391 F.3d 312 (1st Cir. 2004) (Lipez, J., concurring) .............................................3

*Gibuilt Homes, Inc. v. Continental Homes of New England, a Div. of Wylain, Inc.,*
    667 F.2d 209 (1st Cir. 1981) ................................................................................16

*Hughes v. Talen Energy Marketing, LLC,*
    136 S. Ct. 1288 (2016) ....................................................................................8, 14

*Kansas v. UtiliCorp United, Inc.,*
    497 U.S. 199 (1990) ......................................................................................18, 20

*Keogh v. Chicago & Northwestern Railway, Co.,*
    260 U.S. 156 (1922) ..............................................................................................8

*Knowles v. Visa U.S.A. Inc.,*
    No. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004) ....................18

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
    847 F.3d 1236 (10th Cir. 2017) ...........................................................................15

*Lipton v. MCI Worldcom, Inc.,*
    135 F. Supp. 2d 182 (D.D.C. 2001) ......................................................................3

*California ex. rel. Lockyer v. Dynegy, Inc.,*
    375 F.3d 831 (9th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005)..........................9

*Maruho Co., Ltd. v. Miles, Inc.,*
    No. 92-10084-Z, 1993 WL 81453 (D. Mass. Mar. 8, 1993).................................25

*McCullough v. Zimmer, Inc.,*
    382 F. App'x 225 (3d Cir. 2010) .........................................................................20

*Midwest Gas Services, Inc. v. Industrial Gas Co.*,
    317 F.3d 703 (7th Cir. 2003) ...................................................................17

*Milford Lumber Co., Inc. v. RCB Realty, Inc.*,
    780 A.2d 1259 (N.H. 2001) ...................................................................23

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*,
    487 U.S. 354 (1988)...............................................................................12

*In re Montange*,
    431 B.R. 94 (D. Vt. Bankr. Ct. 2010) ....................................................23

*Montana-Dakota Utils. Co. v. Northwestern Public Service Co.*,
    341 U.S. 246 (1951)..............................................................................8, 9

*Nantahala Power & Light v. Thornburg*,
    476 U.S. 953 (1986)..................................................................................9

*PPL EnergyPlus, LLC v. Nazarian*,
    753 F.3d 467 (4th Cir. 2014), *aff'd*, *Hughes*, 136 S. Ct. 1288................13

*Public Utility Dist. No. 1 of Grays Harbor County Washington v. IDACORP, Inc.*,
    379 F.3d 641 (9th Cir. 2004) ............................................................10, 14

*Public Utility Dist. No. 1 of Snohomish County v. Dynegy Power Marketing, Inc.*,
    384 F.3d 756 (9th Cir. 2004) .......................................................9, 10, 14

*In re Refrigerant Compressors Antitrust Litig.*,
    No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)......................19

*RSA Media, Inc. v. AK Media Group, Inc.*,
    260 F.3d 10 (1st Cir. 2001).....................................................................20

*Santander Consumer USA Inc. v. Walsh*,
    762 F. Supp. 2d 217 (D. Mass. 2010) .....................................................15

*SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*,
    48 F.3d 39 (1st Cir. 1995)...........................................................18, 20, 21

*Schafer v. Exelon Corp.*,
    619 F. Supp. 2d 507 (N.D. Ill. 2007) ................................................10, 11

*Schneidewind v. ANR Pipeline Co.*,
    485 U.S. 293 (1988)..................................................................................8

*Serpa Corp. v. McWane, Inc.*,
    14 F. Supp. 2d 147 (D. Mass. 1998) .......................................................20

*Serpa Corp. v. McWane, Inc.*,
  199 F.3d 6 (1st Cir. 1999) ........................................................................................18, 20

*Simon v. KeySpan Corp.*,
  694 F.3d 196 (2d Cir. 2012) ...............................................................................................18

*Simon v. Keyspan Corp.*,
  785 F. Supp. 2d 120 (S.D.N.Y. 2011), *aff'd*, 694 F.3d 196 (2d Cir. 2012) .............................3

*Speakman v. Allmerica Fin. Life Ins.*,
  367 F. Supp. 2d 122 (D. Mass. 2005) ..................................................................................15

*Spectrum Sports v. McQuillan*,
  506 U.S. 447 (1993) .............................................................................................................17

*Sterling Merchandising, Inc. v. Nestlé, S.A.*,
  656 F.3d 112 (1st Cir. 2011) ..........................................................................................17, 19

*Sullivan v. Tagliabue*,
  25 F.3d 43 (1st Cir. 1994) ....................................................................................................19

*Town of Concord v. Boston Edison Co.*,
  915 F.2d 17 (1st Cir. 1990) ..................................................................................................17

*Town of Norwood, Massachusetts v. New England Power Co.*,
  202 F.3d 408 (1st Cir. 2000) ...................................................................................8, 9, 10, 11

*Transmission Agency of Northern California v. Sierra Pacific Power Co.*,
  295 F.3d 918 (9th Cir. 2002) ...............................................................................................13

*United Distribution Cos. v. FERC*,
  88 F.3d 1105 (D.C. Cir. 1996) .............................................................................................12

*United States v. United Shoe Machinery Corp.*,
  110 F. Supp. 295 (D. Mass. 1953) .......................................................................................17

*Utilimax.com, Inc. v. PPL Energy Plus, LLC*,
  378 F. 3d 303 (3d Cir. 2004) ...........................................................................................9, 10

*Vacco v. Microsoft Corp.*,
  793 A.2d 1048 (Conn. 2002) ...............................................................................................24

*Wah Chang v. Duke Energy Trading & Marketing*,
  507 F.3d 1222 (9th Cir. 2007) .........................................................................................9, 10

*Wahlcometroflex, Inc. v. Baldwin*,
  991 A.2d 44 (Me. 2010) .......................................................................................................24

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Resources Management Council*,
589 F.3d 458 (1st Cir. 2009) ............................................................................................ 12, 14

*Wyatt Energy, Inc. v. Motiva Enters., LLC*,
No. X01CV020174090S, 2002 WL 31896707 (Conn. Super. Ct. Dec. 12, 2002) ............................................................................................................................... 18

## Statutes

15 U.S.C. § 2 ................................................................................................................... 8, 15, 17

15 U.S.C. §§ 717-717w ........................................................................................................... 8

15 U.S.C. § 717c(a) ............................................................................................................. 8, 14

15 U.S.C. § 717d(a) ................................................................................................................ 8

16 U.S.C. §§ 824-824e ............................................................................................................ 8

16 U.S.C. § 824v ..................................................................................................................... 14

Conn. Gen. Stat. § 16-19b(c) .............................................................................................. 5, 22

Conn. Gen. Stat. § 42-110b, *et seq.* ...................................................................................... 18

Conn. Gen. Stat. § 42-110c ................................................................................................. 22, 23

Mass. Gen. Laws ch. 93A, § 3 .............................................................................................. 22

Mass. Gen. Laws ch. 164 § 94G(a), (b) ................................................................................. 5

N.H. Rev. Stat. Ann. § 358-A *et seq.* ................................................................................... 19

N.H. Rev. Stat. Ann. § 358-A:3 ........................................................................................... 22

N.H. Rev. Stat. Ann. § 369-B:3a, I ........................................................................................ 6

N.H. Rev. Stat. Ann. § 374-F:7 ......................................................................................... 22, 23

N.H. Rev. Stat. § 378:3-a ....................................................................................................... 5

Vt. Stat. Ann. tit. 9 § 2451 .................................................................................................... 18

## Other Authorities

18 C.F.R. §§ 1c.1, 1c.2 ......................................................................................................... 14

18 C.F.R. § 284.7(a)(4) ........................................................................................................... 4

18 C.F.R. § 284.402(a) ..........................................................................................5, 9

78 FERC ¶ 61186 ...................................................................................................4

79 FERC ¶ 61,374 (1997) ......................................................................................5

143 FERC ¶ 61,023 ...............................................................................................4

ISO-NE Tariff, § III, Rule 1 and Appendix ........................................................14

ISO-NE, *Today's Snapshot* (as of Jan. 29, 2018 at 8:31am),
    https://www.iso-ne.com ................................................................................6

Levi Marks, et al., *Vertical Market Power in Interconnected Natural Gas and*
    *Electricity Markets* (October 11, 2017),
    https://www.edf.org/sites/default/files/vertical-market-power.pdf ...............5, 13

N.H. PUC Order No. 25,792 ...................................................................................7

N.H. PUC Order No. 25,920 ...................................................................................6

Order No. 636-A, 57 Fed. Reg. 36,128 .......................................................4, 12, 13

Order No. 636, 57 Fed. Reg. 13,276 ...........................................................4, 12, 13

Order No. 547, 57 Fed. Reg. 57,952 ......................................................................5

*Petition of Western Massachusetts Electric Co.*,
    2009 WL 2486303 (August 12, 2009) ...........................................................7

## PRELIMINARY STATEMENT

Plaintiffs claim that two unrelated defendants, Eversource Energy ("Eversource") and Avangrid, Inc. ("Avangrid") each *separately* exercised "monopoly" power to manipulate natural gas transportation along the Algonquin gas transmission pipeline. They allege that the defendants, as daily buyers of natural gas for their retail gas distribution customers, over-reserved gas transportation capacity they did not need, and released that capacity late in the day when other wholesale buyers could not react to the suddenly available supply. The complaint theorizes that this restricted the supply of gas, hiked the price electric generating companies paid for that fuel, and increased wholesale electricity prices throughout New England. And the complaint speculates that defendants did all this so they could profit on wholesale electricity sales by their own *non-*gas-fired generating facilities. The individual plaintiffs are retail electric customers who say they were injured when their local electric utilities passed on these higher wholesale prices in their retail electric rates. On behalf of ostensible classes of retail electric consumers in New England, the complaint asserts claims under the Sherman Act, the Clayton Act, the common law of "unjust enrichment," and state antitrust or consumer protection statutes.

But these contentions betray a fundamental misunderstanding about how the gas transportation market operates, how the electricity business works, how Eversource participates through different entities in those businesses, and how federal and state utility regulatory regimes operate. Most importantly, they ignore settled federal law that bars all of their claims.

Plaintiffs seek to set aside wholesale gas and electricity rates and related tariff terms and conditions that are subject to the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC"). Their central theory—that Eversource's retail gas distribution subsidiaries manipulated wholesale gas supplies by exercising contractual rights to reduce capacity orders from the Algonquin pipeline without notice—flatly contradicts FERC's approval of those "no-notice" contracts. Indeed, FERC specifically *mandated* them as "in the public interest" because they permit Eversource to revise its daily transportation capacity orders—at any time during the day without notice—to adjust the supply necessary to meet retail gas customers' needs,

largely in response to weather.  Likewise, FERC explicitly authorized the wholesale electricity rates that plaintiffs claim are unlawful.  All of plaintiffs' claims are accordingly foreclosed by the "filed rate doctrine," which bars private causes of action seeking a judicial re-determination of rates and contractual terms scrutinized and approved by FERC.  For similar reasons, they also are preempted by federal law because they conflict with FERC's exercise of its exclusive authority to approve rates, terms and conditions of wholesale gas and electric sales.

Federal law thus extinguishes plaintiffs' claims as a matter of law.  And state regulation negates Eversource's alleged motive to manipulate wholesale electricity prices.  State regulations *mandate* that Eversource pass through revenues from its wholesale electricity sales dollar-for-dollar to its retail customers.  That eliminates any incentive to "manipulate" wholesale prices because Eversource cannot keep any profits on those sales.  It is not plausible that Eversource would concoct a scheme to increase natural gas prices in order to increase wholesale electricity prices on which Eversource retains *zero* profit.  This fundamental misconception infects every aspect of plaintiffs' theory.

Plaintiffs' antitrust and state law theories also elide elementary principles.  The pleading asserts that Eversource wielded monopoly power, but omits the essential ingredients of a monopolization claim.  The complaint does not define the relevant market, specify Eversource's share of it, or describe how Eversource could conceivably exert monopoly power at the same time that Avangrid separately brandished dominant market control.  And plaintiffs' claim of injury from paying retail electricity rates is not "antitrust injury" arising in markets in which they participated.  Their claimed harm does not spring from conduct the antitrust laws aim to prevent.  Market "standing" does not extend to plaintiffs that are market by-standers.

Plaintiffs' resort to state consumer protection statutes claims is equally meritless.  The statutes they invoke exempt the claims plaintiffs advance by their terms—precisely because the electricity rates plaintiffs complain about are approved by state regulators.  For reasons that echo the "filed rate doctrine," these state statutes protect the primacy of state regulation of electric rates by barring plaintiffs' statutory claims.

Here, plaintiffs seized upon a misguided and fundamentally flawed report that observed how Eversource exercised rights to schedule transmission capacity to accommodate demand, leapt to the wrongheaded conclusion that Eversource had economic motives to exercise those rights that are flatly incompatible with the regulatory regime, and then spun their assumptions into allegations of misconduct they shoehorned into the antitrust laws.  That leap of logic and blindness to the applicable regulations preclude any claim.  The complaint should be dismissed with prejudice.

## BACKGROUND[1]

Eversource is a public utility holding company that is "primarily engaged in the energy delivery business."  Compl. ¶ 30.  Eversource's subsidiaries NSTAR Gas Company ("NSTAR Gas") and Yankee Gas Services Company ("Yankee Gas") are retail suppliers and distributors of natural gas (known as "Local Distribution Companies" or "LDCs").  *Id.*  Eversource's subsidiaries NSTAR Electric Company ("NSTAR Electric"), The Connecticut Light and Power Company ("CL&P"), Public Service Company of New Hampshire ("PSNH") and Western Massachusetts Electric Company ("WMECo")[2] operate as retail electric utilities (known as "Load Servicing Entities" or "LSEs").  *Id.*

### *Eversource's Retail Gas Subsidiaries*

Eversource's LDCs, NSTAR Gas and Yankee Gas, are regulated by state public utility commissions in Massachusetts and Connecticut, where they operate.  Eversource's LDCs buy both the natural gas they resell to consumers and the pipeline transportation services that deliver that gas to the LDCs in wholesale natural gas markets regulated by FERC.[3]  Compl. ¶ 40-42.

---

[1]      On a motion to dismiss, "a federal court must take judicial notice of state statutes."  *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 323 (1st Cir. 2004) (Lipez, J., concurring).  Likewise, filed tariffs are "the equivalent of a federal regulation," *Cahmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998), entitled to consideration on this motion, *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001), as are orders and records of administrative agencies, such as FERC.  *See, e.g.*, *Simon v. Keyspan Corp.*, 785 F. Supp. 2d 120, 124 n. 9 (S.D.N.Y. 2011), *aff'd*, 694 F.3d 196 (2d Cir. 2012).

[2]      WMECo was merged into NSTAR Electric effective December 31, 2017.

[3]      *See* Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol ("Order No. 636"), 57 Fed. Reg. 13,267, at 13276 (Apr. 16, 1992); *see also* O Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, Regulation of Natural Gas Pipelines

According to the complaint, NSTAR Gas and Yankee Gas have no-notice transportation contracts with Algonquin Gas Transmission Company that allow them to adjust their daily capacity orders from the pipeline at any time during the gas day without penalty. *Id*. at ¶¶ 44, 52, 68. FERC mandates that pipelines provide these no-notice firm transportation services to customers so that firm shippers may serve their customers reliably by "receiv[ing] up to their daily contract entitlements on demand." Order No. 636, 57 Fed. Reg. at 13,279. FERC determined that "delivery of supplies on a 'no-notice' basis is in the public interest because it enables pipeline customers to meet unexpected changes in peak service needs caused, for example, by unexpected changes in temperature." *Id*. at 13,726. Contrary to the allegations of the Complaint, FERC requires any pipeline that provides no-notice arrangements to offer the service to *all* customers upon request if capacity is available and the terms of Algonquin's tariff are met.[4]

NSTAR Gas's and Yankee Gas's no-notice service agreements arise under and incorporate Algonquin's Rate Schedule AFT-E, which FERC accepted on April 4, 2013.[5] *See* Algonquin Gas Transmission, LLC, 143 FERC ¶ 61,023, 61,054 (Apr. 4, 2013). Thus, Eversource's LDC subsidiaries have a federally approved, unfettered right to increase or decrease their deliveries on the Algonquin pipeline "at any point" and "during any Hour" without penalty. Algonquin FERC Gas Tariff, Rate Schedule AFT-E, §4.3.

These contractual rights are an integral part of a federal regulatory regime that relies on market forces to set the wholesale price of natural gas and the price for its transportation. Wholesale sellers and transporters of gas engage in market-based arrangements based on FERC filings that secure blanket marketing certificates. *See Regulations Governing Blanket Marketer Sales Certificates*, 57 Fed. Reg. 57,952 (Dec. 8, 1992); 18 C.F.R. § 284.402(a) (granting blanket

---

After Partial Wellhead Decontrol, and Order Denying Rehearing in Part, Granting Rehearing in Part, and Clarifying Order No. 636 ("Order No. 636-A"), 57 Fed. Reg. 36,128, at 36,132-34 (Aug. 12, 1992).

[4] *See* Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol ("Order No. 636-C"), 78 FERC ¶ 61,186, at 61,772 (Feb. 27, 1998); 18 C.F.R. § 284.7(a)(4).

[5] *See* NSTAR Gas Company, Contract 93004EC (FERC Filed Agreement) and Yankee Gas Company, Contract 93013EC (FERC Filed Agreement).

authorization for market-based sales of natural gas at wholesale). Although the complaint ignores it, Algonquin's public FERC filings show the *combined* amount of capacity consumed by NSTAR Gas and Yankee Gas to represent approximately 0.65% of the pipeline's capacity.[6]

***Eversource's Retail Electric Subsidiaries***

The Eversource LSEs CL&P, PSNH, NSTAR Electric and WMECo, are regulated by the state public utility commissions of Connecticut, New Hampshire, and Massachusetts, respectively. Compl. ¶ 34. Under those regulatory schemes, the Eversource LSEs are prohibited from marking up the price they pay for wholesale electric power before passing those costs on to consumers. *Id.* at ¶ 39. Eversource may profit only on its LSEs' capital investment and operating costs. *Id.* at ¶ 34; *see e.g.,* Conn. Gen. Stat. § 16-19b(c); N.H. Rev. Stat. Ann. § 378:3-a; Mass. Gen. Laws ch. 164 § 94G(a), (b).

The wholesale prices that Eversource's LSEs pay to electricity generation companies are set in an auction market designed by independent system operator ISO New England ("ISO-NE"), Compl. ¶¶ 35-39, and approved and regulated by FERC, *see* Order Conditionally Authorizing Establishment of an Independent System Operator and Disposition of Control Over Jurisdictional Facilities, 79 FERC ¶ 61,374 (June 25, 1997), *order on reh'g*, 85 FERC ¶ 61,242 (Nov. 17, 1998). Under the FERC-approved ISO New England Inc. Transmission, Markets and Services Tariff (the "ISO-NE Tariff"), electricity generators submit daily supply bids to ISO-NE, *see* Compl. ¶ 38, ISO-NE accepts the lowest-price supply bid first, and then successively higher bids, until the region's projected electricity demand is met. *Id.* The last accepted bid in the day-ahead auction sets the "clearing price" paid to *all* generators whose bids were accepted, regardless of their proposed bid. Compl. ¶ 39.

---

[6]    As of March 1, 2017, the Algonquin pipeline system had peak day capacity of 3,077,725 Dth. *See* Algonquin Gas Transmission LLC, Annual Peak Day Capacity Report (Mar. 2017). The combined amount of capacity consumed by NSTAR Gas and Yankee Gas was about 20,000 Dth, or roughly 0.65% of the total share of capacity on the Algonquin pipeline. *See* Levi Marks, et al., *Vertical Market Power in Interconnected Natural Gas and Electricity Markets* at 52 (Oct. 11, 2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf.

According to the complaint, the bids that electricity generators submit in the ISO auction market are driven largely by the production costs for that generation, including the generators' costs of fuel, Compl. ¶ 41, and approximately 75% of generation capacity in the ISO-NE service area is produced by natural gas-fired plants.  Compl. ¶ 40.  The spot market gas price heavily influences the wholesale (and thus retail) price of electricity.  Compl. ¶ 41.

**Eversource's Generation Facilities**

The complaint alleges that Eversource "own[s] and operate[s] electricity generating assets within the ISO-NE territory that are not fueled by natural gas."  Compl. ¶ 53.  According to plaintiffs, these power plants "compete in the market against natural gas-fired power plants," and "are more competitive in the market when the supply of natural gas is lower and the price of natural gas is higher."  *Id.*  But plaintiffs omit the critical regulatory reality:  Eversource is not permitted to make a profit from its electricity generation operations—no matter what the price and no matter what fuel they use.  Moreover, those operations are *de minimis*.  Eversource only owns generation facilities in New Hampshire and Western Massachusetts.  PSNH formerly owned[7] and operated approximately 1,200 MW of fossil-fuel- and bio-mass-burning and hydro-powered electricity generation plants.  And WMECo owns 8 MW of solar generation facilities.  In the aggregate, these facilities represent less than 5.6% of the power generation capacity of the ISO-NE market.[8]  But as noted, PSNH and WMECO were required by state tariffs and rate orders to pass along *all* revenues from wholesale electricity sales to their retail customers.[9]  Net revenues from wholesale

---

[7]     PSNH sold each of its fossil and biomass fuel-burning generation assets, and is in the process of selling its hydro-electric generation assets in accordance with New Hampshire Public Utilities Commission orders, the net proceeds of which sales will be credited to PSNH's electric customers.  *See,* N.H. Rev. Stat. Ann. 369-B-3a, I ("The general court finds that divestiture of PSNH's generation plants and securitization of any resulting stranded costs pursuant to RSA 369-B:3, IV(c) is in the public interest"); N.H. PUC Order No. 25,920 dated July 1, 2016.

[8]     The Complaint repeatedly references information drawn from the ISO-NE Website.  *See, e.g.*, Compl. ¶¶ 33, 35 & n. 2-8. That same website describes the aggregate generation capacity of participants in the ISO-NE market to constitute approximately 21,611 MWs.  *See* ISO-NE, *Today's Snapshot* (as of Jan. 29, 2018 at 8:31am), https://www.iso-ne.com.

[9]     In New Hampshire, Eversource's energy service costs include both "the costs and *revenues* from market purchases and *sales* [and] *Independent System Operator-New England expenses and revenues. . . ."  See, e.g.*, N.H. PUC Order No. 25,792, 2015 WL 4064520, at *1 (June 25, 2015).  And in Massachusetts, WMECO's tariff for its limited solar facilities include "offsetting credits [] comprised of:  (1) *energy*; (2) renewable energy certificates[]; and (3) *credits from the forward capacity market administered by ISO New England Inc.*" (emphasis added).  *Petition of*

sales of electricity by Eversource's generation plants simply reduce the rates that PSNH's customers pay for default services. As a matter of law, then, Eversource does not—and cannot—profit from the wholesale generation of electricity.

***The Complaint's Liability Theory***

The complaint theorizes that, as purchasers of natural gas transportation services from the Algonquin pipeline, the Eversource LDCs exercised "monopol[y]" power to "manipulate" the price of natural gas. Compl. ¶ 160-161. Plaintiffs claim that NSTAR Gas and Yankee Gas restricted supply, thereby boosting the price of gas paid by electricity generators, for the express purpose of increasing wholesale electric rates. *Id.* at ¶ 161.

To accomplish this nonsensical objective, plaintiffs allege that Eversource's LDCs regularly "reserved more pipeline capacity" than needed, "planning all the while" to exercise their no-notice rights with Algonquin to cancel supply requests "at the last minute when it was too late for other market participants" to use the released capacity. Compl. ¶ 56. Plaintiffs allege that by making such order adjustments "at the last minute," Eversource LDCs "restricted" the gas supply along the Algonquin pipeline, *id.* at ¶ 58-59, forcing an increase in the spot market price paid by other gas buyers, including gas-fired power plant operators, that provoked "sudden increases in wholesale electric prices," *id.* at ¶ 61. The complaint asserts that Eversource did this to make its own generation facilities "more competitive," and to increase revenues at all Eversource generation plants. *Id.* at ¶ 78-79. Plaintiffs claim that Eversource's[10] conduct amounted to "monopolization" or "attempted monopolization" under Section 2 of the Sherman Act, 15 U.S.C. § 2; Compl. ¶ 160; that it "unjustly enriched" Eversource at common law, *id.* at ¶¶ 128, 131; and

---

*W. Mass. Elec. Co.*, 2009 WL 2486303, at 5 (Aug. 12, 2009); *see also* Western Mass. Elec. Co., M.D.P.U. Tariff No. 1044E (Effective Dec. 17, 2013).

[10]    Plaintiffs sued Eversource Energy, a public utility holding company and Massachusetts business trust, that has a number of wholly owned public utility subsidiary companies, each separately incorporated and none of which have been named as defendants in the complaint. Plaintiffs make no claim in their complaint that there is a basis in fact or law to hold Eversource Energy liable for the alleged actions of its separately incorporated public utility subsidiaries or to "pierce the corporate veil" of those subsidiaries in order to justify their complaint against Eversource Energy, their parent holding company.

constituted violations of the state antitrust or consumer protection statutes of four New England states, *id.* at ¶¶ 133-137.

## ARGUMENT

The complaint does not set out a claim that is "plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.     THE "FILED RATE DOCTRINE" BARS PLAINTIFFS' CLAIMS

Plaintiffs seek to upend filed rates and tariffs for wholesale electricity and natural gas that FERC carefully crafted and approved in the exercise of its exclusive jurisdiction.[11]  They also ask this Court to impose liability on Eversource for exercising contract rights that FERC deemed necessary and in the public interest.  Those claims are foreclosed by the "filed rate doctrine," which bars private causes of action seeking judicial redetermination of rates and contractual terms FERC has approved.  *See Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951); *Keogh v. Chicago & Nw. Ry.*, 260 U.S. 156, 164 (1922); *Town of Norwood, Mass v. New England Power Co.*, 202 F.3d 408, 417-20 (1st Cir. 2000).

Under the "filed rate doctrine," where Congress has committed to a federal agency the authority to approve rates filed under a statutory scheme, that filed rate "is made, *for all purposes*, the legal rate. . . ."  *Keogh*, 260 U.S. at 163 (emphasis added).  Purchasers of a price-regulated product "can claim no rate as a legal right that is other than the filed rate. . . ."  *Montana-Dakota Utils.*, 341 U.S. at 251.  The doctrine protects the primacy of FERC's determinations of wholesale

---

[11]     The Federal Power Act vests in FERC exclusive jurisdiction over interstate wholesale sales of electricity and rates and the responsibility to ensure such rates are just and reasonable.  *See* 16 U.S.C. §§ 824-824e; *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1292 (2016) (discussing FERC's exclusive authority over wholesale sales and pricing of electricity). The Natural Gas Act, 15 U.S.C. §§ 717-717w, similarly "confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988).  Sections 4 and 5 of the Act grant FERC exclusive jurisdiction over "[a]ll rates and charges" for any interstate transportation or sale of natural gas and "all rules and regulations affecting or pertaining to such rate or charges," 15 U.S.C. § 717c(a), and the responsibility to ensure that any "rate, charge, classification, rule, regulation, practice, or contract" for the transportation or sale of natural gas is "just and reasonable." 15 U.S.C. § 717d(a).

rates: "No court may substitute its own judgment on reasonableness for the judgment of the Commission." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).

The filed rate doctrine's "fortification" against collateral challenges to filed rates and tariffs "is impenetrable." *Wah Chang v. Duke Energy Trading & Mktg.*, 507 F.3d 1222, 1225 (9th Cir. 2007). The doctrine prohibits *all* collateral attacks on federally approved rates. *See Norwood*, 202 F.3d at 416 (doctrine "limits attacks outside the regulatory process on tariffed rates filed with federal regulatory agencies"). "It turns away both federal and state antitrust actions . . . [and] it turns away state tort actions." *Wah Chang*, 507 F. 3d. at 1225-26 (footnotes omitted); *see also California ex. rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005); *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F. 3d 303, 306 (3d Cir. 2004).

Critically here, the doctrine "is not limited to 'rates' *per se . .* ," but insulates from collateral attack any tariff terms and conditions that directly affect wholesale rates. *See Nantahala Power & Light v. Thornburg*, 476 U.S. 953, 966 (1986); *see also Norwood*, 202 F.3d at 416 ("the filed rate doctrine sweeps more broadly and governs ancillary conditions and terms included in the tariff"). It also forecloses claims for injunctive relief because those claims also interfere with FERC-approved rates and conditions. *See id.*, 202 F.3d at 419-20 (barring injunctive relief requiring alteration of tariffs); *Pub. Util. Dist. No. 1 of Snohomish Cty. v. Dynegy Power Mktg., Inc.*, 384 F.3d 756, 761-62 (9th Cir. 2004).

Plaintiffs' claims are barred because they attack rates, as well as terms and conditions, of wholesale sales that FERC has deemed "just and reasonable" in the exercise of its exclusive jurisdiction. FERC explicitly approved—through tariffs in the wholesale electricity market and blanket market certificates in wholesale natural gas markets—wholesale electric and gas sales at market-based rates. *See generally* ISO-NE Tariff, Section III.2 (wholesale energy pricing); Compl. ¶¶ 35-39 (describing operation of ISO-NE wholesale electricity auction markets); *see also* 18 C.F.R. § 284.402(a) (granting blanket authorization for market-based wholesale natural gas sales).

The complaint runs afoul of the federal filed rate doctrine's bar in two significant respects. ***First***, plaintiffs' claims would require recalculation of these federally approved wholesale market

rates.  The complaint alleges that defendants' conduct caused "spot market natural gas prices" to be "38% higher than they would have otherwise been on average," and 70% higher in cold winter months.  Compl. ¶ 60.  Plaintiffs also allege that ostensibly higher gas prices caused wholesale electricity prices to be 20% higher than they would otherwise have been.  *Id.* at ¶ 61.  To grant relief, the Court would have to redetermine what rates "would have been" without the challenged conduct for *both* the wholesale natural gas and electricity markets.  The filed rate doctrine "turns away attempts like [plaintiffs'], which necessarily hinge on a claim that the FERC approved rate was too high and would, therefore, undermine FERC's tariff authority through the medium of direct court actions. . . ."  *Wah Chang*, 507 F.3d at 1226.

In similar circumstances, courts consistently have barred claims that anticompetitive conduct in FERC-regulated markets inflated FERC-approved rates.  In *Norwood*, the First Circuit rejected antitrust claims that New England Power engineered a "price squeeze" designed to undercut a municipality's ability to sell electricity to consumers in competition with New England Power's retail affiliates.  202 F.3d at 418.  The court reasoned that the filed rate doctrine "protects a party from civil claims based on its implementation of tariffed rates (and ancillary tariffed matters) that are directly regulated by federal agencies like FERC."  *Id.*

Similarly, in *Snohomish County*, plaintiffs alleged that defendants withheld electric supply to artificially inflate wholesale electricity prices.  384 F.3d at 758-59.  The plaintiffs' federal antitrust and state law claims were barred by the filed rate doctrine because they would interfere with FERC-filed tariffs.  *Id.* at 761-62; *see also Utilimax.com*, 378 F. 3d at 306 (doctrine barred state and federal claims that wholesale supplier exerted undue influence on wholesale markets); *Schafer v. Exelon Corp.*, 619 F. Supp. 2d 507, 517 (N.D. Ill. 2007) (same).

Importantly, *Norwood* concluded that the filed rate doctrine applied even where "'regulated' rates have been left to the free market. . . ."  202 F.3d at 419; *see also Snohomish*, 384 F.3d at 761; *Pub. Util. Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP, Inc.*, 379 F.3d 641, 651 (9th Cir. 2004).  The filed rate doctrine thus applies to protect against judicial challenges to FERC-approved market-based electricity rates, *see Norwood*, 202 F.3d at 418-19, and market-based wholesale

natural gas sales under blanket FERC certificates where FERC has authorized market-based pricing, *see E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1041-42 (9th Cir. 2007).

**Second**, the filed rate doctrine bars plaintiffs' effort to declare unlawful the FERC-regulated *conduct* challenged in the complaint.  Plaintiffs allege that defendants over-reserved pipeline capacity on the Algonquin pipeline and reduced their orders late in the day to restrict pipeline capacity and gas availability for other buyers.  *See* Compl. ¶¶ 56-58.  But FERC explicitly authorized these practices.  Algonquin's FERC-approved tariff permits Eversource to reduce its gas transportation capacity orders "at any point" and "during any Hour" of the day.[12]  The Court cannot grant the relief plaintiffs seek without setting aside FERC-approved tariff conditions expressly authorizing the gas pipeline capacity reductions plaintiffs attack.

Plaintiffs are *retail* electricity consumers who bought from load serving entities that directly pass through allegedly inflated wholesale charges.  *Id*. at ¶ 39.  Their claims would require this Court to set aside the *wholesale* rates and tariffs deemed "just and reasonable" by FERC.  As explained in *E. & J. Gallo Winery*, "retail purchasers whose damages [arise] from upstream FERC-approved wholesale rates . . . [cannot] challenge such rates."  503 F.3d at 1043; *see also Schafer*, 619 F. Supp. 2d at 515-16.  The filed rate doctrine bars plaintiffs' claims.

## II.    FEDERAL LAW PREEMPTS PLAINTIFFS' STATE LAW CLAIMS

For similar reasons, plaintiffs' state law claims also are barred under familiar principles of federal preemption.  Plaintiffs ask this Court to disregard the no-notice terms and conditions of Algonquin's FERC-approved gas tariff and further to calculate "but for" rates for wholesale gas and electricity prices different from those established by FERC-approved market mechanisms.  Plaintiffs' claims conflict with the explicit terms of FERC-approved tariffs and interfere with

---

[12]     Section 4.3 of Schedule AFT-E provides that "[n]otwithstanding the quantities nominated by customer and scheduled by Algonquin hereunder, Customer shall be entitled to increase its deliveries up to the MDDO [Maximum Daily Delivery Obligation] *at any point*, up to the MHTQ [Maximum Hourly Transportation Quantity] *during any Hour*, and up to the MDTQ [Maximum Daily Transportation Quantity], or *to decrease its deliveries*." Algonquin FERC Gas Tariff, Rate Schedule AFT-E § 4.3 (emphasis added).

FERC's exercise of its exclusive jurisdiction over wholesale gas and electricity rates and gas transportation terms.

Under the doctrine of "conflict preemption," state law claims are preempted where "it is impossible for a private party to comply with both state and federal law" or where the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 472 (1st Cir. 2009). Plaintiffs' claims implicate both branches of conflict preemption.

*First*, by challenging the Eversource LDCs' exercise of their capacity release rights on the Algonquin pipeline, plaintiffs' claims conflict with Algonquin's FERC-approved tariff and the Eversource LDCs' FERC-approved rate schedules. As explained above, NSTAR Gas and Yankee Gas each have a no-notice service transportation agreement governed by Algonquin's Rate Schedule AFT-E, which gives them the right to increase or decrease their deliveries on the Algonquin pipeline "at any point" and "during any Hour" without penalty. *See* text, *supra* at 4. FERC did not just authorize no-notice contracts. It *mandated* them. In Order No. 636, FERC *required* pipelines to provide "no-notice" firm transportation service so that firm shippers could continue to serve their customers reliably by "receiv[ing] gas up to their daily contract entitlements on demand," without incurring scheduling penalties. Order No. 636, 57 Fed. Reg. at 13,279; *see also United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1126 (D.C. Cir. 1996). Under no-notice transportation contracts, a gas shipper has "the flexibility to take delivery of gas greater or less than its scheduled volume." Order No. 636-A, 57 Fed. Reg. at 36,156.

To grant plaintiffs the relief they seek, the Court would have to find Eversource liable for conduct that FERC expressly authorized under FERC-approved tariffs and FERC-approved contracts. Algonquin FERC Gas Tariff, Rate Schedule AFT-E, § 4.3. Under similar circumstances, courts have not hesitated to find conflict preemption. For example, in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 372-77 (1988), the Supreme Court determined that

a state agency's attempt to alter FERC-ordered allocations of power conflicted with FERC's regulatory authority over the same activity and was preempted.  Likewise, the Ninth Circuit concluded that the conflict between federal law and plaintiff's state law tort and property claims was "readily apparent" where plaintiff sought damages allegedly resulting from "the operation of an interstate electricity intertie expressly approved by FERC. . . ." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002); *see also Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 345 (Tex. App. 2015) (state law claims challenging utility's purchasing decisions conflicted with discretion to meet capacity needs granted under FERC-approved tariffs and were preempted).  Because plaintiffs' claims conflict with the FERC-approved terms and conditions of the Eversource LDCs' no-notice contracts, they are preempted.

*Second*, plaintiffs' state law claims obstruct FERC's principal objective in approving no-notice contracts:  maintaining reliability of LDC gas service to their end-customers.  FERC mandated that pipelines offer no-notice service because the "delivery of supplies on a 'no-notice' basis *is in the public interest*. . . ."  Order No. 636, 57 Fed. Reg. at 13,276 (emphasis added).  It enables "pipeline customers to meet unexpected changes in peak service needs caused, for example, by an unexpected change in temperature," and reliably serve its retail customers' needs.  *Id.*[13]  A finding that the Eversource LDCs' exercise of their FERC-approved right to release capacity at any point during the day without notice is either unfair or anti-competitive would undermine FERC's determination of the "public interest" and frustrate FERC's regulatory policy.  *See, e.g., PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478-80 (4th Cir. 2014), *aff'd*, *Hughes*, 136 S. Ct. 1288 (state program to subsidize new generation preempted where it disrupted FERC's regulation of wholesale energy market by "substituting the state's preferred incentive structure for that approved by FERC"); *Weaver's Cove Energy*, 589 F.3d at 473 (state agency's attempt to use state law licensing program for coastal dredging to block LNG project "[was] an obstacle to the

---

[13]     Even the research paper plaintiffs rely on for their complaint, *see* Compl. ¶ 57 & n. 9, acknowledges that "FERC allows these contracts on the basis that they are necessary in order for LDCs to reliably serve their retail customers."  Marks, *supra* n.6, at 5.

authority FERC" had asserted over licensing and construction of facility).  Permitting plaintiffs to proceed would inject uncertainty into the wholesale gas markets and threaten the very reliability FERC promotes through its no-notice tariff provisions.

*Third*, to grant plaintiffs damages for ostensibly inflated retail electricity prices, the Court would have to set aside FERC-approved wholesale gas and electricity rates and substitute its own judgment for what "would" have been just and reasonable.  Despite an extensive tariff governing the ISO-NE auction markets, which includes active market monitoring and anti-manipulation measures,[14] plaintiffs ask this Court to set aside wholesale electricity rates in favor of hypothetical rates they theorize "would" have resulted but for FERC-permitted conduct in the upstream gas transportation market.

Numerous courts have held that such judicial determinations conflict with FERC's exclusive jurisdiction over wholesale rates.  *See, e.g.*, *Hughes*, 136 S. Ct. at 1297-99 (state subsidies that supplanted wholesale rates interfered with FERC's authority); *Snohomish Cty*, 384 F.3d at 761 (state antitrust and unfair competition claims preempted where claims asked court "to determine the rates that would have been achieved in a competitive market").  To permit plaintiffs "to receive in its court action what is essentially a refund would create a conflict with FERC's authority over wholesale rates."  *Grays Harbor*, 379 F.3d at 650.  Because plaintiffs' state law claims conflict with the FERC's exercise of its exclusive authority over wholesale markets, they are preempted.

---

[14]      Under its authority to investigate and prohibit manipulation of the gas and electric markets, *see* 15 U.S.C. § 717c(a); 16 U.S.C. § 824v; 18 C.F.R. §§ 1c.1, 1c.2, FERC has promulgated anti-manipulation rules that prohibit manipulation of the natural gas and electric energy markets. *See, e.g.,* 18 C.F.R. §§ 1c.1, 1c.2; *see also* ISO-NE Tariff, § III, Market Rule 1 and Appendix A.

III.   **PLAINTIFFS' FEDERAL AND STATE ANTITRUST ALLEGATIONS DO NOT STATE COGNIZABLE CLAIMS**

Plaintiffs' federal and state antitrust claims also must be dismissed because plaintiffs fail to allege the requisite elements of monopolization or attempted monopolization and because the complaint makes clear that they lack standing to bring such claims.[15]

A.   **The Complaint Does Not Make Out a Viable Claim of "Monopolization" or "Attempted Monopolization"**

1.   **The Complaint Does Not Define the Relevant Market**

The *sine qua non* of a claim for monopolization or attempted monopolization is definition of the relevant "market" that the defendant allegedly dominates. *Santander Consumer USA Inc. v. Walsh,* 762 F. Supp. 2d 217, 238 (D. Mass. 2010) (citation omitted) ("'Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2.'"); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 550 (1st Cir.1974) (citation omitted) ("[A] section 2 attempt case, like a monopolization case, requires a definition of the relevant market"). To sustain a viable claim, plaintiffs must identify with precision the market in which the defendant operates and has achieved or attempted to achieve monopoly power through improper means. The complaint does not identify that "indispensable" element of this claim.

A relevant market has both product and geographic dimensions. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).[16] But here, plaintiffs do not specify either the relevant product or geographic market they claim Eversource has monopolized. The pleading is rife with references

---

[15]     The complaint does not distinguish between Eversource—a public utility holding company—and the subsidiaries through which it operates. For Eversource to be liable on plaintiffs' theories, the pleading must establish that Eversource was a single enterprise responsible for the alleged conduct and that Eversource *itself* was actively involved in that conduct. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) (citing 7 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1464g, at 227 (2017)); *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 142 (D. Mass. 2005). The complaint does not contain any allegations that could make Eversource liable for its subsidiaries' actions. And not one of Eversource's subsidiaries is named as a defendant.

[16]     "The relevant product market generally consists of products that have reasonable interchangeability for the purposes for which they are produced, taking into consideration price, use and quality." *Santander*, 762 F. Supp. 2d at 238 (citation omitted). The relevant geographic market is "'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.'" *Coastal Fuels of P. R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir.1996) (citation omitted).

to *different* markets plaintiffs claim were "affected" by the cancellation of capacity orders, but it fails to define a specific market that Eversource monopolized or attempted to dominate exclusively. The complaint points ambiguously to the "energy market," Compl. ¶ 49, but describes Eversource's power in that "market" from the ownership of assets in three separate markets—retail natural gas, retail electric, and electric generation. The complaint contains no allegations that Eversource acted improperly in any of those markets.

Although plaintiffs' claims are directed at the alleged manipulation of wholesale natural gas prices through the exercise of contractual rights to release capacity, the complaint does not identify the wholesale natural gas market or any market for transportation services for wholesale natural gas as one that Eversource monopolizes. And the complaint utterly fails to limn the contours of that market: who participates, who competes in it, or how and to what degree Eversource dominates the field. Likewise, although plaintiffs claim that releasing transportation capacity increased wholesale electricity prices from generating facilities, resulting in increased retail electricity prices, the pleading does not and could not allege that Eversource monopolized that retail market either. So the Court is left to guess at precisely what "product" market plaintiffs claim Eversource "monopolized." And since the pleading does not state with precision what "product" market Eversource either dominated or tried to control, it equally fails to define the "geographic" market that Eversource monopolized. The complaint makes only nebulous allegations of monopolization "among the several states." Compl. at 60. But that is insufficient. "'Without a definition of [the relevant] market, there is no way to measure [a defendant's] ability to lessen or destroy competition.'" *Gibuilt Homes, Inc. v. Cont'l Homes of New England, a Div. of Wylain, Inc.*, 667 F.2d 209, 211 (1st Cir. 1981) (quoting *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).

### 2.     The Complaint Does Not Allege That Eversource Possesses the Market Power Essential to Monopolize Any Market It Mentions

Plaintiffs have also not stated facts sufficient to show that Eversource possesses monopoly power in some market or has a dangerous probability of doing so. "Whether a defendant has

monopoly power depends on the defendant's 'ability to lessen or destroy competition' in the relevant market." *Sterling Merch., Inc. v. Nestlé, S.A*., 656 F.3d 112, 125 (1st Cir. 2011) (quoting *Coastal Fuels*, 759 F.3d at 196).  To make that calculus, courts examine whether "the defendant has a dominant share in a well-defined relevant market" and whether "there are significant barriers to entry in that market," such that "existing competitors lack the capacity to increase their output in the short run."  *Coastal Fuels*, 795 F.3d at 197; *see Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).  A market share in excess of 70 percent generally establishes a *prima facie* case of monopoly power, at least with evidence of substantial barriers to entry and evidence that existing competitors could not expand output.  *See, e.g.*, *Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 30 (1st Cir. 1990).  In contrast, courts virtually never find monopoly power when market share is less than 50 percent.  *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002); *see also United States v. United Shoe Mach. Corp*, 110 F. Supp. 295, 346 (D. Mass. 1953).

But here, the complaint is silent on the scope of Eversource's share of any relevant market. The pleading does not say what portion of the wholesale natural gas market Eversource represented. It does not identify how much of the Algonquin pipeline's capacity Eversource bought.  It omits any reference to the ability of other electricity generators to participate in the market; to the contrary, it acknowledges that buyers of natural gas for wholesale electricity generation compete with Eversource for capacity.  The pleading does not suggest that competitors could *not* acquire capacity when needed.  And ironically, the complaint advances the logically impossible contention that *each of* Eversource and Avangrid *independently* possess monopoly market share.  *See, e.g.*, *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003) ("[A] § 2 claim can only accuse one firm of being a monopolist. . . .").  That implausibility is fatal.

### B.     Plaintiffs Lack Antitrust Standing

Plaintiffs in this case are all retail electric end user consumers.  They do not participate in the natural gas or wholesale electricity markets.  Compl. ¶¶ 19-29.  Courts have consistently held

that end user public utility consumers are not proper federal antitrust plaintiffs against parties in *wholesale* energy markets; whether the market is for natural gas, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), or electricity, *Simon v. KeySpan Corp.*, 694 F.3d 196 (2d Cir. 2012).

The Clayton Act's authorization for private plaintiffs to pursue monopolization claims "does not 'allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.'" *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 9-10 (1st Cir. 1999) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477(1982)). Instead, the Supreme Court has established a comprehensive doctrine of "antitrust standing" to determine who may sue under the antitrust statutes." *Id*. at 10. A plaintiff must establish he or she "is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983); *see also SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 43 (1st Cir. 1995) ("[E]ven where a violation exists and a plaintiff has been damaged by it, the courts—for reasons of prudence—have sought to limit the right of private parties to sue for damages or injunctions"). When determining "whether a plaintiff has standing to bring an antitrust action," *Serpa*, 199 F.3d at 10, courts consider six factors set forth in *AGC*; namely: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages. *Id*. (citing *AGC*, 459 U.S. at 537-45).[17] Although all of the *AGC*

---

[17]   The factors that federal courts employ to assess "antitrust standing" under the Clayton Act apply with equal force to most state antitrust measures, including the lone state antitrust claim—brought under Maine law—at issue here. *See, e.g.*, *Knowles v. Visa U.S.A. Inc.*, No. CV-03-707, 2004 WL 2475284, at *3-9 (Me. Super. Ct. Oct. 20, 2004) (applying *AGC* factors under Maine's antitrust statute, 10 M.R.S. § 110, *et seq*.); *see* Compl. ¶ 135. Plaintiffs' effort to circumvent *AGC*'s exacting standard by avoiding the applicable antitrust statutes and instead invoking violations of the Connecticut and Vermont consumer protection statutes, Compl. ¶¶ 134, 137, is futile. When a plaintiff lacks antitrust standing under the Connecticut Antitrust Act, she also lacks an essential element of a claim under Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, *et seq. See, e.g.*, *Wyatt Energy, Inc. v. Motiva Enters., LLC*, No. X01CV020174090S, 2002 WL 31896707, at *9 (Conn. Super. Ct. Dec. 12, 2002). The same is true for claims brought under the Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, rather than an antitrust statute. *See Fucile v. Visa USA, Inc.*, No. S1560-03 CNC, 2004 WL 3030037 (Vt. Sup. Ct. Dec. 27, 2004).

factors are relevant, the First Circuit has focused most often on the "antitrust injury" factor—which it has identified as the "central factor"—and the "causation" factor. *Sullivan v. Tagliabue*, 25 F.3d 43, 47 (1st Cir. 1994); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing. . . .").

Even read in its best light, the complaint fails to establish an antitrust injury or offer a plausible, non-attenuated causation theory. Plaintiffs' entire theory rests on the notion that Eversource's release of gas capacity late in the day provoked hikes in *wholesale* gas prices that, in turn, increased electrical generation facilities' fuel costs that, again, in turn, escalated wholesale electricity rates that were passed on to plaintiff-consumers in the retail electric markets. And the ostensible motive to support that elaborate scheme was the competitive position of Eversource's non-gas fired generation plants, which sell wholesale power on which the company earns no profit. But as *retail* electric consumers, plaintiffs are not participants in the gas transportation or wholesale electricity markets the pleading tries to put at issue. The concocted array of contingencies it advances simply do not fit into the *AGC* construct.

Plaintiffs' claimed harm of paying inflated electric rates does not constitute an "antitrust injury" under the Sherman Act or any of the state antitrust laws. "Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Sterling*, 656 F.3d at 121 (quoting *Brunswick Corp. v. Pueblo Bowl O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Plaintiffs do not participate in the wholesale gas market they allege Eversource manipulated. They are not purchasers of wholesale electricity at prices they claim the defendants' conduct inflated. Compl. ¶¶ 19-29. A proper plaintiff in an antitrust suit, by contrast, is generally "a customer who obtains services *in the threatened market* or a competitor who seeks

---

Though Massachusetts electric consumers are included in plaintiffs' so-called "unified class," the complaint does not assert claims under Massachusetts antitrust or consumer protection law. Rhode Island electric consumers are also included in the unified class, but plaintiffs do not assert a separate cause of action under Rhode Island law. Only the claim purported to be brought under New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A *et seq.*, Compl. ¶ 136, is not evaluated for standing under the *AGC* factors. *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756, at *17 (E.D. Mich. Apr. 9, 2013). As to that claim, *see* Section IV.B, *infra*.

to serve that market." *SAS*, 48 F.3d at 44 (emphasis added).[18] That is because "antitrust injury" ordinarily arises from effects on competition in the market claimed to be restrained, and effects outside those markets are too remote to confer standing. *Utilicorp United, Inc.,* 497 U.S. at 219 (dismissing for lack of cognizable antitrust injury Clayton act claims on behalf of residential consumers who were indirect purchasers of natural gas).

Here, plaintiffs are several steps removed from both the misconduct and the affected markets. Indeed, the complaint acknowledges both that plaintiffs' injury reflects only "conduct in the upstream natural gas market," Compl. ¶ 72, and that they do not participate in that market. That concedes the absence of antitrust injury. And importantly, because Eversource is *obliged* to pass on its gas costs as a matter of law, and has no reason to manipulate gas prices when purchasing wholesale gas under no-notice service contracts, it cannot be said to have generated an "injury" of the sort the antitrust laws were designed to prevent. *See* text, *supra* at 5-6.

Even if the plaintiffs conceivably had claimed cognizable antitrust injury, they still have not pled a sufficient causal connection between the alleged wrongdoing and their claims of harm. "When considering whether a plaintiff has standing to bring an antitrust action, the Court must consider whether 'the defendant's conduct was the substantial cause of the injury.'" *In re Asacol Antitrust Litig.*, 233 F. Supp.3d 247, 265 (D. Mass. 2017) (Casper, J.) (citing *Bristol–Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F. Supp.2d 21, 22 (D. Mass. 2000)). The "causation" factors examine the relationship between the defendant's ostensible misconduct and the harm plaintiffs claim to have suffered; the more attenuated the relationship between the defendant's behavior and the claimed injury, the less likely standing will exist. *See RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 14-15 (1st Cir. 2001). The inquiry "involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Serpa*, 199 F.3d at 10.

---

[18]     *See also Serpa Corp. v. McWane, Inc.*, 14 F. Supp. 2d 147, 151 (D. Mass. 1998); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157-63 (2d Cir. 2016) (antitrust injury lacking for purchasers of fabricated aluminum to pursue claims of antitrust violations by companies who sold that aluminum to fabricators); *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 229 (3d Cir. 2010) (antitrust injury lacking for a plaintiff who did business with competitors and consumers in the relevant market but were not themselves competitors or consumers).

Here, the complaint describes conduct by participants in the wholesale gas markets, including industrial users and power plants, all of which compete for natural gas for the benefit of their own stakeholders.  The Eversource LDCs are described as purchasers of natural gas under contractual arrangements for the purpose of providing their retail customers with gas for cooking, and in winter months, for heating.  Compl. ¶¶ 43, 44, 45.  But plaintiffs were not natural gas buyers competing to obtain a resource allegedly made scarce by the Eversource LDCs' exercise of their contractual capacity rights.  They were only indirect purchasers of a different product whose price they argue was affected by behavior in a market in which they did *not* participate.  *See SAS*, 48 F.3d at 44. These claimed injuries are multiple levels removed from the violations they allege and far too remote to support antitrust standing.[19]  As this Court observed in *In re Asacol Antitrust Litigation*, "if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing."  233 F.Supp.3d 247, 261 (D. Mass., 2017) (quoting *City of Anaheim*, 955 F.2d 1373, 1376 (9th Cir. 1992)).

## IV.   THE COMPLAINT DOES NOT ALLEGE VIABLE STATE LAW CLAIMS

Plaintiffs purport to bring claims on behalf of sub-classes under the consumer protection statutes in their respective states and under the common law of "unjust enrichment."  All of those claims must be dismissed.

### A.   Plaintiffs' Claims Are Exempt From the Connecticut and New Hampshire Consumer Protection Statutes

The consumer protection statutes plaintiffs invoke do not capture every transaction that arises in trade or commerce that a plaintiff can label "unfair."  In nearly identical language, the statutes exempt from their reach "[t]ransactions or actions otherwise permitted under law as

---

[19]      The other *AGC* factors confirm the lack of antitrust standing.  Eversource had no motive to profit from higher electricity prices.  The alleged damages are indirect—layers removed from the alleged improper conduct—and even then are speculative, complex, and difficult to apportion.  For example, plaintiffs' acknowledge that gas-fired electricity generators had no influence on real-time electricity prices in one-fourth of the hours, Compl. ¶ 40, and there is no simple way to determine which of the hundreds of thousands of plaintiffs purchased electricity in those hours when there was such alleged influence.  Indeed, the complaint does not even allege that electricity generators served by the Algonquin pipeline actually raised their bids in those hours.  There is accordingly no way to connect any of the alleged higher price hours to the alleged misconduct, much less to apportion any effects among the plaintiffs.

administered by any regulatory board or officer acting under statutory authority of the state or of the United States," Conn. Gen. Stat. § 42-110c, and "[t]rade or commerce that is subject to the jurisdiction of" several regulators, including the "[P]ublic [U]tilities [C]ommission" (the "PUC"), N.H. Rev. Stat. Ann. § 358-A:3, which has the power to regulate "competitive energy suppliers." N.H. Rev. Stat. Ann. § 374-F:7.[20]

The purpose of the statutory exemption is clear. The legislatures intended to keep courts out of the business of labeling transactions "unfair" or "deceptive" when they are permitted by regulatory authorities. The measures thus operate in the same way as the judge-made "filed rate doctrine" that avoids conflict between regulatory actions and claims of illegality, and preserves the primacy of the regulators' authority over wholesale gas transportation and electricity rates. The statutory exemption divests courts of jurisdiction over claims under the act when the challenged conduct is "permitted" by state, local, or (as in the case here) federal regulators.

As detailed above, the Eversource LDCs' exercise of their contractual rights to reduce their capacity orders under no-notice agreements, and the resulting wholesale electricity prices that plaintiffs challenge, are exclusively regulated and specifically permitted by FERC. FERC not only approved but mandated Eversource's no-notice agreements with the Algonquin pipeline as in the public interest, and FERC specifically approved the market structure resulting in the wholesale electricity prices that are passed through to retail electric customers. *See* Section I, *supra* at pp. 8-11.

Likewise, state regulators set and have continuing jurisdiction to review Eversource LSEs' retail electricity rates and their practice of passing through costs of natural gas to consumers. In fact, Eversource LSEs are *prohibited* from charging consumers rates for electricity that are not approved by the Connecticut Public Utility Regulatory Authority (PURA), and *required* to pass-

---

[20]     Plaintiffs have signaled their intent to amend their pleading to include a claim under Mass. Gen. Laws ch. 93A, and sent a "demand" letter to Eversource asserting such a claim. Amendment would be futile. The Massachusetts statute also exempts "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." Mass. Gen. Laws ch. 93A, § 3.

through to consumers their actual charges for generating electricity.  *See, e.g.,* Conn. Gen. Stat. § 16-19b(c).  Consequently, plaintiffs' claim that the retail electricity rates they paid were excessive fits squarely within the exemption of Section 42-110c, because that claim specifically criticizes Eversource LSEs' regulatorily "permitted" behavior, and must be dismissed.

Plaintiffs' sub-class claim under the New Hampshire Consumer Protection Act must suffer the same fate.  That statute exempts from its coverage matters "subject to the jurisdiction" of the PUC.  The PUC may assess penalties, including fines and rescission of residential consumer contracts, against electricity suppliers found to have "engaged in any unfair or deceptive acts or practices in the marketing, sale, or solicitation of electricity supply or related services."  N.H. Rev. Stat. Ann. § 374-F:7.  Because the PUC has authority to regulate the allegedly unfair conduct at issue, that conduct is exempt from the statute's coverage, and plaintiffs' claims are essentially preempted.  *See Edwards v. N. Am. Power & Gas, LLC*, No. 3:14-CV-1714 (VAB), 2016 WL 3093356, at *5 (D. Conn. June 1, 2016) (refusing class action plaintiff's request to add NHCPA unfair conduct claim against electricity supplier).

### B.    The Complaint Does Not State Cognizable Claims Under The State Consumer Protection Statutes

Even if plaintiffs' claims were not barred by the statute's exemptions, to plead a viable claim under the state consumer protection statutes, a plaintiff must allege (i) an unfair or deceptive act or practice on the part of the defendant; (ii) an injury or loss suffered by the consumer; and (iii) a causal connection between the wrongful conduct and the consumer's injury.  *E.g.*, *Aviles v. Wayside Auto Body, Inc.*, 49 F. Supp. 3d 216 (D. Conn. 2014); *In re Montagne*, 431 B.R. 94 (D. Vt. Bankr. Ct. 2010); *Milford Lumber Co., Inc. v. RCB Realty, Inc.*, 780 A.2d 1259, 1263 (N.H. 2001) (requiring that the acts caused a "substantial injury").

Here, plaintiffs have not established any of the three required elements.  First, there is nothing "unfair" about the exercise of rights designed to ensure the accommodation of Eversource's needs for gas to serve consumers without interruption.  The no-notice service contracts were intended—and mandated by FERC—precisely to serve the "public interest."

Preemption aside, that refutes "unfairness" under any rational definition.  Second, according to plaintiffs, Eversource's alleged conduct was aimed at generation rivals in the wholesale electricity market.  Plaintiffs do not allege that any consumer was involved in the exercise of Eversource's rights, changed his or her position in any way by the operation of the contracts, or received any communication from Eversource that could be called deceptive.  Third, for the reasons discussed above, plaintiffs' causation theory is attenuated, multi-layered and speculative.  A plaintiff "is barred from bringing a claim" under state consumer protection acts where "his alleged injuries are too remote with respect to the defendant's alleged conduct."  *Vacco v. Microsoft Corp.*, 793 A.2d 1048, 1050 (Conn. 2002).  In other words, the injury must be caused by "the type of unfair act or practice that the Consumer Protection Act was enacted to protect against."  *See Gautschi v. Auto Body Disc. Ctr., Inc.*, 660 A.2d 1076, 1078 (N.H. 1995); *see also Abrahams v. Young & Rubicam, Inc.*, 692 A.2d 709, 712 (Conn. 1997).

### C.     The Complaint Does Not State a Cognizable "Unjust Enrichment" Claim

As a cause of action in equity, unjust enrichment is unavailable when a plaintiff has an adequate remedy at law.  *See*, *e.g.*, *Wahlcometroflex, Inc. v. Baldwin*, 991 A.2d 44, 49 (Me. 2010).  Because plaintiffs' unjust enrichment claims are simply incompatible with their claims under antitrust and consumer protection statutes, plaintiffs' sub-class unjust enrichment claims brought under Connecticut, Maine, New Hampshire, and Vermont law must be dismissed.  *Cf. Fernandes v. Havkin*, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (availability of consumer protection claim precluded unjust enrichment claim as matter of law).

Even if a legal remedy did not exist, the *sine qua non* of an unjust enrichment claim is "enrichment."  But as noted repeatedly above, Eversource was not, and could not have been, "enriched" by increasing wholesale electricity prices in New England to make its own non-gas-fired generation plants more competitive.  *See* text, *supra* at 5, 20.  Since the complaint cannot contend that Eversource obtains so much as a penny from the wholesale electricity prices it is required to pass-through to consumers as a matter of law—whether they are low or high, and whether they are the product of "manipulation" or not, or are "just" or not—plaintiffs' claims of

"enrichment" are precluded as a matter of law.  *See*, *e.g.*, *Maruho Co., Ltd. v. Miles, Inc.*, No. 92-10084-Z, 1993 WL 81453, at*6 (D. Mass. Mar. 8, 1993) (dismissing unjust enrichment claim where defendant "never possessed or controlled" disputed funds and, thus, was not "enriched").

## CONCLUSION

For the foregoing reasons, this Court should grant Eversource's motion and dismiss the Complaint with prejudice.

Respectfully submitted,

Dated: January 29, 2018

Douglas G. Green (*pro hac vice*)
Shannen W. Coffin (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
dgreen@steptoe.com
scoffin@steptoe.com

Duncan R. MacKay (BBO# 556069)
Deputy General Counsel
Eversource Energy
107 Selden Street
Berlin, CT 06037
Tel: (860) 665-3495
Fax: (860) 665-5504
Duncan.mackay@eversource.com

/s/ *John D. Donovan, Jr.*
John D. Donovan, Jr. (BBO #130950)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
john.donovan@ropesgray.com

Chong S. Park (*pro hac vice admission pending*)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006-6807
Tel: (202) 508-4600
Fax: (202) 508-4650
chong.park@ropesgray.com

*Attorneys for Eversource Energy*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on January 29, 2018.

/s/ *John D. Donovan, Jr.*
John D. Donovan, Jr.