# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTT BREIDING, AMY POLLUTRO, MIKAELA ORTSTEIN-OTERO, BENJAMIN ROSE, MARGARET LEWIS AND RICHARD LEWIS, ERIC LONG, PETER STEERS, ERIK ALLEN, BRADFORD KEITH, JOHN ODUM, and DAVID LEIGHTON, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation,<br><br>*Defendants.* | Civil Action No. 17-cv-12274-DJC<br><br>**JURY TRIAL DEMANDED**<br><br>Leave to file granted on Feb. 21, 2018 |
| DONNA CORDEIRO, JANICE ANGELILLO, ANNA MARIA FORNINO, MICHELE CASSETTA, JUDY CENNAMI, JANICE BRADY, OPAL ASH, MARK LEJEUNE, and ROBERTO PRATS, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation,<br><br>*Defendants.* | Civil Action No. 17-cv-12274-DJC<br><br>**JURY TRIAL DEMANDED**<br><br>Leave to file granted on Feb. 21, 2018 |

# CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   DEFINITIONS.......................................................................................................6

III.  JURISDICTION AND VENUE ..........................................................................7

IV.  PARTIES ...............................................................................................................8

      A.     Plaintiffs.................................................................................................8

      B.     Defendants ...........................................................................................13

V.   FACTUAL ALLEGATIONS ..............................................................................14

      A.     Overview of United States electricity markets. ...................................14

      B.     The New England electricity market. ..................................................17

              1.     The cost of wholesale electricity is the single biggest
                     determinant of the cost of retail electricity. ................................17

              2.     The cost of natural gas is the single biggest determinant of
                     the cost of wholesale electricity ..................................................19

                        a.     Today, FERC only regulates the price of natural gas
                                transportation and transmission. .........................................22

                        b.     The non-retail price of natural gas is determined by
                                  demand – and supply. ..........................................................24

                        c.     Natural gas prices factor prominently in the cost of
                                  wholesale electricity............................................................25

      C.     Eversource and Avangrid possess market power in the New
            England electricity market because they control the supply of
            natural gas to that market. ...................................................................26

               1.     Eversource and Avangrid own substantial retail natural gas
                       business...................................................................................27

               2.     Eversource and Avangrid own substantial wholesale and
                       retail electric business. ...........................................................28

3.      Eversource and Avangrid own non-natural-gas-fired electricity-generating assets that flourish when natural gas supply lags. .................................................................29

4.      Eversource's and Avangrid's diverse energy businesses mean that they can raise prices and reduce output............................30

D.      Eversource and Avangrid artificially restricted natural gas supply, which artificially raised electricity prices in the New England electricity market. .................................................................32

1.      Eversource and Avangrid cancelled large quantities of natural gas reserves on the Algonquin Pipeline at the last minute. .................................................................33

2.      Eversource's and Avangrid's last-minute natural-gas-supply restrictions were unique. .................................................................35

3.      Eversource and Avangrid admit that they cancelled transmission capacity reservations at the last minute. ....................................39

4.      Eversource and Avangrid admit that restricting the pipeline capacity raises electricity prices.........................................41

5.      Eversource and Avangrid had an alternative, economically rational alternative – an option that would not have restricted supply and driven up cost.................................................42

E.      Eversource and Avangrid stood to gain from their manipulation of the New England electricity market...............................................44

1.      Eversource's and Avangrid's conduct enabled them to make more money on their non-natural-gas generated electricity.................................................................45

2.      Eversource's and Avangrid's conduct increased the value of their assets – increasing their rate of return on those assets. .................................................................47

3.      Eversource's and Avangrid's conduct gave them the opportunity to expand their capital investments, yet another lucrative revenue source for them, at consumers' expense............................49

F.      Eversource's and Avangrid's conduct injured all New England electricity customers. .................................................................50

G. Eversource's and Avangrid's misconduct was exposed for the first time in an August 2017 academic study, resulting in significant fall out. ........................................................................................................54

1. States have begun to investigate. ....................................................55

2. FERC claims to have investigated. .................................................55

3. Eversource tries public-relations damage control. ..........................56

a. Eversource threatens to sue EDF. ........................................56

b. Eversource pays for a consultant to identify factual disputes with the Zaragoza-Watkins study. ......................56

c. Eversource undermines the FERC press release by admitting to decreasing transmission capacity – and implicating Avangrid, too. ...................................................58

4. Zaragoza-Watkins et al. stand by their analysis, despite the factual disputes raised by Eversource. ...........................................61

VI. TOLLING OF STATUTE OF LIMITATIONS .....................................................61

VII. CLASS ACTION ALLEGATIONS ........................................................................62

A. Eversource State Law Classes – Asserting State Law Claims Against Eversource. ......................................................................................62

B. Avangrid State Law Classes – Asserting State Law Claims Against Avangrid. ...............................................................................................65

C. Eversource Federal Law Class – Asserting Federal Claims Against Eversource.......................................................................................68

D. Avangrid Federal Law Class – Asserting Federal Claims Against Avangrid. ...............................................................................................71

E. Federal Law Injunctive Class – Asserting Federal Claims Against Both Defendants....................................................................................73

VIII. VIOLATIONS ALLEGED .....................................................................................76

FIRST CLAIM FOR RELIEF (The Plaintiffs' Claim against Eversource under Massachusetts Consumer Protection Act) ...............................................................76

SECOND CLAIM FOR RELIEF (Plaintiffs' Alternative Claims against Eversource under Individual State Consumer Protection and Antitrust Laws)................................................................................................................77

THIRD CLAIM FOR RELIEF  (Plaintiffs' Claims against Avangrid under State
    Consumer Protection and Antitrust Laws)..............................................................................81

FOURTH CLAIM FOR RELIEF  (Eversource Plaintiffs' and Avangrid Plaintiffs'
    Claims for Damages and Other Relief under Federal Antitrust Laws)....................................84

FIFTH CLAIM FOR RELIEF (Plaintiffs' Claim for Injunctive Relief under
    Federal Antitrust Law).............................................................................................................86

IX.    DEMAND FOR RELIEF.........................................................................................................87

X.    JURY TRIAL DEMANDED..................................................................................................89

The plaintiffs, all of whom are consumers of electricity in New England, by and through their counsel, individually and on behalf of others similarly situated, state and allege the following as their consolidated First Amended Complaint:

## I.      INTRODUCTION

1.      In a three-year period from 2013 to 2016, New Englanders paid $3.6 billion more for electricity than they should have. That is an additional $3.6 billion dollars spent by New Englanders to turn on their lights, cook their food, and keep warm during some of the harshest northeast winters on record. In fact, in one winter alone – the brutal polar vortex of 2013 and 2014 – New Englanders may have overpaid by as much as $1.8 billion.

2.      Why? Because the defendants, Eversource Energy and Avangrid, Inc., artificially reduced the region's available supply of natural gas – a key component in the generation of over half the electricity consumed in New England – and consequently drove up regional electricity prices by 20% on average.

3.      Federal and state regulators have a role in some, but not all, of the steps in the supply and distribution chains by which natural gas and electricity are generated, priced, and delivered in New England. Critically, for example, the price of natural gas used to generate electricity is typically established in an unregulated "spot market" on the basis of supply and demand conditions. Thus, while government entities are involved in crafting the formula for setting wholesale electricity prices and overseeing its calculation, they do not regulate all of the variables that serve as inputs to that formula. In other words, government regulators may eye-ball the ultimate price of electricity, but no one regulator oversees all parts of the distribution system that brings natural gas into New England and converts it into electricity. There are no regulatory safeguards aimed at preventing the scheme the plaintiffs allege.

4.      As a result, certain vulnerabilities in the system can be manipulated by market actors – thereby infecting all market prices. Indeed, just like a player in a Plinko game cannot rig the second of ten rows and claim the outcome was not influenced by cheating, companies in the energy industry cannot claim unregulated prices manipulated by a supply constraint scheme are "cleansed" by subsequent rate proceedings. The spot price of natural gas, once manipulated and elevated through supply constraints, is permanently elevated in this industry due to the fact that those infected prices are then passed through one hundred percent to the downstream consumer in the form of electricity prices.

5.      Greedy companies may not subvert this procompetitive system by manipulating the variables that go into the equation to line their own pockets. Indeed, as an Eversource consultant recently acknowledged in a paper written on behalf of Eversource, if a "corporate-level profit-maximizing strategy directs the operational schedulers of [its natural gas subsidiaries] to pursue pipeline capacity withholding in order to benefit the electric generator division," such actions would be "against the law, and completely at odds with the array of gas and wholesale power safeguards long enacted to prohibit market power abuse."[1]

6.      But this is just what Eversource and Avangrid did.

7.      Eversource and Avangrid are two of the largest energy companies in New England, and big players not only in the electricity market but also upstream in the natural gas supply network that supplies a critical component of electricity generation (and electricity pricing) in New England. The defendants owned and operated (1) substantial natural gas

---

[1] Levitan & Assocs., *Critical Assessment of EDF's Workpaper on Vertical Market Power in Interconnected Natural Gas and Electricity Markets (prepared for Eversource Energy)* at 8 (Feb. 27, 2018) (the "Levitan Paper"), *available at* https://www.eversource.com/content/docs/default-source/pdfs/lai-critical-assessment.pdf.

distribution and sales businesses, and (2) substantial electricity distribution, sales, and generation businesses.

8.      Eversource and Avangrid reserved large quantities of natural gas capacity on the Algonquin Pipeline (the principal pipeline supplying natural gas to New England), and then cancelled significant portions of those orders at the last minute, leaving less total natural gas immediately available for electricity generation. This reduction in available natural gas capacity for electricity generation translated directly into artificially elevated spot prices for natural gas. Eversource, for example, has *admitted* that its "strategy" was to reserve *twice* as much natural gas transmission capacity as it needed, then cancel unnecessary capacity "at the end of the gas day."[2] These last minute, artificial shortages spiked natural gas prices. Because natural gas is converted downstream to generate electricity, higher costs for natural gas meant higher marginal costs of electricity generation and higher electric bills for New Englanders.

9.      There is no factual dispute that Eversource and Avangrid reserved more natural gas pipeline capacity than they needed. Nor is there any dispute that Eversource's and Avangrid's conduct was unique among many other like companies operating in the same market against a similar business and regulatory backdrop. The following table and accompanying figure, recently produced by a consultant for Eversource in response to these allegations, confirms that Local Distribution Companies (LDCs) owned by Eversource (NSTAR Gas and Yankee Gas) and Avangrid (Connecticut Natural Gas and Southern Connecticut Gas) made, on average, last-minute downward order adjustments of pipeline capacity during winter that were *orders of magnitude greater* than many other New England LDCs:[3]

---

[2] *Id.* at 14.

[3] Levitan Paper at 42-43.

Table 3. Average Winter Schedule Change during Last Three Hours of the Gas Day

| LDC | Schedule Change (MDth/d) | Schedule Change % of End-of-Day Volume |
|---|---|---|
| Bay State Gas | 0.03 | 0.0% |
| Boston Gas | 0.09 | 0.0% |
| City of Norwich | 0.06 | 0.9% |
| Colonial Gas | 0.01 | 0.0% |
| Connecticut Natural Gas | -17.43 | -34.7% |
| Middleborough G&E | 0.01 | 0.2% |
| New England Natural Gas | 0.04 | 0.0% |
| Narragansett Electric | 0.04 | 0.1% |
| NSTAR Gas | -4.77 | -2.4% |
| Southern Connecticut Gas | -20.54 | -26.8% |
| Yankee Gas | -13.56 | -9.9% |

Figure 19. Profiles of Average Winter Algonquin Deliveries to New England LDCs



Indeed, while other LDCs worked to adjust their capacity reservations upward *and* downward throughout the gas day, Eversource's and Avangrid's LDCs show only downward adjustments, mostly at the last minute, with little exception.

10.     Eversource and Avangrid exploited their ability to idle natural gas supply (at the mouth of the river) that caused an economic chain reaction throughout the natural gas and electricity distribution networks and covertly interfered with competitive market forces, as well

as downstream government oversight, in the New England electricity market. Because of the defendants' unique position in the New England energy distribution and sales network, the defendants had the power to restrict supply and elevate prices without governmental oversight.

11.     By artificially inflating natural gas and electricity prices in the New England electricity market, Eversource and Avangrid could artificially inflate not just the price of the electricity their power plants produced, but also the value of their electricity-generating assets. And, by artificially constraining the perceived availability of natural gas resources in New England, the defendants could make the case that they needed authorization to lay new natural gas pipelines, raise new electricity transmission lines, and build new power plants – all highly valuable capital investments that are supposedly justified by insufficient natural gas supply and resulting high electricity prices.

12.     Eversource's and Avangrid's schemes did not just force New Englanders to pay more for natural-gas-fired electricity.  Nor did Eversource's and Avangrid's schemes force only their own customers to pay more for electricity. Because of the complex way in which electricity is generated, offered for sale, purchased, and priced, the defendants' misconduct had an enormous and wide-ranging impact on the New England electricity market as a whole. It affected the prices paid by every New Englander, for all retail electricity, even if some portion of the electricity consumed came from wind- or solar-powered generators, nuclear power plants, or hydroelectric facilities.

13.     For at least three years, consumers in Connecticut, Maine,[4] Massachusetts, New Hampshire, Rhode Island, and Vermont paid at least 20% more for electricity than they would

---

[4] A small geographic portion of northern Maine is not part of the electricity market that otherwise encompasses all of New England. All references to Maine in this consolidated First

have absent Eversource's and Avangrid's misconduct. No one on the New England electrical grid was spared.

14.     This consumer class action arises from the extensive injuries that the defendants' misconduct inflicted on New England electricity consumers. The plaintiffs seek to make New Englanders whole – and to deter future abuses by the defendants and others.

## II.     DEFINITIONS

15.     *The class period*. Eversource's and Avangrid's unlawful conduct began no later than August 1, 2013, continued through at least July 31, 2016, and ended or will end on the date the effects of the defendants' anticompetitive conduct end.

16.     *The relevant market*. The relevant market for antitrust purposes is the New England electricity market. It is defined as the retail electricity market supplied by all load serving entities (LSEs) that obtain electricity at wholesale from the electricity grid overseen by the Independent System Operator – New England (ISO-NE). Geographically, this market spans the six New England states (with the exception of a small geographic portion of northern Maine).

17.     *The plaintiffs*. Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Margaret and Richard Lewis, Eric Long, Peter Steers, Erik Allen, Bradford Keith, John Odum, David Leighton, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, Judy Cennami, Janice Brady, Opal Ash, Mark Lejeune, and Roberto Prats resided in New England and purchased electricity in the New England electricity market, for their own use and not for resale, during the class period.

18.     *The customer plaintiffs*. Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Margaret and Richard Lewis, Eric Long, Peter Steers, Erik Allen, Bradford

---

Amended Complaint exclude that portion of the state which is outside of the six-state electricity market known as ISO-NE (see further discussion and explanation below).

Keith, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, Judy Cennami, Janice Brady, and Opal Ash purchased electricity, for their own use and not for resale, directly from Eversource, Avangrid, and/or their subsidiaries or affiliates during the class period.

19.     *The Eversource plaintiffs.* Scott Breiding, Amy Pollutro, Mikaela Ortstein-Otero, Benjamin Rose, Peter Steers, Erik Allen, Bradford Keith, Donna Cordeiro, Janice Angelillo, Anna Maria Fornino, Michele Cassetta, and Judy Cennami purchased electricity, for their own use and not for resale, directly from Eversource and/or its subsidiaries or affiliates during the class period.

20.     *The Avangrid plaintiffs.* Margaret and Richard Lewis, Eric Long, Janice Brady, and Opal Ash purchased electricity, for their own use and not for resale, directly from Avangrid and/or its subsidiaries or affiliates during the class period.

21.     *The market plaintiffs.* John Odum, David Leighton, Mark Lejeune, and Robert Prats purchased electricity in the New England regional electricity market, for their own use and not for resale, from entities other than the defendants and/or their subsidiaries or affiliates during the class period.

### III.     JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over the customer plaintiffs' federal antitrust claims, under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. The customer plaintiffs' federal antitrust claims arise under federal law under 28 U.S.C. §§ 1331 & 1337, and specifically under federal statutes regulating commerce and trade.

23.     The Court has supplemental jurisdiction over the plaintiffs' state law claims under 28 U.S.C. § 1367. The plaintiffs' state law claims are so related to the customer plaintiffs' federal antitrust claims that they form part of the same case or controversy.

24.     The Court also has subject matter jurisdiction over at least some of the plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(d). The amount of damages incurred by the plaintiffs, as a result of the defendants' unlawful conduct, exceeds $5 million, exclusive of interest and costs, and at least one member of most of the plaintiffs' state-law classes are citizens of a state different from any Defendant.

25.     The Court has personal jurisdiction over the defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each defendant conducts substantial business in the state of Massachusetts and because one defendant, Eversource, is a Massachusetts voluntary association with a headquarters in Boston. The defendants purposefully availed themselves of the laws of the United States and Massachusetts insofar as they engaged in electric and/or natural gas utility business in the United States and in Massachusetts. And they have appeared in this action and responded to the plaintiffs' original complaint without contesting personal jurisdiction, thereby waiving any such objection.

26.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because each defendant transacts business in this District and/or is a resident of this District, and because a substantial part of the events giving rise to this claim occurred in this District.

## IV.     PARTIES

### A.     Plaintiffs

27.     Scott Breiding is a resident of Somerville, Massachusetts. Throughout the class period, Mr. Breiding purchased electricity from Eversource and/or its subsidiary, NSTAR Electric Company, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Breiding was forced to pay artificially inflated prices for electricity.

28.     Amy Pollutro is a resident of Boston, Massachusetts. Throughout the class period, Ms. Pollutro purchased electricity from Eversource and/or its subsidiary, NSTAR Electric Company, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Pollutro was forced to pay artificially inflated prices for electricity.

29.     Mikaela Ortstein-Otero is a resident of Amherst, Massachusetts. Throughout the class period, Ms. Ortstein-Otero purchased electricity from Eversource and/or its subsidiary, Western Massachusetts Electric Company, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Ortstein-Otero was forced to pay artificially inflated prices for electricity.

30.     Benjamin Rose is a resident of Roslindale, Massachusetts. During substantially all of the class period, Mr. Rose purchased electricity from Eversource and/or its subsidiary, NSTAR Electric Company, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Rose was forced to pay artificially inflated prices for electricity.

31.     Margaret and Richard Lewis, husband and wife, are residents of Walpole, Maine. Throughout the class period, Mrs. and Mr. Lewis purchased electricity from Avangrid and/or its subsidiary, Central Maine Power Company, for their own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mrs. and Mr. Lewis were forced to pay artificially inflated prices for electricity.

32.     Eric Long is a resident of Lewiston, Maine. Throughout the class period, Mr. Long purchased electricity from Avangrid and/or its subsidiary, Central Maine Power Company,

for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Long was forced to pay artificially inflated prices for electricity.

33.     Peter Steers is a resident of Vernon, Connecticut. Throughout the class period, Mr. Steers purchased electricity from Eversource and/or its subsidiary, The Connecticut Light and Power Company, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Steers was forced to pay artificially inflated prices for electricity.

34.     Erik Allen is a resident of Middletown, Connecticut. Throughout the class period, Mr. Allen purchased electricity from Eversource and/or its subsidiary, The Connecticut Light and Power Company, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Allen was forced to pay artificially inflated prices for electricity.

35.     Bradford Keith is a resident of Lyme, New Hampshire. Throughout the class period, Mr. Keith purchased electricity from Eversource and/or its subsidiary, Public Service Company of New Hampshire, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Keith was forced to pay artificially inflated prices for electricity.

36.     John Odum is a resident of Montpelier, Vermont. Throughout the class period, Mr. Odum purchased electricity from Green Mountain Power Corporation, an electric utility not owned by or affiliated with defendants, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Odum was forced to pay inflated prices for electricity.

37.     David Leighton is a resident of South Royalton, Vermont. Throughout the class period, Mr. Leighton purchased electricity from Green Mountain Power Corporation and/or its predecessor, Central Vermont Public Service Corporation, electric utilities not owned by or affiliated with defendants, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Leighton was forced to pay inflated prices for electricity.

38.     Donna Cordeiro is a resident of New Bedford, Massachusetts. Throughout the class period, Ms. Cordeiro purchased electricity from Eversource and/or one of its subsidiaries for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Cordeiro was forced to pay artificially inflated prices for electricity.

39.     Janice Angelillo is a resident of Rocky Hill, Connecticut. Throughout the class period, Ms. Angelillo purchased electricity from Eversource and/or one of its subsidiaries for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Angelillo was forced to pay artificially inflated prices for electricity.

40.     Anna Maria Fornino is a resident of Newington, Connecticut. Throughout the class period, Ms. Fornino purchased electricity from Eversource and/or one of its subsidiaries for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Fornino was forced to pay artificially inflated prices for electricity.

41.     Michele Cassetta is a resident of Whitefield, New Hampshire. Throughout the class period, Ms. Cassetta purchased electricity from Eversource and/or one of its subsidiaries for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair

conduct described herein, Ms. Cassetta was forced to pay artificially inflated prices for electricity.

42.     Judy Cennami is a resident of Portsmouth, New Hampshire. Throughout the class period, Ms. Cennami purchased electricity from Eversource and/or one of its subsidiaries for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Cennami was forced to pay artificially inflated prices for electricity.

43.     Janice Brady is a resident of Hermon, Maine. Throughout the class period, Ms. Brady purchased electricity from Avangrid and/or its subsidiary, Central Maine Power Company, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Brady was forced to pay artificially inflated prices for electricity.

44.     Opal Ash is a resident of Belfast, Maine. Throughout the class period, Ms. Ash purchased electricity from Avangrid and/or its subsidiary, Central Maine Power Company, for her own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Ms. Ash was forced to pay artificially inflated prices for electricity.

45.     Roberto Prats is a resident of Puerto Rico and maintains a second residence in Stowe, Vermont. Throughout the class period, Mr. Prats purchased electricity from Stowe Electric, an electric utility not owned by or affiliated with the defendants, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Prats was forced to pay artificially inflated prices for electricity.

46.     Mark Lejeune is a resident of Pawtucket, Rhode Island. Throughout the class period, Mr. Lejeune purchased electricity from National Grid, an electric utility not owned by or

affiliated with the defendants, for his own use and not for resale. As a result of the unlawful, anticompetitive, and unfair conduct described herein, Mr. Lejeune was forced to pay artificially inflated prices for electricity.

## B.     Defendants

47.     Eversource Energy is a Massachusetts voluntary association. Eversource maintains a headquarters in Boston, Massachusetts. Eversource is a public utility holding company primarily engaged in the energy delivery business, at least in part through six wholly-owned subsidiaries: NSTAR Electric Company, NSTAR Gas Company, Western Massachusetts Electric Company,[5] The Connecticut Light and Power Company, Public Service Company of New Hampshire, and Yankee Gas Services Company. Collectively, Eversource and its subsidiaries serve more than 3.1 million electricity customers in 500 New England communities and more than half-a-million natural gas customers in 120 New England communities. Eversource operates the largest energy delivery system in the region and it also owns (or owned during the class period) a number of power plants in Massachusetts, New Hampshire, and Maine. Eversource operations generate approximately $8 billion in revenue each year.

48.     Avangrid, Inc. is a New York corporation headquartered in New Haven, Connecticut. Avangrid's direct, wholly-owned subsidiary, Avangrid Networks, Inc., directly owns electric generation, transmission, and distribution companies and natural gas distribution, transportation, and sales companies in New York, Maine, Connecticut, and Massachusetts – specifically, The Berkshire Gas Company, The United Illuminating Company, The Southern Connecticut Gas Company, Connecticut Natural Gas Corporation, Central Maine Power Company, and Maine Natural Gas Corporation. Collectively, through its subsidiaries and/or

---

[5] According to Eversource, Western Massachusetts Electric Company merged into NSTAR Electric Company effective December 31, 2017.

affiliates, Avangrid serves more than 950,000 electricity customers and more than 415,000 natural gas customers in New England. Through another wholly-owned subsidiary, Avangrid Renewables Holdings, Inc., Avangrid owns electricity generating facilities in many states, including Massachusetts and New Hampshire.

## V.   FACTUAL ALLEGATIONS

### A.   Overview of United States electricity markets.

49.     The Federal Power Act (FPA) charges the Federal Energy Regulatory Commission (FERC) with overseeing wholesale sales of electricity in interstate commerce.[6] FERC has the authority to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce."[7] "But the law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale' – most notably, any retail sale – of electricity."[8]

50.     Until relatively recently, many states' electricity markets were served by vertically integrated monopolies: single entities that controlled electricity generation, transmission, and sale to retail consumers within a defined service territory, usually in one state or municipality. But over the past few decades, many states have moved towards regional energy supply systems.[9] In this new, deregulated system, FERC "often foregoes the cost-based rate-setting traditionally used to prevent monopolistic pricing" in response to the new system of electricity wholesale that has arisen.[10]

---

[6] 16 U.S.C. § 791 *et seq.*

[7] 16 U.S.C. § 824(b)(1).

[8] *FERC v. Elec. Power Supply Ass'n.*, 136 S. Ct. 760 (2016).

[9] *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).

[10] *Elec. Power Supply Ass'n.*, 136 S. Ct. at 768.

51.     In these deregulated systems, organizations that deliver electricity to retail consumers – called "load serving entities," or "LSEs" – purchase electricity at wholesale from independent power generators. FERC has charged independent non-profit organizations known as Independent System Operators ("ISOs") and Regional Transmission Organizations ("RTOs") with managing certain segments of the electricity grid. These ISOs and RTOs work to facilitate an efficient market for electricity while also ensuring reliability for electricity consumers.[11]

52.     Wholesale electricity in these deregulated markets is typically accomplished through two mechanisms.

53.     Some wholesale electricity is purchased through bilateral contracts: an LSE can sign an agreement with an electricity generator to purchase a certain amount of electricity at a certain rate over a certain period of time. These fixed-rate bilateral contracts are filed with FERC, which may review the agreed-upon rate for reasonableness.[12]

54.     But more often, wholesale electricity is purchased through auctions administered by the RTOs and ISOs. This may include (1) a "same-day auction" for immediate delivery of wholesale electricity to LSEs experiencing an immediate spike in demand; and (2) a "next-day auction" to satisfy expected wholesale demand the following day. The ISO or RTO files with FERC a tariff that describes in detail the procedures for the auctions, which FERC may approve. But, with auctions, FERC does not dictate or approve the day-to-day (or hour-by-hour) actual rates that result from the bidding in the auction.[13]

55.     In simple terms, here is how the auctions work. An ISO (or an RTO) obtains (1) orders from LSEs and other electricity retailers indicating how much energy they need at

---

[11] *Talen Energy Mktg.*, 136 S. Ct. at 1292.

[12] *Id.*

[13] *Id.*

various times and (2) bids from electricity generators specifying how much electricity they can produce at those times, and how much they propose to charge for it. The ISO accepts the generators' bids in order of cost (lowest cost first) until they satisfy the LSEs' total demand. The price of the last unit of electricity purchased is then paid to all suppliers whose bids were accepted, even if their actual offer was lower.

56.     Here is an example. Suppose that, at 9:00 am on March 28, four plants serving the New England region place bids to supply wholesale electricity. Generator A offers 100 units of electricity for $10/unit; Generator B offers 100 units of electricity for $20/unit; Generator C offers 100 units of electricity for $30/unit; and Generator D offers 100 units of electricity for $40/unit. And suppose that the LSEs inform their ISO that they need 275 units of electricity. The ISO will accept Generator A's $10/unit bid (and all 100 units offered), then Generator B's $20/unit bid (and all 100 units offered), and then Generator C's $30/unit bid (but only the first 75 units offered). After that, the regional wholesale demand from the LSEs has been satisfied. Generator A, Generator B, and Generator C will all be paid $30/unit;[14] that cost will be split proportionally amongst the LSEs, according to the proportion of the energy they have ordered.

57.     This system incentivizes electricity generators to conform their auction bids to their true marginal costs – the market is highly competitive, and if a generator marks up its costs even a little, it risks placing a losing bid and going home empty-handed. Generators' bid prices reflect the cost to the generator to produce the electricity. So the bid price is impacted by the cost of raw materials that go into creating electricity. At a natural-gas-fired electricity generator, therefore, higher natural gas prices would mean higher marginal costs, and higher bids in the auction.

---

[14] This price is referred to, in economic terms, as the marginal cost – the added cost of meeting another unit of demand, which is the price an efficient market would produce.

**B.      The New England electricity market.**

58.      In 1999, New England became one of the first of the deregulated, competitive electricity markets described above.

59.      The six New England states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont are organized into a single electricity market. Although retail electric and natural gas companies in each state are regulated by public utility commissions, the overall electricity market in the region is overseen and facilitated by ISO New England (ISO-NE). ISO-NE performs three primary roles: grid operation, market administration, and power system planning.[15] The ISO-NE market serves 7.1 million retail electricity customers and an overall population of 14.7 million people.[16]

**1.      The cost of wholesale electricity is the single biggest determinant of the cost of retail electricity.**

60.      The price New Englanders pay for electricity at any given time incorporates several factors. Some factors are fixed for longer periods of time, like distribution charges imposed by LSEs and approved from time to time by each state's public utility commission. Other price factors fluctuate more frequently based on market conditions impacted by, for example, supply and demand. In New England, as elsewhere, one market-based driver of retail electricity costs is the wholesale price of electricity within ISO-NE.

---

[15] ISO-NE, *Our Three Critical Roles*, https://www.iso-ne.com/about/what-we-do/three-roles.

[16] ISO-NE, *New England's Electricity Use*, https://www.iso-ne.com/about/key-stats/electricity-use.

61.     ISO-NE determines wholesale electricity prices in New England via a "multi-settlement" system – a set of auctions, as described above – that includes both a "day-ahead" electricity auction and a "real-time" electricity auction.[17]

62.     In the day-ahead energy auction, electricity generators and wholesale electricity buyers like LSEs plan significant electricity transactions a day in advance, with the goal of avoiding price volatility. Wholesale electricity prices for the day ahead market are projected in advance, in hourly increments, by ISO-NE.[18] Each day, in the day-ahead electricity auction, LSEs submit orders to ISO-NE that estimate the amount of electricity they will need to serve their customers the next day. ISO-NE then estimates an overall amount of electricity demand for the entire region. Next, the ISO seeks supply and price bids from electricity generators. ISO-NE accepts the lowest-price bid first, and then the next lowest-price bid, and so on until all of the region's projected electricity demand is met by the total offered supply. ISO-NE calls the group of accepted bids an electricity "supply stack," or an "economic dispatch stack."

63.     ISO-NE pays the marginal price (the price of the last accepted bid in this day-ahead auction, sometimes called the "clearing price," or the "energy price")[19] to all electricity generators with accepted bids on a particular day. These wholesale electricity prices paid by LSEs are then passed on to retail customers.

64.     In the real-time electricity auction, electricity generators and wholesale electricity buyers like LSEs conduct same-day transactions to account for last-minute changes in

---

[17] ISO-NE, *Day-Ahead and Real-Time Energy Markets*, https://www.iso-ne.com/markets-operations/markets/da-rt-energy-markets.

[18] ISO-NE, *FAQs: Locational Marginal Pricing*, https://www.iso-ne.com/participate/support/faq/lmp.

[19] The "energy price" is simply the price paid for electricity on a per-unit basis (i.e., dollars per megawatt-hour ("MWh")).

demand, prices, and other variables. ISO-NE projects wholesale electricity prices for the real-time auction on a rolling basis, in five-minute increments, throughout the day.

65.     The availability and price of natural gas affect both the day-ahead and real-time electricity auctions. But most trading occurs in the day-ahead electricity auction – so much so that the day-ahead auction sets price expectations for other auctions, like the real-time electricity auction.

66.     The retail price for electricity charged to consumers may include certain additional costs – for example, discrete charges for transmission, distribution, transition, and reliability.[20] But in the end, the largest factor in determining the overall electricity price paid by consumers throughout the ISO-NE regional electricity market is the cost of wholesale electricity, which is turn dictated by the energy prices paid to electric generators in ISO-NE's daily supply stack. So if the energy price rises, so does the cost of wholesale electricity. And if the cost of wholesale electricity rises, so does the retail electric price paid by New England consumers.

> **2.     The cost of natural gas is the single biggest determinant of the cost of wholesale electricity.**

67.     Forty-eight percent of the electricity generated in New England – 49,198 out of 102,534 GWH in 2017 – comes from natural-gas-fired power plants.[21] This should be great news for New England consumers: using natural gas to generate electricity should "ensure[] that the

---

[20] Due to the differing costs and engineering constraints of transmitting electricity to different geographic points around New England, ISO-NE makes minor adjustments to the energy price set by the day-ahead electricity auction to account for the cost or reaching each of eight different "wholesale load zones" – three in Massachusetts and one in each of the other New England states. The individual wholesale electricity price established by ISO-NE for each wholesale load zone is called a "locational marginal price" or "LMP." Although LMPs are influenced by several factors, LMPs and wholesale electricity prices throughout ISO-NE are primarily determined by a daily energy price paid to generators – and so, like the energy price, the LMPs are largely determined by the cost of generating wholesale electricity.

[21] ISO-NE, *Resource Mix*, https://www.iso-ne.com/about/key-stats/resource-mix.

grid operates reliably" and that "adequate supply is available to meet demand,"[22] and keep wholesale electricity costs down.[23]

68.     Because so much of New England's generating capacity comes from natural gas, the price of natural gas is the single most significant factor in determining wholesale electricity prices.[24] Put differently, the price of wholesale electricity is very closely tied to and dependent upon the cost of natural gas.[25]

69.     Given the ubiquity of natural-gas-generated electricity in New England, it is not surprising that natural-gas-fired generators frequently set the price in both the day-ahead and real-time electricity auctions. Natural-gas-fired generators set the real-time price of electricity about 75% of the time in 2016 and 70% of the time in 2017. Natural-gas-fired generators set the day-ahead price more often than any other type of power plant in both years.[26]

---

[22] *Id.*

[23] ISO-NE, *Natural Gas Infrastructure Constraints*, https://www.iso-ne.com/about/regional-electricity-outlook/grid-in-transition-opportunities-and-challenges/natural-gas-infrastructure-constraints (noting that "natural-gas-fired generation" plays a "major role" in "setting prices for wholesale electricity").

[24] ISO-NE, *Markets*, https://www.iso-ne.com/about/key-stats/markets.

[25] The New England Council, *The New England Energy Landscape: History, Challenges, & Outlook* at 27 (2016) ("New England's cost of electricity . . . depends heavily on the price of natural gas."). Eversource admits as much in a report prepared on its behalf by ICF International. ICF International, *Access Northeast Project – Reliability Benefits and Energy Cost Savings to New England Consumers* at 10 (Dec. 18, 2015), http://www.accessnortheastenergy.com/~/media/Microsites/AccessNortheast/Documents/KeyDocuments/ICF-Report-on-Access-Northeast-Project1.pdf?la=en (report prepared on behalf of Eversource) ("ICF paper") (describing the "closely correlated" nature of natural gas prices and wholesale power prices in New England). So does, for example, Avangrid's subsidiary Central Maine Power Company. *See* Maine Public Radio*, New Central Maine Power CEO Lays Out His Vision For The Company*, January 18, 2018, available at: http://mainepublic.org/post/new-central-maine-power-ceo-lays-out-his-vision-company#stream/0 ("[W]hen natural gas prices are high, energy prices are going to be high; when natural gas drops low, energy prices are going to be low.").

[26] ISO-NE, *Markets*, https://www.iso-ne.com/about/key-stats/markets.

70.     Because natural gas itself is the most important variable cost for natural-gas-fired power plants, the price paid by plant owners for natural gas directly affects the electricity sales price at which the plant bids into the ISO-NE supply stack each day.

71.     The purchase and sale of natural gas works very differently than the purchase and sale of electricity. There is no rule-bound auction process designed to force the market towards the marginal cost of delivered natural gas. And, most importantly, there is no federal regulator responsible for approving the price for the commodity – the natural gas – itself.

72.     In the 1950s through the 1970s, the Federal Power Commission (FPC), FERC's predecessor, strictly regulated both (1) the cost of interstate *transmission* of natural gas (i.e., the prices charged for transporting natural gas from a wellhead to a buyer) *and* (2) the wellhead prices of natural gas *itself* (i.e., the commodity price). For wellhead prices, the FPC imposed a traditional cost-plus ratemaking system, meaning natural gas producers were allowed to charge prices high enough to cover their actual costs of producing natural gas, plus a "fair" profit. The FPC decided what was "fair."

73.     This restrictive pricing regime gave natural gas producers no incentive to explore new natural gas reserves, or for pipeline operators to expand their pipelines. By the 1970s, most of the nation was experiencing a severe natural gas shortage.

74.     This prompted Congress to begin deregulating the price of the natural gas commodity. In 1978, Congress enacted the Natural Gas Policy Act (NGPA) as part of the broader National Energy Act (which also replaced the FPC with FERC). The NGPA abolished the cost-plus system of wellhead pricing. Instead, under the NGPA, competitive forces – i.e., the balance of supply versus demand – determined the wellhead price of natural gas.

75.     In 1989, Congress further deregulated the price of natural gas. In the Natural Gas Wellhead Decontrol Act, Congress prohibited FERC (or any other federal agency) from imposing any price regulations on the "first sales" of natural gas at the wellhead. "First sales" included sales by a natural gas producer to a pipeline or a direct purchaser.

76.     In 1992, FERC issued Order No. 636, which permanently decoupled the sale of natural gas as a commodity from the sale of natural gas transmission as a service. In other words, arranging to receive natural gas encompassed two transactions: one to purchase the commodity, and one to transport that commodity from the seller to the purchaser.

77.     FERC has authority to regulate only one of these two transactions.

78.     Ever since the early 1990s, the purchase and supply of natural gas to the New England region has taken the form of two related, but separate, transactions. First, a natural gas purchaser, like an LDC, purchases a quantity of natural gas at the Henry Hub, the origination point for an extensive network of pipelines that eventually branch into New England's main pipeline, the Algonquin. Second, the purchaser must also purchase from pipeline operators the means of transmitting their natural gas from the wellhead to its final destination. It is not unlike purchasing corn and then separately paying a railroad to transport it from a grain elevator to a manufacturing facility: the transportation cost may be regulated by railroad regulators, but the commodity price of corn is not.

> **a.     Today, FERC only regulates the price of natural gas transportation and transmission.**

79.     FERC regulates how interstate pipelines sell "transmission capacity" – i.e., space in the pipeline reserved by a natural gas purchaser to transport the quantum of natural gas that the purchaser has bought from a producer. This means FERC oversees the rates charged for

transmission capacity, how the pipeline allocates access to the pipeline, and the construction of new pipelines.

80.     Because natural gas transmission is often a "natural monopoly" – i.e., in many areas, a single pipeline infrastructure is the only source of natural gas transportation, FERC is charged with ensuring that the transmission monopoly is not abused. FERC may:

    a.    Ensure that there is no discriminatory or preferential access to transmission capacity;

    b.    Prevent unfair pricing;

    c.    Attempt to instill competition into an otherwise non-competitive market; and

    d.    Protect customers and market participants from abuse of market power.

81.     When FERC acts to regulate, it can act on either a company-specific or an industry-wide basis.

82.     Company-specific issues are raised with FERC either through an application (i.e., by a pipeline company to alter an existing tariff governing transmission) or a complaint (i.e., by a pipeline customer identifying unfair rates). FERC must publicly post the applications and complaints so that interested parties may weigh in. Then, FERC staff reviews the issue and makes a recommendation to the Commission (a group of five appointed members, each serving a five-year term). The Commission then reaches a decision on the matter.

83.     When industry-wide issues are raised, FERC issues a Notice of Inquiry or a Notice of Proposed Rulemaking seeking comments from interested parties, including industry members, the public, trade associations, and environmental groups. All interested parties have the right to be heard and have their positions considered. Only after allowing interested parties to weigh in can FERC act.

84.     FERC does not regulate the local, retail sale of natural gas once it leaves the interstate pipelines and is in the control of the LDCs that distribute gas to retail customers. It is then up to the states ensure that the prices charged and service provided by LDCs to retail gas consumers – i.e., individuals who use natural gas to heat their homes or fire up their stoves – are fair and equitable.

        **b.**    **The non-retail price of natural gas is determined by demand – and supply.**

85.     Although FERC is charged with ensuring that the price charged for natural gas transportation in interstate pipelines is "just and reasonable," FERC does *not* regulate the price of natural gas itself. Ever since the Natural Gas Wellhead Decontrol Act of 1989, the price of natural gas has been determined (or ought to be determined) based on competitive forces. That is, the price of natural gas is driven by the fundamental economic principles of supply and demand.

86.     There are essentially two ways that natural gas is bought and sold: a natural gas producer can sell gas futures, or it can sell the natural gas on a so-called "spot market."

87.     A futures contract allows a gas producer to agree to sell a specific quantity of gas at some predetermined future time. Often purchasers with steady natural gas demand – like LDCs – may enter into futures contracts.[27]

88.     But natural-gas-fired electricity generators' natural gas needs are typically much more variable and less predictable. So gas-fired generators typically purchase their gas on the secondary wholesale "spot market."

---

[27] These natural gas futures are bought and sold on the New York Mercantile Exchange (NYMEX).

89.     The spot market is where natural gas is bought and sold "right now." It arises because entities that purchase natural gas under long-term or futures contracts find themselves holding title to excess amounts of natural gas, or because traders or marketers place bets on the prices of natural gas, securing the right to gas supplies in advance in order to sell those supplies when prices rise.

90.     The spot-market price of natural gas is not regulated. Instead, it is determined by the economics of supply and demand: the spot price of natural gas increases when the amount of available natural gas on the spot market is lower.[28] The states regulate some LDC conduct. But, like FERC, they do not regulate or oversee transactions in the unregulated secondary spot market for natural gas among other, non-retail purchasers and sellers like natural-gas-fired power plants.

**c.     Natural gas prices factor prominently in the cost of wholesale electricity.**

91.     Most natural-gas-fired power plants calculate the marginal cost of producing electricity (and therefore the price they will bid in an auction) based upon the price they predict they will have to pay for natural gas. Most generators do not have a steady stream of natural gas on reserve, but rather purchase it only if accepted into the supply stack and called upon by ISO-NE to generate electricity.

92.     Thus, as ISO-NE recognizes, there is a direct economic relationship between the unregulated spot-market price of natural gas and the price at which natural gas-fired power plant operators bid electricity sales into the regional wholesale electricity market:

---

[28] The prevailing price reference point is called the "Henry Hub index" – the price of natural gas at a hub in the hamlet of Henry, in Erath Louisiana, near one of the key wellheads in the United States. But spot markets operate at each of more than 30 hubs around the country, and the price of natural gas differs across the major hubs, depending on the current supply and demand at that location. The difference between the Henry Hub price and the price at a different location is called the location differential.



93.     Because so much of New England's electricity is generated by natural-gas-fired power plants, the unregulated spot price of natural gas heavily influences both the wholesale and retail price of electricity. If there is a shortage in natural gas supply, the unregulated spot price of natural gas will go up, and so, too, will electricity prices.

**C.     Eversource and Avangrid possess market power in the New England electricity market because they control the supply of natural gas to that market.**

94.     Eversource and Avangrid possess the power to raise the price of electricity in the New England electricity market, and to reduce the amount of electricity available, because they can restrict the amount of natural gas flowing into New England – and therefore the amount of natural gas available to fuel natural-gas-fired electricity generators.

1.    **Eversource and Avangrid own substantial retail natural gas business operations.**

95.    Natural gas is delivered to and distributed within New England by pipeline. New England's principal arterial natural gas pipeline is the Algonquin Gas Transmission Pipeline. The Algonquin is owned by Spectra Energy Partners, Eversource, and National Grid; and operated by Enbridge, Inc., a Canadian oil and gas pipeline company that is Spectra's parent company.

96.    The Algonquin Pipeline transports 3.08 Bcf/d[29] of natural gas through 1,129 miles of pipeline through New Jersey, New York, Connecticut, Rhode Island and Massachusetts. As such, the Algonquin Pipeline is a critical conduit for the supply of natural gas in the New England electricity market.

97.    Both Eversource and Avangrid own and operate substantial natural gas utilities, or LDCs. Of the eight largest LDCs in New England, half are owned by Eversource or Avangrid: Eversource owns NSTAR Gas Co. and Yankee Gas Co., and Avangrid owns Connecticut Natural Gas Co. and Southern Connecticut Gas Co. Both defendants own other natural gas LDCs as well.

98.    Eversource's and Avangrid's LDCs serve hundreds of thousands of natural gas customers in New England. Eversource serves more than 500,000 natural gas customers, while Avangrid serves more than 400,000. In order to provide this service, they have developed substantial control over the natural gas transmission and distribution system within the region, either through ownership in or contractual rights to capacity along various pipelines – including the all-critical Algonquin Pipeline.

99.    As a result of their LDC operations, Eversource and Avangrid possess a large number of "no-notice" contracts for natural gas transmission capacity along the Algonquin

---

[29] Bcf/d means billion cubic feet per day, a unit of measurement for large production rates of natural gas.

Pipeline. These no-notice contracts, which are only available to LDCs, give them power to reserve space, or transmission capacity on the pipeline for a given day and time, then adjust that reservation upward or downward at the last minute without penalty. Non-LDCs that reserve pipeline capacity can suffer penalties if they do not use the full capacity they need, or if they have to reserve extra capacity at the last minute. But, because Eversource and Avangrid operate LDCs, their no-notice contracts allow them to adjust their pipeline capacity reservations whenever they want, even towards the end of the day.

100.    For example, suppose Firm X reserved enough capacity on the Algonquin Pipeline to move a total of 2400 cubic feet of natural gas through the pipeline at a steady rate over the course of a 24-hour period (i.e., 100 cubic feet per hour). Firm X might realize, after receiving only 400 units of natural gas (in the first 4 hours of the 24-hour period), that it did not want or need any more natural gas, and cancel the remaining 20 hours of reserved capacity. In most cases, Firm X would be penalized by the pipeline operator for the last-minute cancellation. But if Firm X was Eversource or Avangrid (or one of their LDCs), they would pay no penalty for the last minute change.

**2.    Eversource and Avangrid own substantial wholesale and retail electric business operations.**

101.    Eversource and Avangrid also each operate retail electric utilities that provide electricity to millions of residential, commercial, and industrial customers in New England.

102.    Eversource owns the Connecticut Light & Power Company, which provides electricity to residential, commercial, and industrial customers in parts of Connecticut; NSTAR Electric Company, which provides electricity to residential, commercial, and industrial customers in parts of eastern Massachusetts; Public Service Company of New Hampshire, which provides electricity to residential, commercial, and industrial customers in parts of New

Hampshire; and Western Massachusetts Electric Company, which provides electricity to residential, commercial, and industrial customers in parts of western Massachusetts. Collectively, Eversource and its subsidiaries and/or affiliates provide electricity to more than 3.1 million electricity customers in 500 New England communities.

103.     Avangrid owns the United Illuminating Company, which provides electricity to residential, commercial, and industrial customers in southwestern Connecticut, and Central Maine Power Company, which serves electric customers in central and southern Maine. Collectively, through its subsidiaries and/or affiliates, Avangrid provides electricity to more than 950,000 electricity customers in New England.

104.     The price of electricity sold by these entities is driven, in large part, by the market-wide wholesale price of electricity established within the ISO-NE market. When the price of wholesale electricity established within the ISO-NE market is higher, the price of electricity sold by Eversource and Avangrid to their respective retail customers is also higher.

### 3.     Eversource and Avangrid own non-natural-gas-fired electricity-generating assets that flourish when natural gas supply lags.

105.     While on one hand controlling the supply of natural gas to fuel the New England electricity market, Eversource and Avangrid also each own and operate electricity-generating assets within the ISO-NE territory that are not fueled by natural gas. Specifically, they own renewable electricity resources such as hydroelectric, wind, and solar generating facilities. These facilities have low variable operating costs because, unlike natural gas power plants, they employ fuels that are free. These power plants directly compete in the New England electricity market against natural-gas-fired power plants, and, as a result, they are more competitive when the supply of natural gas is lower and the price of natural gas is higher.

#### 4.     Eversource's and Avangrid's diverse energy businesses mean that they can raise prices and reduce output.

106.     Eversource and Avangrid have their fingers in every step of the energy supply and generation network in New England. That is why Eversource and Avangrid are able to (1) restrict the supply of natural gas that would otherwise have been available on the unregulated spot market; (2) increase the spot market price of natural gas to a level above that which would have prevailed in the absence of their supply-restricting conduct; and (3) ultimately increase the wholesale price of electricity to supracompetitive levels throughout the New England electricity market.

107.     There is a fixed amount of pipeline capacity on a given day (a little more than 3 billion cubic feet),[30] so the amount of natural gas available to power plants and other industrial users in New England is limited by pipeline capacity. Industry reports indicate that, some days, 90 to 95% of the pipeline capacity is reserved.[31] That means the volume reserved by Eversource, Avangrid, and their LDCs (and other LDCs with contractual transmission capacity rights) affect how much capacity is available for other natural gas needs.

108.     When, at the last minute, Eversource and Avangrid adjust their capacity reservations downward, that does not mean that capacity is automatically freed up for other companies' use. Put simply, after Eversource or Avangrid cancels part of a reservation, the pipeline is running partially empty.

109.     Returning to the example of Firm X, above, and assuming the pipeline was fully reserved for the full day after Firm X made its 2400-unit reservation, Firm X's last-minute

---

[30] Spectra Energy Partners, *Algonquin Gas Transmission*, http://www.spectraenergypartners.com/operations/natural-gas-pipelines/algonquin-gas-transmission.

[31] *See* ICF Paper at 13.

cancellation would mean that, for 20 hours out of the day, the pipeline would be flowing at 100 units/hour under capacity. That amounts to 2000 units less natural gas available to New England companies, including natural-gas-fired electricity generators purchasing natural gas on the unregulated spot market.

110.     Eversource's and Avangrid's last-minute cancellations mean that, even if there was enough demand to reserve the full pipeline capacity for the full day, supply is diminished. That is because the nature and timing of such cancellations does not allow the unused pipeline capacity to be used by other actors in the market. Not only are the cancellations made too late in the day to allow for other transactions to be arranged, but, as discussed below, capacity cancellations under no-notice contracts do not allow the pipeline to release that capacity to other buyers and sellers wishing to fulfill demand in the market. By contrast, Eversource and Avangrid could have, but did not, formally release their capacity in the "capacity release market" – an alternative course of action that *would* have allowed other actors in the market to use the released capacity to fulfill otherwise unmet demand for gas.

111.     Diminished natural gas supply has two important consequences for the New England electricity market.

112.     First, having insufficient natural gas to meet the needs of natural-gas-fired electricity generators threatens a shortage of electricity. One report, commissioned by and written on behalf of Eversource, admits as much, vaguely expressing concerns about "reliability" of the regional electric grid.[32]

113.     Second, diminished natural gas supply means less natural gas available on the spot market and, therefore, higher spot-market prices. Those higher prices on the unregulated

---

[32] ICF Paper at 4.

spot market mean higher prices for wholesale electricity, and higher retail prices for electricity for New England consumers. So, by using their ability to restrict natural gas supply and increase the spot market price of natural gas, Eversource and Avangrid raised the price of electricity throughout New England.

**D.      Eversource and Avangrid artificially restricted natural gas supply, which artificially raised electricity prices in the New England electricity market.**

114.      Electricity prices in New England are already higher than most of the rest of the country because New England is at the "end of the pipeline" for natural gas supply.[33] So when New England electricity prices spike, it is record-breaking. During the polar vortex of 2013-2014, New England gas prices averaged $17.86 per MMBtu (million British Thermal Units) and reached a record high of $78/MMBtu on January 22, 2014. In January 2018, during the "bomb cyclone" storm, prices skyrocketed to $92.65 per MMBtu.[34] As a point of reference, ISO-NE deems $23 per MMBtu to be "extreme" prices indicative of constrained gas supplies.[35] New England gas prices were, at times, almost *four times* the Henry Hub price. According to ISO-NE's CEO, Gordon van Welie: "[t]he volatility we saw [in 2015] in wholesale power prices – going from the third-highest monthly price in February to the lowest in June . . . illustrates the impact of . . . natural gas pipeline constraints, on the region's power system."[36]

---

[33] The New England Council, *The New England Energy Landscape: History, Challenges, & Outlook* at 5 (2016).

[34] Levitan Paper at 17 n.7. A dekatherm (Dth) is equal to a MMBtu.

[35] ICF Paper at 17.

[36] ISO-NE, *New England's 2015 Average Wholesale Power Price Fell to Second-lowest Level Since 2003* (March 29, 2016), https://www.iso-ne.com/static-assets/documents/2016/03/20160329_prelim_2015_prices_release.pdf.

1.    **Eversource and Avangrid cancelled large quantities of natural gas reserves on the Algonquin Pipeline at the last minute.**

115.    Eversource and Avangrid have consistently blamed high electricity prices on natural gas pipeline constraints, and natural gas pipeline constraints on a lack of pipeline infrastructure, but they are only half right. As explained above, lower natural gas pipeline capacity *does* increase the price of electricity in the New England electricity market. But in large part, pipeline constraints have been exacerbated by Eversource's and Avangrid's own self-serving conduct, not an infrastructure shortage.

116.    Eversource and Avangrid regularly reserved more pipeline capacity than they knew they needed and then, at the last minute, cancelled portions of their reservations. They did not, however, release that capacity, so that others could take advantage of it, leaving the pipeline running partially empty.

117.    Relying on millions of publicly available data points for a period between mid-2013 and mid-2016, recent academic research by Matthew Zaragoza-Watkins et al. demonstrates that Eversource and Avangrid routinely made day-ahead orders of natural gas that substantially exceeded the amount of gas they ultimately purchased.[37] Then, they routinely reduced their orders for natural gas transmission capacity on the Algonquin Pipeline at the last minute.

118.    Zaragoza-Watkins' analysis of the LDCs' parent companies' practices showed that only two – Avangrid and Eversource – consistently cancelled substantial volumes of transmission capacity in the final hours of the day. Together, Eversource and Avangrid reduced the pipeline's daily effective capacity by approximately 50,000 MMBtu on average. That is equal to approximately 14% of the natural gas that would otherwise have been available on the

---

[37] Levi Marks, Charles F. Mason, Kristina Mohlin & Matthew Zaragoza-Watkins, *Vertical Market Power in Interconnected Natural Gas and Electricity Markets* (October 11, 2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf.

unregulated secondary spot market to natural gas-fired power plants served by the Algonquin pipeline. On 37 days, the two firms reduced capacity by over 100,000 MMBtu. That amounts to 28% of the daily capacity typically earmarked to supply gas-fired electricity generators.

119.    Avangrid, labelled "Firm A" in the Zaragoza-Watkins study, cancelled an average of 41,506 MMBtu of pipeline capacity in the last three hours of the day *every day* during the class period. Eversource, "Firm B," cancelled an average of 8,832 MMBtu of pipeline capacity in the last three hours of the day every day during the class period. During the winter months, Avangrid and Eversource cancelled an average of 37,903 MMBtu and 18,320 MMBtu of daily capacity, respectively.

| LDC | Schedule Change in Last 3 Hours (MMBtu) | Schedule Change (Winter Only) (MMBtu) | Generation Capacity (MW) | Unregulated Capacity (MW) | All Contracts (MMBtu) | NN from TE Contracts (MMBtu) |
|---|---|---|---|---|---|---|
| Firm A | −41,506 | −37,903 | 232 | 77 | 185,300 | 39,200 |
| Firm B | −8,832 | −18,320 | 1,177 | 0 | 632,400 | 105,100 |
| Firm C | −225 | −262 | 33 | 33 | 166,500 | 0 |
| Firm D | −4 | −10 | 0 | 0 | 32,000 | 0 |
| Firm E | 5 | 8 | 0 | 0 | 1,300 | 800 |
| Firm F | 7 | 36 | 0 | 0 | 24,500 | 0 |
| Firm G | 17 | 38 | 116 | 116 | 42,200 | 19,700 |
| Firm H | 21 | 56 | 23 | 0 | 7,600 | 5,000 |
| Firm I | 108 | 146 | 1,008 | 1,008 | 12,500 | 0 |
| Firm J | 177 | 227 | 10 | 0 | 768,900 | 167,100 |
| Firm K | 298 | 3 | 0 | 0 | 156,700 | 44,300 |

Not shown: 14 electricity generation firms and 2 industrial end users that operate nodes on Algonquin

120.    Reduced natural gas supply, caused by the Eversource's and Avangrid's last-minute downward adjustments of reservations, resulted in prices on the unregulated spot market that were, on average, 38% higher than they would otherwise have been. During the cold winter months, Eversource's and Avangrid's conduct resulted in unregulated spot-market prices that were nearly 70% higher than they otherwise would have been.

121.    These increased natural gas prices in the unregulated spot market caused retail electricity prices to be 20% higher than they would otherwise have been. Eversource's and

Avangrid's conduct caused sudden increases in wholesale electricity prices, passed on to retail consumers by LSEs throughout New England – including, for many New Englanders, LSEs that are owned and controlled by Eversource or Avangrid. And then electric bills jumped.[38] Over the course of at least three years, New Englanders overpaid for retail electricity by at least $3.6 billion.

## 2.    Eversource's and Avangrid's last-minute natural-gas-supply restrictions were unique.

122.    Eversource's and Avangrid's last-minute downward adjustment of natural gas pipeline capacity reservations was not just a function of ordinary business practices within the New England natural gas supply network. Their behavior stands in stark contrast to the behavior of similarly situated companies operating against the same business and regulatory backdrop. While many firms changed their pipeline capacity reservations, Avangrid and Eversource were clear outliers in their practice. The firm with the next highest average last-minute cancellations, designated as "Firm C" in the chart above, cancelled only 225 MMBtu per day. So Eversource cancelled nearly 40 times more capacity as Firm C, and Avangrid cancelled more than 184 times more. During the cold winter months, Avangrid and Eversource cancelled nearly 144 times and 70 times the capacity cancelled by their next closest competitor, respectively.

123.    The quantitative difference between Eversource's and Avangrid's conduct and the conduct of their competitors is statistically significant. On 351 days during the class period – nearly one third of the days – Eversource made at least one downward adjustment that was more than three standard deviations larger than the average adjustment of all other natural gas companies. On 1,031 days during the class period – nearly every day – Avangrid made at least

---

[38] Katharine Q. Seelye, *Even Before Long Winter Begins, Energy Bills Send Shivers in New England*, N.Y. TIMES, Dec. 13, 2014, https://www.nytimes.com/2014/12/14/us/even-before-long-winter-begins-energy-bills-send-shivers-in-new-england.html?_r=0.

one downward adjustment that was more than three standard deviations larger than the average adjustment of all other gas companies.

124.     Indeed, other firms that (like Eversource and Avangrid) had both a natural gas distribution business and electricity generating assets *did not* perform the same type of last-minute downward adjustments. At least one other LDC also held a large number of no-notice contracts for transmission capacity on the Algonquin Pipeline, but that company made only a small fraction of the last-minute capacity order adjustments made by Eversource and Avangrid during the class period. While Eversource's and Avangrid's last-minute order reductions averaged many *thousands* of MMBtu per affected pipeline "node" – particular geographic points where capacity orders are placed and later adjusted – the other company made average downward adjustments of only 229 MMBtu at its most-adjusted node.

125.     The difference in conduct is stark. Most companies' adjustment to their natural-gas reservations were modest, causing little to no decrease in capacity on the Algonquin Pipeline:



As demonstrated by these figures, pipeline capacity order adjustments are typically made throughout the day before natural gas is to be used – i.e., as new information about the next day's

likely gas demand becomes known. The next two figures, however, show capacity order adjustments at a single pipeline node operated by Avangrid:



And the following figures show capacity order adjustments at a node operated by Eversource:



While Eversource and Avangrid made some minor capacity reservation adjustments earlier in the day, the figures show a clear pattern of large downward adjustments at the very end of the gas day. This pattern is very different than the pattern of all other Algonquin Pipeline users shown in the first set of figures.

126.     The unique pattern of behavior demonstrated by Eversource and Avangrid is confirmed by a recent study commissioned by Eversource in response to these allegations:[39]



Figure 18. Average Winter Algonquin Deliveries to New England LDCs

Although the volumes are higher for winter days, LDC profiles similarly involve both upward and downward adjustments throughout the course of the gas day.

This figure from Eversource's study shows that, of eleven LDCs in the region, the only LDCs with significant downward order adjustments at the end of the gas day during winter are LDCs owned by Eversource (Yankee Gas and NSTAR Gas) and Avangrid (Southern Connecticut Gas and Connecticut Natural Gas).

127.     Neither Eversource nor Avangrid needed to over-reserve natural gas pipeline capacity and adjust their orders downward at the last minute. Their no-notice contracts would have allowed them to order a smaller amount of capacity one day in advance, and then gradually increase that order, if necessary, as information about the next day's projected demand evolved.

---

[39] Levitan Paper at 42.

In fact, 7 out of their 9 competitors studied (Firms E through K in the chart above in paragraph 119) did just that.

128.     Or, even if Eversource and Avangrid were worried that they would not be able to secure enough capacity without their vast over-reservations, they could have mitigated the effects of their conduct on the New England electricity market. Instead of cancelling their excess capacity at the very end of the day, they could have sold the capacity to other companies in the so-called "capacity release" market (discussed more below). This alternative would have provided both companies a way to ensure sufficient capacity for themselves, and to avoid creating a restricted natural gas supply.

129.     There was at least some economic benefit to this alternative: although regulations would have required Eversource and Avangrid to return most of the revenue made on the unregulated spot market to LDC customers, they nevertheless could have earned at least some return. But this potential benefit paled in comparison to the benefits of Eversource's and Avangrid's misbehavior.

     **3.**    **Eversource and Avangrid admit that they cancelled transmission capacity reservations at the last minute.**

130.     In direct response to the Zaragoza-Watkins study, Eversource commissioned and paid for a paper by Levitan Associates, Inc. The Levitan paper confirms many of the facts and findings in the Zaragoza-Watkins study. For example, The Levitan paper confirms that one of Eversource's LDCs, Yankee Gas, used its no-notice contract with the Algonquin pipeline to cancel reservations of pipeline capacity at the very end of the gas day, rather than releasing that capacity for other companies to secure adequate natural gas for New England.

131.     Eversource's consultant wrote that both Eversource and Avangrid had "a large amount of no-notice contracts."[40] In fact, "no-notice service [is] an integral part of Yankee's [an Eversource LDC] supply portfolio . . . ."[41] "The absence of no-notice service on [the] Tennessee [pipeline] heightens [Eversource's LDCs'] reliance on the daily swing capability embedded in the Algonquin tariff . . . ."[42]

132.     Eversource, through its consultant, admitted, that "[a] review of the data indicates that Yankee and NSTAR [Eversource's LDCs] reduced their scheduled quantities during the last three hours of the gas day . . . ."[43]

133.     Eversource, through its consultant, admitted that "Eversource's strategy for scheduling its no-notice service is to nominate flexible storage resources while targeting using approximately half of that quantity and then balance its system by adjusting the scheduled quantities, if necessary, at the end of the gas day."[44]

134.     Eversource's Levitan paper also (at least implicitly) admits that "over-scheduling" capacity would be "market manipulative."[45] Yet when the Levitan paper recounts the Zaragoza-Watkins study's statement that "large, consistently negative adjustments just before the end of the gas day are consistent with an LDC shipper that intentionally nominates capacity in excess of its predictions of its customers' daily demand," Eversource does not deny doing just

---

[40] Levitan Paper at 12.

[41] Levitan Paper at iv.

[42] *Id.* at vii.

[43] *Id.* at viii. Eversource's consultant claims that this amount is a "sliver of New England's peak demand," *id.*, but that does not differentiate between the gas that would typically be available for electricity generation, and that used to satisfy firm contracts for retail natural gas.

[44] *Id.* at 14.

[45] *Id.* at 11.

that. Instead, it takes issue with the "impli[cation] that this behavior is irresponsible," countering

that, in its view it was "operating responsibly."[46]

135.    Avangrid, too, has effectively admitted that it cancels pipeline reservations at the

last minute. In opposing the plaintiffs' original complaint, Avangrid argued that it was

"explicitly" allowed to "'decrease'" its "scheduled deliveries freely at any hour during the

day."[47]

### 4.    Eversource and Avangrid admit that restricting pipeline capacity raises electricity prices.

136.    In testimony before the U.S. Department of Energy Quadrennial Energy Review

Meeting on April 15, 2016, Camilo Serna, Vice President of Strategic Planning and Policy for

Eversource, said:

> When our pipeline system is unconstrained, New England's
> wholesale energy prices are competitive with the rest of the nation.
> However, *when there are constraints our customers pay much*
> *more*. For example, the energy market value for the winter of
> 2013-2014 was over $6.8 billion, which was up from an average of
> $2.8 billion in the prior three winters. We believe that $3 billion of
> this increase can be directly attributed to pipeline constraints. This
> occurred when 8,000 to 10,000 megawatts of our most efficient
> power plants sat idle without gas supply. This uncertainty in the
> market caused retail electric prices to increase a staggering 40-60%
> in the winter of 2015.[48]

137.    In the Levitan paper, Eversource admits that selling its capacity to another firm,

so that the other firm could sell natural gas in the unregulated spot market "could conceivably

---

[46] *Id.* at 26.

[47] Avangrid Mem. in Support of Mot. Dismiss at 2, ECF No. 25; *see also id.* at 7-8.

[48] Prepared Statement of Camilo Serna, Vice President of Strategic Planning and Policy for
Eversource Energy, delivered to U.S. Department of Energy Quadrennial Energy Review
Meeting, April 15, 2016,
https://energy.gov/sites/prod/files/2016/04/f30/Panel%201%20Remarks%20by%20Camilo%20S
erna%2C%20Vice%20President%20for%20Strategic%20Policy%20%26%20Planning%2C%20
Eversource.pdf (emphasis added).

lower electricity prices."[49] In fact, it admits that it "ha[d] a responsibility to follow good industry practice regarding the release of capacity or off-system supply of sale that is not needed to serve firm customer demand."[50]

138.     In a 2015 press release, James P. Torgerson, president and CEO of UIL Holdings Corporation – which would later merge with another company to form Avangrid – praised the company's decision to invest in a natural gas transmission pipeline project, saying the project would "bring abundant, low-cost and critically needed natural gas supplies to the heart of New England, helping alleviate infrastructure bottlenecks that have resulted in higher energy costs to residents of the New England region."[51]

139.     In these statements, Eversource and Avangrid attributed the constraints to the need for more pipeline. After all, the statements were made in support of the companies' plans to build more natural gas pipelines. Both companies failed to mention that, at the time of these statements, they were cancelling natural gas transmission orders on the Algonquin pipeline, leaving the existing pipeline running partially empty.

**5.     Eversource and Avangrid had an alternative, economically rational alternative – an option that would not have restricted supply and driven up cost.**

140.     Eversource and Avangrid did not *need* to cancel their capacity at the last minute and leave the pipeline flowing partially empty; FERC regulations gave them an alternative.

---

[49] Levitan Paper at 11. Eversource, of course, claims this would be "rolling the dice."

[50] *Id.* at 15.

[51] United Illuminating, *News Release: UIL Holdings to Invest in Regional Energy Solution*, July 24, 2015, https://www.uinet.com/wps/portal/uinet/about/news%20information/news/072415%20ned%20investment/!ut/p/a0/04_Sj9CPykssy0xPLMnMz0vMAfGjzOJ9_D3dfZ3NPR09wwJNDTxNPI0C_YOcDQ0MTPULsh0VAfenORs!/.

141.     FERC authorizes holders of firm gas transmission capacity rights, like Eversource and Avangrid, to "release" capacity to other potential buyers and sellers of gas in exchange for a monetary payment.[52] This "capacity release" mechanism is flexible: holders of no-notice contracts can make longer-term monthly or even seasonal capacity releases; or they can make shorter releases – even releasing a portion of their capacity on an "intraday basis."[53]

142.     Capacity release was first approved by FERC in 1992, as part of Order No. 636, but FERC has expanded the program over time, most importantly in Order No. 712, in 2008.

143.     The ability to "release" and resell capacity is designed to encourage the efficient use of natural gas pipeline infrastructure by transferring capacity rights from those who hold it (and do not plan to use it) to those who do not hold it (but would like to use it).[54] In short, the primary goal of the capacity-release mechanism is to "allocat[e] capacity to those that value it the most."[55] A second goal is "to ensure consumers have access to an adequate supply of gas at a reasonable price."[56]

144.     As such, capacity releases of varying duration can be sold at competitively derived prices rather than the rates established by a pipeline's tariff.[57] And, at least since 2008, there is no cap on the sales prices of short-term (less than one year) capacity releases.

145.     The pipeline facilitates the capacity release mechanism.[58] So, a capacity seller or its agent releases capacity directly to the pipeline, which then contracts with a buyer or seller of

---

[52] *See generally* FERC Order No. 712 (2008).

[53] Levitan Paper at 24.

[54] FERC Order No. 712 at 2-3.

[55] *Id.* at 21-22.

[56] *Id.* at 2-3.

[57] *Id.* at 21-22.

[58] *Id.* at 5-6.

gas to use the released capacity. The capacity seller is then paid for the capacity released to the pipeline.

146.     There is a difference between the release of capacity and a downward adjustment of a capacity reservation under a no-notice contract. Merely shrinking a reservation does not make that now-empty capacity available to be filled by others. Instead, the capacity must be affirmatively released by the contract-holder before the pipeline may resell that capacity. This is because the no-notice contract holder may choose to increase its order again in the same gas day. The potential for upward reservation adjustments requires the pipeline to hold onto the contract holder's full capacity rights even if less than that full capacity is nominated in any given order – unless the contract holder formally releases capacity.

147.     So Eversource and Avangrid could have – but did not – release their excess capacity in return for a payment from another gas seller or purchaser to use that capacity. Had either company done so, other companies – such as generators looking to jump into the real-time auction at the last minute – may have purchased that capacity.

148.     As Eversource itself admits, "[t]he process of releasing and re-assigning capacity helps to ensure that the available capacity is allocated according to the highest economic use."[59] But instead, Eversource and Avangrid just hung onto their unused capacity, leaving the pipeline partially empty every day, and depriving New England of natural gas supplies that could have been used to generate electricity for a lower price.

**E.     Eversource and Avangrid stood to gain from their manipulation of the New England electricity market.**

149.     While Eversource and Avangrid do not dispute that they took the actions described above, they have publicly asserted they did so to ensure an adequate supply of natural

---

[59] Levitan Paper at 23.

gas to their retail gas customers.[60] Setting aside that their behavior was unique compared to other LDCs, however, Eversource and Avangrid had powerful economic incentives to manipulate market prices.

**1. Eversource's and Avangrid's conduct enabled them to make more money on their non-natural-gas generated electricity.**

150.    Because of the structure of the New England electricity market, Eversource's and Avangrid's conduct raised the price of not *only* natural-gas generated electricity, but *all* electricity. In other words, Eversource and Avangrid had the ability to, and did, reap substantial benefits for themselves by artificially raising and maintaining the energy price paid to electricity generators in the ISO-NE market.

151.    Only LDCs can have no-notice contracts allowing the penalty-free downward adjustment of capacity orders. And among New England energy companies engaged in both natural gas distribution and electricity generation and supply, Eversource and Avangrid are two of the top three electricity generators.

152.    By using their natural gas subsidiaries to restrict natural gas supply and increase the unregulated spot market price for natural gas, or to cut off available natural gas supplies to competing gas-fired power plants altogether, Eversource and Avangrid could, and did, artificially increase demand for non-natural gas-fired power plants *and* increase the price paid to those generating resources.

---

[60] *See, e.g.*, Gavin Bade, *Eversource, Avangrid artificially constrained gas pipeline capacity for years, report argues*, UTILITY DIVE, Oct. 11, 2017, https://www.utilitydive.com/news/eversource-avangrid-artificially-constrained-gas-pipeline-capacity-for-yea/507018/; Mary C. Serreze, *Study claims Eversource and Avangrid manipulated natural gas pipeline capacity*, costing New England consumers $3.6 billion, Masslive.com, Oct. 12, 2017, http://www.masslive.com/news/index.ssf/2017/10/mit_study_accuses_eversource_a.html.

153.     By artificially depressing supply, Eversource and Avangrid may well have reduced the number of natural-gas-fired power plants that could even secure enough gas to compete in the region's wholesale electricity auctions. For those gas plants that still managed to compete, the defendants raised the price at which those plants bid their electric supply into the auctions. This then raised the marginal cost of electricity and the clearing price for generating resources in the ISO-NE supply stack and increased the price of energy paid to all generating resources in the stack – including Eversource's and Avangrid's own wind, solar, and hydroelectric generating resources.

154.     When the cost of one electricity-generation resource, like natural gas, is higher, it is more likely that bids from other types of generating resources will be accepted in ISO-NE's day ahead and real-time wholesale electricity auctions.

155.     Even so, natural-gas-fired generators still set the energy price in 3 out of every 4 auctions. And, because all generating resources in ISO-NE's supply stack are paid the same energy price on a given day, renewable generating resources are more profitable when the day's clearing price is higher due to higher natural gas prices. As a result, higher prices in the unregulated natural gas spot market caused by Eversource's and Avangrid's constraint of natural gas supplies resulted in more usage and higher profits for their electricity-generating resources.

156.     Eversource also owns (or owned during the class period) non-renewable electricity-generating resources fueled by coal, oil, and biomass. All three resources burn fuel with a variable cost, much like natural gas. When the unregulated natural gas spot market price goes up or supply shrinks, other electricity-generating resources become more competitive and more likely to be accepted into the supply stack. Alternatively, coal, oil, and biomass generators may be called on to generate electricity simply because regional natural gas power plants cannot

access sufficient gas supply due to pipeline capacity constraints. As ISO-NE has explained, high

natural gas prices can cause natural-gas-fired power plants not to operate, which then forces the

ISO "to dispatch more expensive oil- and coal-fired plants," which results "in significant 'uplift'

costs and reliability concerns."[61] In the Levitan paper, Eversource recently admitted as much:

> [Eversource's] thermal fleet operates "more" merely because there
> are region wide deliverability constraints on the pipelines serving
> New England, thereby limiting or precluding daily deliveries to
> non-firm shippers throughout the region during both cold snaps
> and often under more temperate conditions as well.[62]

157.    When New England electricity prices spiked during the infamous polar vortex,

oil-fired power plants like Maine's Wyman Station, in which Eversource is a minority owner,

accounted for more than 5% of generation in the region during the winter of 2013-2014, and

produced more than eight times the amount of generation those assets produced in the winter of

2012-2013.[63] Increased generation resulted in increased revenue for Eversource.

### 2.    Eversource's and Avangrid's conduct increased the value of their assets – increasing their rate of return on those assets.

158.    Eversource's and Avangrid's conduct also increased the value of the companies'

existing non-natural-gas-fired electricity-generating assets: a power plant that is called on often

to produce electricity is more valuable than one that usually sits dormant. Increased generation

by Eversource's non-gas power plants, at greater economic margins, increased those assets'

value. More broadly, increased prices in the New England electricity market, and increased

---

[61] ISO-NE, *2014 Regional Electricity Outlook* (January 2014), https://www.iso-ne.com/static-assets/documents/aboutiso/fin/annl_reports/2000/2014_reo.pdf.

[62] Levitan Paper at 4-5.

[63] John-Laurent Tronche, *US New England Oil-Fired Generation Averaging 16.2 GWh/day in 2014: ISO-NE*, PLATTS, March 26, 2014, https://www.platts.com/latest-news/electric-power/houston/us-new-england-oil-fired-generation-averaging-21386021.

competitiveness of both defendants' non-gas electric generating assets, increases the value of all such assets in the market.

159.    Eversource, for example, seems to have benefitted handsomely when it sold most of its electricity-generating assets in New Hampshire. In 2014, its fossil-fuel and hydropower assets were valued at $225 million.[64] In 2015, Eversource reached a settlement with the state of New Hampshire to sell off its electricity-generating assets in the state to comply with a new state law. But in December 2017, after a three-round auction conducted by J.P Morgan, Eversource was paid $341 million for those assets.[65]

160.    This increase in the value of electricity-generating assets throughout New England created an economic and regulatory environment that encouraged investment in new generating assets. This is important because it is the capital investments of regulated utilities like Eversource's and Avangrid's LSEs that generates the most profit for such entities. Capital investments in assets like power plants or wind farms, whether through purchase, new construction, or upgrades, increase the "rate base" of utilities. Because utilities earn a predetermined "rate of return" on their rate base, increased investments in new or upgraded electric generating assets results in increased profits.

---

[64] LaCapra Assocs., Inc., *PSNH Generation Asset and PPA Valuation Report* at 6 (Mar. 31, 2014), *available at* http://www.puc.state.nh.us/Electric/PUBLIC%20VERSION%20PSNH%20Asset%20Valuation%20Report_FINAL.pdf (prepared for N.H. Public Utilities Commission).

[65] *Eversource completes the sale of its New Hampshire power assets*, Enerdata (Jan. 12, 2018), https://www.enerdata.net/publications/daily-energy-news/eversource-completes-sale-its-new-hampshire-power-assets-us.html (reporting a $258 million sale of fossil-fuel generators, and $83 million for hydropower assets).

3.    **Eversource's and Avangrid's conduct gave them the opportunity to expand their capital investments, yet another lucrative revenue source for them, at consumers' expense.**

161.    Not satisfied solely with increasing their power production profits, or with creating an environment that encouraged the development of new generating assets, Eversource and Avangrid have also exploited a condition of their own making – constrained natural gas supply and high electricity prices – to advocate for new construction of other multi-billion-dollar energy infrastructure, including both natural gas pipelines and electricity transmission lines.

162.    Eversource and Avangrid, like other utilities in New England, have for years blamed high electricity prices on insufficient natural gas pipeline infrastructure. They have argued that additional pipelines are needed to address the capacity shortage.[66] And they have argued for additional electricity infrastructure, such as electricity transmission lines to carry power generated elsewhere into the New England electricity market. For example, Eversource and Avangrid have been competing for a contract to construct billion-dollar electric transmission lines to carry hydroelectric power from Quebec into New England – a project that both companies tout as a solution for natural-gas capacity constraints and the effect of such constraints on prices within the New England electricity market. Eversource, Avangrid, and other utilities have worked to convince lawmakers and regulators that New England residents – rather than the utilities – should foot the bill for this type of new infrastructure.[67] That

---

[66] Access Northeast, *Our Solution: A Solution is Needed*, http://www.accessnortheastenergy.com/Our-Solution/.

[67] *See, e.g.*, Testimony of James G. Daly before the N.H. Pub. Util. Commission (Feb. 18, 2016), https://www.puc.nh.gov/Regulatory/Docketbk/2016/16-241/INITIAL%20FILING%20-%20PETITION/16-241_2016-02-18_PSNH_DBA_EVERSOURCE_DTESTIMONY_J_DALY.PDF (advocating for the construction of a new natural gas pipeline, claiming that "Eversource customers will be the direct beneficiaries of the incremental release of gas-transmission capacity to the market, with improved electric reliability and price relief expected to result from the procurement").

infrastructure has generated or will generate further profit for Eversource and Avangrid at the further expense of New Englanders.

163.    As another example, Eversource has proposed to build the Access Northeast Pipeline to address New Englanders' "serious and well-documented electric reliability and price challenges."[68] Industry experts have explained that this new infrastructure will quickly become obsolete – even before it has paid for itself. But, within three years of the ANE pipeline going operational in 2020, New England's need for natural gas will plummet because "[e]xisting laws – renewable portfolio standards, energy efficiency resource standards, long-term requirements for additional hydropower and wind power, and carbon dioxide ($CO_2$) emissions caps – require a significant reduction in natural gas-fired generation throughout New England."[69] By 2023, the proportion of electricity coming from natural-gas-fired power plants will be an estimated 27% less than today; by 2030, that percentage will rise to 41%.[70] Yet, that pipeline would still cost roughly $6.6 billion over 20 years. Eversource proposes to foist $227 million of that cost on New England electricity customers, and to saddle Massachusetts and Connecticut residents with an additional $185 million and $85 million, respectively.

**F.    Eversource's and Avangrid's conduct injured all New England electricity customers.**

164.    The unique structure of the New England regional electricity market allowed defendants to unilaterally raise the price of electricity paid not just to their own generating resources but to all generating resources in the region. This is not a case where one party's

---

[68] Access Northeast, *New England's Energy Challenges*, http://www.accessnortheastenergy.com/.

[69] Pat Knight et al., *New England's Shrinking Need for Natural Gas: An analysis of policy impacts on natural gas use in New England's electric sector* at iii-iv, Synapse Energy Economics, Inc. (Feb. 7, 2017).

[70] *Id.*

market manipulation causes faultless competitors to raise their prices in pursuit of market parity. In this case, Eversource's and Avangrid's conduct directly and automatically affected the prices across the entire market.

165.     As described above, the New England electricity market sets a single market price for all wholesale electricity sold in a given auction. That price is the marginal cost – or energy price – determined by the highest accepted bid in the auction. By artificially restricting gas supplies, Eversource and Avangrid raised natural gas prices on the unregulated spot market, which raised the bids in the electricity auctions. This raised the price of the highest accepted bid, and, therefore, the energy price paid for all wholesale electricity. And since wholesale electricity costs are passed through to New Englanders, Eversource's and Avangrid's conduct automatically raised the retail prices of electricity throughout New England.

166.     Eversource and Avangrid found a way to manipulate the market – raising prices, increasing their revenue from their non-natural-gas-generated electricity assets, and enhancing their chances at capital expansions – despite the fact that some aspects of the energy supply chain are regulated. As described above, FERC regulates (1) the prices charged for the transmission of natural gas along interstate pipelines; and (2) the sale of wholesale (but not retail) electricity. The states regulate retail natural gas sales. So Eversource and Avangrid did not manipulate those aspects of the supply chain. Instead, they found the one unregulated loophole in the entire system: they manipulated the cost of natural gas itself – a link in the chain that has been deregulated by federal law since the early 1990s – which is bought and sold on the unregulated spot market.

167.     The price of natural gas is one variable in the overall formula used to set the price of wholesale electricity. But the manipulation of just that one critical market input can

greatly affect prices throughout the New England electricity market. In the New England regional electricity market, wholesale electricity prices for the entire market are established by ISO-NE after an auction. But the rates established in this process can be manipulated by those with sufficient market power to do so.

168.     Eversource's and Avangrid's conduct forced natural-gas-fired power plant operators to behave differently than they otherwise would have in a competitive market.[71]

169.     Eversource's and Avangrid's conduct did not directly touch any aspect of the New England energy supply chain that ISO-NE oversaw. They did not manipulate ISO-NE's procedures or formula for calculating, establishing, or approving a rate. Instead, they manipulated a single input – skewing the bids even before they were cast. As far as ISO-NE knew, wholesale electricity auctions worked as intended. In its oversight of the electricity market, therefore, ISO-NE did not consider or approve Eversource's and Avangrid's conduct in the natural gas supply network. And the harm done to consumers by the companies' misconduct can be remedied without changing either ISO-NE's methods of regulating the wholesale electricity market or FERC's regulations governing natural gas transmission.

170.     The market formulas may have worked as intended, but, as a result of Eversource's and Avangrid's manipulation of critical, unregulated variable in that formula, New Englanders overpaid for their retail electricity needs.

171.     Never was the overpayment more apparent, or more heartless, than during especially cold weather in New England from 2013 to 2015. Because natural gas is used directly for home heating as well as for electricity generation, the polar vortex of 2013 and 2014 caused

---

[71] Natural gas power plant operators that simply responded price signals in the unregulated spot market for natural gas when submitting bids for generation into the electricity market did nothing wrong.

substantial spikes in electricity bills for New Englanders.[72] In January 2014, daily natural gas spot market prices along the Algonquin Pipeline were 1100% higher than the average price under unconstrained conditions.[73] In turn, New England wholesale electricity cost $5.05 billion in the three-month period from December 2013 through February 2014 – nearly the same cost for wholesale electricity incurred by the region during *all* of 2012. Eversource and Avangrid have openly acknowledged the role of restricted natural gas supply in creating this problem, but they have failed to admit their own role in creating that restriction.[74]

172.   The winter of 2014-2015 was largely the same, with retail electric customers enduring enormous increases in their regular electricity bills. Some consumers spent money on energy upgrades to their homes as a way to mitigate high electricity bills, yet continued to see electric bills climb.[75] All the while, Eversource and Avangrid were artificially constraining

---

[72] Clifford Krauss, *As Winter Takes Hold, Plunging Temperatures Test Utilities*, N.Y. TIMES, Jan. 8, 2014, https://www.nytimes.com/2014/01/09/business/energy-environment/as-winter-takes-hold-plunging-temperatures-test-utilities.html.

[73] United States Energy Information Agency, *Northeast and Mid-Atlantic power prices react to winter freeze and natural gas constraints*, January 21, 2014, https://www.eia.gov/todayinenergy/detail.php?id=14671.

[74] *See* Prepared Statement of Camilo Serna, V.P. of Strategic Planning & Policy for Eversource, delivered to U.S. Dep't Energy Quadrennial Energy Review Mt'g, April 15, 2016, https://energy.gov/sites/prod/files/2016/04/f30/Panel%201%20Remarks%20by%20Camilo%20S erna%2C%20Vice%20President%20for%20Strategic%20Policy%20%26%20Planning%2C%20 Eversource.pdf; United Illuminating, *News Release: UIL Holdings to Invest in Regional Energy Solution*, July 24, 2015, https://www.uinet.com/wps/portal/uinet/about/news%20information/ news/072415%20ned%20investment/!ut/p/a0/04_Sj9CPykssy0xPLMnMz0vMAfGjzOJ9_D3dfZ 3NPR09wwJNDTxNPI0C_YOcDQ0MTPULsh0VAfenORs!/.

[75] Katharine Q. Seelye, *Even Before Long Winter Begins, Energy Bills Send Shivers in New England*, N.Y. TIMES, Dec. 13, 2014, https://www.nytimes.com/2014/12/14/us/even-before-long-winter-begins-energy-bills-send-shivers-in-new-england.html?_r=0.

natural gas supply in New England. Eversource, for example, collected $7.9 billion in revenue during 2015, with nearly $1.8 billion in profit.[76]

## G.    Eversource's and Avangrid's misconduct was exposed for the first time in an August 2017 academic study, resulting in significant fallout.

173.    In August 2017, Zaragoza-Watkins and colleagues published a study laying bare Eversource's and Avangrid's misconduct.[77] Three of the authors were academics; one worked for the Environmental Defense Fund (EDF). They undertook a literature review, recounted the structure of the "three interconnected markets" – the market for natural gas transportation, the wholesale natural gas market, and the wholesale electricity market – the structure of which enabled the defendants' schemes. They studied millions of data points across all 117 "nodes" in the New England natural gas supply network, applying a regression analysis – a commonly-used and academically-accepted statistical model that enables one to understand which of many independent variables accounts for an observed phenomenon (i.e., which one many potential factors caused a particular outcome).

174.    The authors "identif[ied] a major inefficiency spanning the natural gas transportation and wholesale electricity markets," "quantif[ied] the extent to which two firms" (i.e., Eversource and Avangrid) "withheld pipeline capacity," and "detail[ed] the institutional arrangements that allowed these firms to execute their withholding strategy." And they considered and ruled out alternative reasons why Eversource and Avangrid (like risk aversion) may have engaged in this conduct.[78]

---

[76] Eversource Energy, 2015 Annual Report, 1, https://www.eversource.com/content/docs/default-source/Investors/2015-annual-report.pdf.

[77] Levi Marks, Charles F. Mason, Kristina Mohlin & Matthew Zaragoza-Watkins, *Vertical Market Power in Interconnected Natural Gas and Electricity Markets* (October 11, 2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf.

[78] *Id.* at 46-47.

1.      **States have begun to investigate.**

175.      On the heels of these revelations, Eversource's and Avangrid's alleged manipulation of natural gas and electricity prices in New England became the subject of numerous investigations, reviews or calls for additional regulatory investigations.

176.      The Connecticut Public Utilities Regulatory Authority (PURA) and the Office of Consumer Counsel (OCC, Connecticut's statutory advocate for utility customers) opened an investigation (Docket No. 17-10-31) into allegations that Eversource and Avangrid abused their market power by engaging in gas scheduling practices that deliberately manipulated the market to create shortage conditions that raised energy prices.

177.      The Massachusetts Attorney General, Maura Healey, is reviewing alleged manipulation of energy prices in New England by Eversource and Avangrid.

2.      **FERC claims to have investigated.**

178.      Others have called on FERC to perform its own assessment of these allegations. Connecticut Senator Richard Blumenthal has called on FERC to launch an investigation, for example, as has the New Hampshire Public Utilities Commission Office of Consumer Advocate.

179.      FERC – the entity with jurisdiction over natural gas *transmission* (not the commodity sale) and over *wholesale* electricity sales (not retail) – issued a press release on February 27, 2018. The three-paragraph press release, entitled "FERC Staff Inquiry Finds *No Withholding* of Pipeline capacity in New England Markets,"[79] claimed that a staff review "found

---

[79] Press Release, FERC, FERC Staff Inquiry Finds No Withholding of Pipeline Capacity in New England Markets (Feb. 27, 2018), https://www.ferc.gov/media/news-releases/2018/2018-1/02-27-18.asp#.Wqk_SejwaUl (emphasis added).

*no evidence of capacity withholding*"[80] (even though both Eversource and Avangrid admit that they withhold pipeline capacity).

180.    Upon information and belief, FERC did not institute a formal or informal rulemaking or adjudicatory proceeding to look into Eversource's or Avangrid's conduct. There is no regulatory docket reflecting a FERC inquiry; and there was no public notice nor any request for public comment. FERC does not appear to have published any final decision on the matter: it does not set forth the facts and materials it considered, nor its reasoning.

### 3.    Eversource tries public-relations damage control.

#### a.    Eversource threatens to sue EDF.

181.    On December 11, 2017, Eversource sent a "Demand to Cease and Desist" letter, calling the academic study "defamatory" and threatening to sue. Eversource demanded that the authors not only stop publishing the study, but also that they "direct all websites or other media outlets . . . to do the same." Eversource insisted that the report be "remove[d] . . . from the internet [sic]."[81]

#### b.    Eversource pays for a consultant to identify factual disputes with the Zaragoza-Watkins study.

182.    Then, on February 27, 2018 – within minutes of FERC's press release – Eversource released the rebuttal drafted by Levitan & Associates entitled "Critical Assessment of EDF's Workpaper on 'Vertical Market Power in Interconnected Natural Gas Markets.'" Eversource "commissioned" and "funded in full" the document.[82]

---

[80] *Id.* (emphasis added).

[81] Letter from Gregory B. Butler, Exec. V.P. & General Counsel, Eversource Energy, to Fred Krup, President EDF and N. Jonathan Peress, Senior Dir., Energy Market Policy, EDF (Dec. 11, 2017), https://www.eversource.com/content/docs/default-source/pdfs/edf-cease-desist.pdf.

[82] Levitan Paper at "Disclosure."

183.     Eversource's paper focused on raising factual disagreements over the

assumptions used by the Zaragoza-Watkins study. For example:

a.     The Zaragoza-Watkins study discussed Eversource's and Avangrid's pipeline constriction in terms of the absolute volume of capacity restriction, Eversource expressed it in terms of percentages of total no-notice capacity used.[83]

b.     The Zaragoza-Watkins study explained that Eversource's and Avangrid's conduct drove up natural gas prices because they cancelled their reservations, rather than selling excess capacity in the spot-market. Eversource, on the other hand, focused on the fact that the *Algonquin Pipeline itself* could not unilaterally give that capacity to someone else.[84]

c.     Eversource disputed the weather on the days it made the largest negative reservation adjustments: on "the coldest" days, or on "less-cold days."[85]

d.     The Zaragoza-Watkins study focused on the percent reduction in natural gas available in the spot-market – which is what impacts the price of wholesale electricity. Eversource, by contrast, discussed the percent reduction in *all* natural gas in the pipeline – even though the majority of that natural gas was not destined for, and did not affect, wholesale electricity generation.[86]

e.     Zaragoza-Watkins identified Eversource and Avangrid as clear outliers in terms of the volumes of capacity reservations cancelled each day. Eversource emphasized that "other LDCs" were also "relying on reserve no-notice capacity to manage demand uncertainty," even though it would

---

[83] *See id.* at 45 (Table 4).

[84] *See, e.g.*, *id.* at ii ("EDF failed to recognize that Algonquin is prohibited from releasing unscheduled no-notice service entitlements to third parties . . . ."); *id.* at 4 ("[O]perational constraints on Algonquin would almost always preclude the scheduling of any released capacity during the heating season to direct-connected generators on Algonquin.").

[85] *Id.* at iv.

[86] *Id.* at i (claiming Eversource's "reductions in scheduled quantities during the last three hours of the Gas Day . . . represented a sliver of New England's peak demand"); *id.* at viii (same, calling it "inconceivable" that an "infinitesimal portion of average demand could itself explain a significant fraction of the alleged $3.6 billion in alleged increased wholesale energy costs over the three-year period).

later admit that only Avangrid and Eversource had persistent, significant cancellations.[87]

184.    Despite strong language criticizing the Zaragoza-Watkins study, Eversource's consultant wrote that it "has not attempted to counter or redress" what it called the Zaragoza-Watkins study's "mistakes related to the authors' vertical market power conceptual framework and statistical analysis."[88] In fact, it admitted, the Zaragoza-Watkins study's analysis was not even necessarily improper:

> The methods [Zaragoza-Watkins] used to simulate the changes in gas and electric energy prices are not part of standard industry practice in the power industry. *Deviations from standard practice sometimes make sense*, but must be explained. [Zaragoza-Watkins] did not do this. Notwithstanding the lack of any reason to analyze the impact on energy prices of a change in gas prices in this analysis, it would have been far *preferable* to have used a more complete econometric model of gas-price formation . . . . Since [Zaragoza-Watkins] employed unproven techniques, it would have been far *preferable* if [Zaragoza-Watkins] had made its analysis transparent . . . .[89]

185.    In other words, Eversource's consultant did not conclude that the Zaragoza-Watkins analysis was improper – just that it was different, and that more information would have been "preferable." But, importantly, it admitted it did not "perform[] an alternative analysis."[90]

### c.    Eversource undermines the FERC press release by admitting to decreasing transmission capacity – and implicating Avangrid, too.

186.    Despite being released on the same day, Eversource's commissioned paper undercut the sole factual assertion in the FERC press release: that Eversource and Avangrid did

---

[87] *Id.* at ii ("EDF failed to recognize, while raising the scheduling practices of other LDCs in New England with no generation portfolio, that these other LDCs are relying on reserved no-notice capacity to manage demand uncertainty, *with the same effect*.").

[88] *Id.* at 6.

[89] *Id.* at viii (emphasis added).

[90] *Id.* at 6.

not withhold capacity. Eversource's paper *admitted* it cancelled capacity in the last three hours of

the day. Eversource admitted that its Yankee Gas LDC cancelled, on average, 7.1% of its daily

reservation, and its NSTAR LDC cancelled 1.7% if its daily reservation:

**Table 2. Average Schedule Change during Last Three Hours of the Gas Day**

| LDC | Schedule Change (MDth/d) | Schedule Change % of End-of-Day Volume |
|---|---|---|
| Bay State Gas | 0.29 | 0.4% |
| Boston Gas | 0.13 | 0.1% |
| City of Norwich | 0.02 | 0.7% |
| Colonial Gas | 0.01 | 0.0% |
| Connecticut Natural Gas | -19.51 | -42.0% |
| Middleborough G&E | 0.01 | 0.2% |
| Narragansett Electric | 0.01 | 0.0% |
| New England Natural Gas | 0.02 | 0.1% |
| NSTAR Gas | -2.26 | -1.7% |
| Southern Connecticut Gas | -22.35 | -30.8% |
| Yankee Gas | -6.82 | -7.1% |

187.     The table also confirmed the Zaragoza-Watkins study's conclusions about

Avangrid's conduct: it resulted in substantial reductions in natural gas volumes. On average,

Avangrid's Connecticut Natural Gas LDC cancelled 42% of its daily reservations; and

Avangrid's Southern Connecticut Gas LDC cancelled an average of 30.8% of its daily

reservations.[91]

188.     The same disparity existed in the winter months, where Eversource's NSTAR

LDC cancelled, on average, 2.4% of its daily reservation; Eversource's Yankee Gas cancelled

nearly a tenth of its reserved volume every day; Avangrid's Connecticut Natural Gas LDC

cancelled 34.7% every day; and Avangrid's Southern Connecticut Gas LDC cancelled 26.8%.[92]

---

[91] *Id.* at 41.

[92] *Id.* at 43.

**Table 3. Average Winter Schedule Change during Last Three Hours of the Gas Day**

| LDC | Schedule Change (MDth/d) | Schedule Change % of End-of-Day Volume |
|---|---|---|
| Bay State Gas | 0.03 | 0.0% |
| Boston Gas | 0.09 | 0.0% |
| City of Norwich | 0.06 | 0.9% |
| Colonial Gas | 0.01 | 0.0% |
| Connecticut Natural Gas | -17.43 | -34.7% |
| Middleborough G&E | 0.01 | 0.2% |
| New England Natural Gas | 0.04 | 0.0% |
| Narragansett Electric | 0.04 | 0.1% |
| NSTAR Gas | -4.77 | -2.4% |
| Southern Connecticut Gas | -20.54 | -26.8% |
| Yankee Gas | -13.56 | -9.9% |

189.    Eversource states that these charts "reveal[] that most utilities do in fact make . . . scheduled adjustments to varying degrees, in both directions." But, according to Eversource's own consultant, *none* of its other competitors consistently cancelled large portions of natural gas reservations at the very end of the gas day – in fact, many of them modestly increased their requests as Eversource's and Avangrid's fell. This is true in both the general trends and the winter-only trends.

190.    Rather than disproving (or even denying) the conduct at the core of the Zaragoza-Watkins' study and this complaint, the Levitan paper just theorized alternative factual explanations for the behavior – principally, the weather.[93] Eversource's Levitan paper even went so far as to imply that the market manipulation identified in the Zaragoza-Watkins study was the regulators' fault.[94]

---

[93] *Id.* at ii-v, 3, 6-7, 9, 10-11, 14, 16-17, 18-21, 22-23, 26, 31, 32-33, 51-68.

[94] *Id.* at 8 ("The record shows PURA's approval of [Eversource's] entitlements. It would not reflect well on PURA's and OCC's oversight roles if this alleged behavior had been overlooked as both PURA Staff and the OCC are authorized to leave no stone unturned when it comes to responsible management . . . .").

4.      **Zaragoza-Watkins et al. stand by their analysis, despite the factual disputes raised by Eversource.**

191.    Despite the attack from Eversource, EDF has stood by the "rigorous analysis by academic researchers from three top universities" that showed that "the scheduling decisions by these two companies had a multi-billion-dollar side-effect on the New England electricity user."[95]

## VI.    TOLLING OF STATUTE OF LIMITATIONS

192.    The plaintiffs and members of the classes they represent had no way of knowing that their electricity bills were exorbitantly high during the class period as a result of the defendants' conduct. It took sophisticated academic research involving millions of data points and complicated modeling to discover Eversource's and Avangrid's misconduct and its impacts on New Englanders. Within the time period of any applicable statutes of limitation, the plaintiffs and members of the classes they represent could not have discovered through the exercise of reasonable diligence that Eversource and Avangrid were engaged in the unlawful and unfair conduct alleged in this complaint.

193.    Nor would the plaintiffs have had any reason to suspect wrongdoing by Eversource and Avangrid. The defendants attempted to conceal their wrongdoing by repeatedly blaming electricity price spikes during the class period on insufficient natural gas pipeline infrastructure rather than on artificial restriction of existing pipeline capacity. Indeed, the companies used the public narrative of insufficient infrastructure to justify investment in new pipeline construction projects during the class period – projects that saddled, or may yet saddle, even more costs onto New Englanders, including the plaintiffs and the class they represent. By

---

[95] Andy Metzger, *Federal agency rebuts environmentalists' claim about gas pipeline usage*, TELEGRAM.COM, Feb. 28, 2018, http://www.telegram.com/news/20180228/federal-agency-rebuts-environmentalists-claims-about-gas-pipeline-usage.

blaming natural gas pipeline capacity shortages and electricity price increases on a lack of

sufficient infrastructure, Eversource and Avangrid concealed a substantial reason for electricity

price spikes during the class period; namely, their own abuse of market power in artificially

restricting the natural gas transmission capacity of existing pipeline infrastructure.

## VII.   CLASS ACTION ALLEGATIONS

194.    The plaintiffs bring state and federal law claims in this action on behalf of

themselves and similarly situated classes of persons pursuant to Rule 23 of the Federal Rules of

Civil Procedure. Excluded from all classes defined below are defendants; the officers, directors

or employees of any defendant; any entity in which any defendant has a controlling interest; and

any affiliate, legal representative, heir, or assign of any defendant. Also excluded are any federal

or state governmental entities, any judicial officer presiding over this action and the members of

his/her immediate family and judicial staff, and any juror assigned to this action.

**A.     Eversource State Law Classes – Asserting State Law Claims Against Eversource.**

195.    The plaintiffs bring claims for damages and other relief under Massachusetts law

against Eversource, on behalf of themselves and a class of similarly situated electricity

consumers throughout New England (the "Unified State Law Class"). The Unified State Law

Class is defined as follows: all consumers who purchased electricity during the class period, for

their own use and not for resale, in the six-state ISO-NE market territory of Connecticut, Maine,

Massachusetts, New Hampshire, Rhode Island, and Vermont.

196.    In the event that Massachusetts law is not applied to the state-law claims of all

members of the Unified State Law Class, regardless of where they reside, the plaintiffs

alternatively bring state-law claims against Eversource on behalf of themselves and state-specific

subclasses (collectively, the "Separate State Law Classes"), under the relevant laws of

Connecticut, Maine, Massachusetts, New Hampshire, and Vermont. The Separate State Law

Classes are defined as follows:

    a.    *Connecticut State Law Class*: all consumers who purchased electricity in Connecticut, for their own use and not for resale, during the class period.

    b.    *Maine State Law Class*: all consumers who purchased electricity in the ISO-NE territory of Maine, for their own use and not for resale, during the class period.

    c.    *Massachusetts State Law Class*: all consumers who purchased electricity in Massachusetts, for their own use and not for resale, during the class period.

    d.    *New Hampshire State Law Class*: all consumers who purchased electricity in New Hampshire, for their own use and not for resale, during the class period.

    e.    *Vermont State Law Class*: all consumers who purchased electricity in Vermont, for their own use and not for resale, during the class period.

197.    The persons in each of the Unified State Law Class and the Separate State Law

Classes (collectively, the "Eversource State Law Classes") are so numerous that individual

joinder of all members is impracticable under the circumstances of this case. Although the

precise number of such persons is unknown, the exact sizes of the Eversource State Law Classes

are easily ascertainable, as each class member can be identified by using readily obtainable

records, including publicly available records and records in the possession of the defendants

and/or their subsidiaries or affiliates. Through their counsel, the plaintiffs are informed and

believe that there are approximately seven million members of the Unified State Law Class and,

collectively, well over six million members of the Separate State Law Classes.

198.    The plaintiffs' state-law claims against Eversource are typical of the claims of

the Eversource State Law Classes in that the plaintiffs purchased electricity in the ISO-NE

territory of New England, for their own use and not for resale, during the class period. All

members of the Eversource State Law Classes were damaged by the same wrongful conduct of

Eversource, and the relief sought is common to all members of the Eversource State Law

Classes.

199.    There are common questions of law and fact specific to the Eversource State

Law Classes that predominate over any questions affecting individual members, including

whether, during the class period:

    a.    Eversource engaged in unfair and anticompetitive conduct in the New
England electricity market by restricting natural gas transmission capacity
along a key regional pipeline;

    b.    Eversource engaged in unfair and anticompetitive conduct in the New
England electricity market by restricting natural gas supplies available for
sale on the spot market for natural gas, and therefore increased the spot
market price of natural gas available to electricity generators in the region;

    c.    Eversource's conduct in the New England electricity market covertly
interfered with natural competitive forces within that market, causing
operators of natural gas-fired power plants to withhold otherwise
economic bids or to bid generation into the ISO-NE wholesale market at
artificially high prices;

    d.    Eversource's conduct in the New England electricity market, and covert
interference with otherwise competitive forces within that market, caused
artificially inflated wholesale and retail electricity prices throughout the
regional electricity market during the class period;

    e.    Eversource's conduct injured the plaintiffs and all members of the
Eversource State Law Classes, and, if so, the appropriate class-wide
measure of damages for the plaintiffs and all members of the Eversource
State Law Classes;

    f.    The plaintiffs and all other members of the Eversource State Law Classes
are entitled to, among other things, injunctive relief, and if so, the nature
and extent of such injunctive relief.

200.    These and other questions of law and fact are common to the Eversource State

Law Classes, and predominate over any questions affecting only individual class members.

201.    The plaintiffs' claims are typical of the claims of members of the Eversource

State Law Classes as they arise out of the same course of conduct and the same legal theories as

the claims of all members of the Eversource State Law Classes, and the plaintiffs challenge the practices and course of conduct engaged in by Eversource with respect to the Eversource State Law Classes as a whole.

202.     The plaintiffs will fairly and adequately protect the interests of the Eversource State Law Classes. The plaintiffs have retained class counsel who are able and experienced class-action litigators.

203.     Resolution of the plaintiff's state-law claims against Eversource on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Eversource State Law Classes can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Eversource. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Eversource and substantially impede or impair the ability of members of the Eversource State Law Classes to pursue their claims. A class action also makes sense because Eversource's conduct, upon information and belief, including publicly-available data, is generally applicable to millions of individuals, thereby making injunctive relief appropriate with respect to the Unified State Law Class as a whole or, alternatively, to one or more of the Separate State Law Classes.

**B.     Avangrid State Law Classes – Asserting State Law Claims Against Avangrid.**

204.     Plaintiffs bring claims for damages and other relief against Avangrid, on behalf of themselves and members of the Separate State Law Classes under the laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont. The Separate State Law Classes, as previously defined in Paragraph 196, above, are as follows:

     a.     *Connecticut State Law Class*: all consumers who purchased electricity in Connecticut, for their own use and not for resale, during the class period.

     b.     *Maine State Law Class*: all consumers who purchased electricity in the ISO-NE territory of Maine, for their own use and not for resale, during the class period.

     c.     *Massachusetts State Law Class*: all consumers who purchased electricity in Massachusetts, for their own use and not for resale, during the class period.

     d.     *New Hampshire State Law Class*: all consumers who purchased electricity in New Hampshire, for their own use and not for resale, during the class period.

     e.     *Vermont State Law Class*: all consumers who purchased electricity in Vermont, for their own use and not for resale, during the class period.

205.     The persons in the Separate State Law Classes are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Separate State Law Classes is easily ascertainable, as each class member can be identified by using readily obtainable records, including publicly available records and records in the possession of the defendants and/or their subsidiaries. Through their counsel, the plaintiffs are informed and believe that, collectively, there are well over six million members of the Separate State Law Classes.

206.     The plaintiffs' state-law claims against Avangrid are typical of the claims of the Separate State Law Classes in that the plaintiffs purchased electricity in New England, for their own use and not for resale, during the class period. All members of the Separate State Law Classes were damaged by the same wrongful conduct of Avangrid, and the relief sought is common to all members of the Separate State Law Classes.

207.     There are common questions of law and fact specific to the Separate State Law Classes that predominate over any questions affecting individual members, including whether, during the class period:

a.      Avangrid engaged in unfair and anticompetitive conduct in the New
        England electricity market by restricting natural gas transmission capacity
        along a key regional pipeline;

b.      Avangrid engaged in unfair and anticompetitive conduct in the New
        England electricity market by restricting natural gas supplies available for
        sale on the spot market for natural gas, and therefore increased the spot
        market price of natural gas available to electricity generators in the region;

c.      Avangrid's conduct in the New England electricity market covertly
        interfered with natural competitive forces within that market, causing
        operators of natural gas-fired power plants to withhold otherwise
        economic bids or to bid generation into the ISO-NE wholesale market at
        artificially high prices;

d.      Avangrid's conduct in the New England electricity market, and covert
        interference with otherwise competitive market forces within that market,
        caused artificially inflated wholesale and retail power electricity
        throughout the regional electricity market during the class period;

e.      Avangrid's conduct injured the plaintiffs and all members of the Separate
        State Law Classes, and, if so, the appropriate class-wide measure of
        damages for the plaintiffs and all members of the Separate State Law
        Classes;

f.      The plaintiffs and all other members of the Separate State Law Classes are
        entitled to, among other things, injunctive relief, and if so, the nature and
        extent of such injunctive relief.

208.    These and other questions of law and fact are common to the Separate State Law

Classes, and predominate over any questions affecting only individual class members.

209.    The plaintiffs' claims are typical of the claims of members of the Separate State

Law Classes as they arise out of the same course of conduct and the same legal theories as the

claims of all members of the Separate State Law Classes, and the plaintiffs challenge the

practices and course of conduct engaged in by Avangrid with respect to the Separate State Law

Classes as a whole.

210.     The plaintiffs will fairly and adequately protect the interests of the Separate State

Law Classes. The plaintiffs have retained class counsel who are able and experienced class-

action litigators.

211.     Resolution of the plaintiff's state-law claims against Avangrid on a class-wide

basis is superior to other available methods and is a fair and efficient adjudication of the

controversy because in the context of this litigation, no individual member of the Separate State

Law Classes can justify the commitment of the large financial resources to vigorously prosecute

a lawsuit against Avangrid. Separate actions by individual class members would also create a

risk of inconsistent or varying judgments, which could establish incompatible standards of

conduct for Avangrid and substantially impede or impair the ability of members of the Separate

State Law Classes to pursue their claims. A class action also makes sense because Avangrid's

conduct, upon information and belief, including publicly-available data, is generally applicable

to millions of individuals, thereby making injunctive relief appropriate with respect to the

Separate State Law Classes.

**C.     Eversource Federal Law Class – Asserting Federal Claims Against Eversource.**

212.     Eversource plaintiffs bring claims for damages and other relief under federal

antitrust law against Eversource, on behalf of themselves and a class of similarly situated

electricity consumers in New England ("Eversource Federal Law Class"). The Eversource

Federal Law Class is defined as follows: all consumers who purchased electricity in the ISO-NE

market territory from Eversource and/or its subsidiaries or affiliates, during the class period, for

their own use and not for resale.

213.     The persons in the Eversource Federal Law Class are so numerous that

individual joinder of all members is impracticable under the circumstances of this case. Although

the precise number of such persons is unknown, the exact size of the Eversource Federal Law

Class is easily ascertainable, as each class member can be identified by using records in the possession of Eversource and/or its subsidiaries or affiliates. Through their counsel, the Eversource plaintiffs are informed and believe that there are well over three million members of the Eversource Federal Law Class.

214.     Eversource Plaintiffs' federal antitrust law claims against Eversource are typical of the claims of the Eversource Federal Law Class in that the Eversource plaintiffs purchased electricity in the ISO-NE market territory from Eversource and/or its subsidiaries, during the class period, for their own use and not for resale. All members of the Eversource Federal Law Class were damaged by the same wrongful conduct of Eversource, and the relief sought is common to all members of the Eversource Federal Law Class.

215.     There are common questions of law and fact specific to the Eversource Federal Law Class that predominate over any questions affecting individual members, including whether, during the class period:

     a.    Eversource engaged in unfair and anticompetitive conduct in the New England electricity market by restricting natural gas transmission capacity along a key regional pipeline;

     b.    Eversource engaged in unfair and anticompetitive conduct in the New England electricity market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas available to electricity generators in the region;

     c.    Eversource's conduct in the New England electricity market covertly interfered with natural competitive forces within that market, causing operators of natural gas-fired power plants to withhold otherwise economic bids or to bid generation into the ISO-NE wholesale market at artificially high prices;

     d.    Eversource's conduct in the New England electricity market, and covert interference with otherwise competitive market forces within that market, caused artificially inflated wholesale and retail electricity prices throughout the regional electricity market during the class period;

     e.    Eversource's conduct injured the Eversource plaintiffs and all members of the Eversource Federal Law Class, and, if so, the appropriate class-wide measure of damages for Eversource Plaintiffs and all members of the Eversource Federal Law Class;

     f.    The Eversource plaintiffs and all other members of the Eversource Federal Law Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

216.    These and other questions of law and fact are common to the Eversource Federal Law Class, and predominate over any questions affecting only individual class members.

217.    The Eversource plaintiffs' claims are typical of the claims of members of the Eversource Federal Law Class as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Eversource Federal Law Class, and the Eversource plaintiffs challenge the practices and course of conduct engaged in by Eversource with respect to the Eversource Federal Law Class as a whole.

218.    The Eversource plaintiffs will fairly and adequately protect the interests of the Eversource Federal Law Class. The Eversource plaintiffs have retained class counsel who are able and experienced class-action litigators.

219.    Resolution of the Eversource plaintiffs' claims for damages and other relief under federal antitrust law against Eversource on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Eversource Federal Law Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Eversource. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Eversource and substantially impede or impair the ability of members of the Eversource Federal Law Class to pursue their claims. A class action also makes sense because Eversource's conduct, upon

information and belief, including publicly-available data, is generally applicable to millions of individuals, thereby making injunctive relief appropriate with respect to the Eversource Federal Law Class as a whole.

**D.    Avangrid Federal Law Class – Asserting Federal Claims Against Avangrid.**

220.    The Avangrid plaintiffs bring claims for damages and other relief under federal antitrust law against Avangrid, on behalf of themselves and a class of similarly situated electricity consumers in New England ("Avangrid Federal Law Class"). The Avangrid Federal Law Class is defined as follows: all consumers who purchased electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries or affiliates, during the class period, for their own use and not for resale.

221.    The persons in the Avangrid Federal Law Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Avangrid Federal Law Class is easily ascertainable, as each class member can be identified by using records in the possession of Avangrid and/or its subsidiaries or affiliates. Through their counsel, the Avangrid plaintiffs are informed and believe that there are more than 900,000 members of the Avangrid Federal Law Class.

222.    The Avangrid plaintiffs' federal antitrust law claims against Avangrid are typical of the claims of the Avangrid Federal Law Class in that the Avangrid plaintiffs purchased electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries or affiliates, during the class period, for their own use and not for resale. All members of the Avangrid Federal Law Class were damaged by the same wrongful conduct of Avangrid, and the relief sought is common to all members of the Avangrid Federal Law Class.

223.    There are common questions of law and fact specific to the Avangrid Federal

Law Class that predominate over any questions affecting individual members, including whether,

during the class period:

    a.    Avangrid engaged in unfair and anticompetitive conduct in the New
          England electricity market by restricting natural gas transmission capacity
          along a key regional pipeline;

    b.    Avangrid engaged in unfair and anticompetitive conduct in the New
          England electricity market by restricting natural gas supplies available for
          sale on the spot market for natural gas, and therefore increased the spot
          market price of natural gas available to electricity generators in the region;

    c.    Avangrid's conduct in the New England electricity market covertly
          interfered with natural competitive forces within that market, causing
          operators of natural gas-fired power plants to withhold otherwise
          economic bids or to bid generation into the ISO-NE wholesale market at
          artificially high prices;

    d.    Avangrid's conduct in the New England electricity market, and covert
          interference with otherwise competitive market forces within that market,
          caused artificially inflated wholesale and retail electricity prices
          throughout the regional electricity market during the class period;

    e.    Avangrid's conduct injured the Avangrid plaintiffs and all members of the
          Avangrid Federal Law Class, and, if so, the appropriate class-wide
          measure of damages for the Avangrid plaintiffs and all members of the
          Avangrid Federal Law Class;

    f.    The Avangrid plaintiffs and all other members of the Avangrid Federal
          Law Class are entitled to, among other things, injunctive relief, and if so,
          the nature and extent of such injunctive relief.

224.    These and other questions of law and fact are common to the Avangrid Federal

Law Class, and predominate over any questions affecting only individual class members.

225.    The Avangrid plaintiffs' claims are typical of the claims of members of the

Avangrid Federal Law Class as they arise out of the same course of conduct and the same legal

theories as the claims of all members of the Avangrid Federal Law Class, and the Avangrid

plaintiffs challenge the practices and course of conduct engaged in by Avangrid with respect to the Avangrid Federal Law Class as a whole.

226.     The Avangrid plaintiffs will fairly and adequately protect the interests of the Avangrid Federal Law Class. The Avangrid plaintiffs have retained class counsel who are able and experienced class-action litigators.

227.     Resolution of the Avangrid plaintiffs' claims for damages and other relief under federal antitrust law against Avangrid on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Avangrid Federal Law Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Avangrid. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Avangrid and substantially impede or impair the ability of members of the Avangrid Federal Law Class to pursue their claims. A class action also makes sense because Avangrid's conduct, upon information and belief, including publicly-available data, is generally applicable to nearly a million individuals, thereby making injunctive relief appropriate with respect to the Avangrid Federal Law Class as a whole.

E.     **Federal Law Injunctive Class – Asserting Federal Claims Against Both Defendants.**

228.     The plaintiffs bring claims for injunctive relief under federal antitrust law against defendants, on behalf of themselves and a class of all electricity consumers in New England ("Federal Law Injunctive Class"). The Federal Law Injunctive Class is defined as follows: all consumers who purchased electricity in the ISO-NE market territory of New England, during the class period, for their own use and not for resale.

229.     The persons in the Federal Law Injunctive Class are so numerous that individual

joinder of all members is impracticable under the circumstances of this case. Although the

precise number of such persons is unknown, the exact size of the Federal Law Injunctive Class is

easily ascertainable, as each class member can be identified by using records in the possession of

defendants and/or their subsidiaries. Through their counsel, the plaintiffs are informed and

believe that there are approximately seven million members of the Federal Law Injunctive Class.

230.     The plaintiffs' federal antitrust law claims against defendants are typical of the

claims of the Federal Law Injunctive Class in that the plaintiffs purchased electricity in the ISO-

NE market territory from defendants and/or their subsidiaries, during the class period, for their

own use and not for resale. All members of the Federal Law Injunctive Class were damaged by

the same wrongful conduct of defendants, and the relief sought is common to all members of the

Federal Law Injunctive Class.

231.     There are common questions of law and fact specific to the Federal Law

Injunctive Class that predominate over any questions affecting individual members, including

whether, during the class period:

> a.     The defendants engaged in unfair and anticompetitive conduct in the New
>         England electricity market by restricting natural gas transmission capacity
>         along a key regional pipeline;
>
> b.     The defendants engaged in unfair and anticompetitive conduct in the New
>         England electricity market by restricting natural gas supplies available for
>         sale on the spot market for natural gas, and therefore increased the spot
>         market price of natural gas available to electricity generators in the region;
>
> c.     The defendants' conduct in the New England electricity market covertly
>         interfered with natural competitive forces within that market, causing
>         operators of natural gas-fired power plants to withhold otherwise
>         economic bids or to bid generation into the ISO-NE wholesale market at
>         artificially high prices;
>
> d.     The defendants' conduct in the New England electricity market, and
>         covert interference with otherwise competitive market forces within that

market, caused artificially inflated wholesale and retail electricity prices throughout the regional electricity market during the class period;

e.    The defendants' conduct injured the plaintiffs and all members of the Federal Law Injunctive Class and threatens further injury; and

f.    The plaintiffs and all other members of the Federal Law Injunctive Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

232.    These and other questions of law and fact are common to the Federal Law Injunctive Class, and predominate over any questions affecting only individual class members.

233.    The plaintiffs' claims are typical of the claims of members of the Federal Law Injunctive Class as they arise out of the same course of conduct and the same legal theories as the claims of all members of the Federal Law Injunctive Class, and the plaintiffs challenge the practices and course of conduct engaged in by the defendants with respect to the Federal Law Injunctive Class as a whole.

234.    The plaintiffs will fairly and adequately protect the interests of the Federal Law Injunctive Class. The plaintiffs have retained class counsel who are able and experienced class-action litigators.

235.    Resolution of the plaintiffs' claims for injunctive relief under federal antitrust law against defendants on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual member of the Federal Law Injunctive Class can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against defendants. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for defendants and substantially impede or impair the ability of members of the Federal Law Injunctive Class to pursue their claims. A class action also makes sense because defendants' conduct, upon information and belief, including

publicly-available data, is generally applicable to millions of individuals, thereby making

injunctive relief appropriate with respect to the Federal Law Injunctive Class as a whole.

## VIII.   VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF
**(The Plaintiffs' Claim against Eversource Under Massachusetts Consumer Protection Act)**

236.    The plaintiffs incorporate by reference all of the preceding allegations.

237.    Eversource's unlawful conduct has violated the Massachusetts Consumer

Protection Act, MASS. GEN. LAWS. ch. 93A, § 1 *et seq*.

238.    The plaintiffs residing in Massachusetts, on behalf of themselves and their

respective classes, mailed to Eversource written demands for relief, pursuant to the

Massachusetts Consumer Protection Act, on November 14, 2017, and January 8, 2018. On

November 30, 2017, and February 2, 2018, counsel for Eversource provided written responses

stating that Eversource "does not intend to make a written tender of settlement" in response to

the plaintiffs' November 14, 2017, and January 8, 2018, demand letters. More than 30 days have

elapsed since the plaintiffs provided Eversource with a demand.

239.    The plaintiffs, on behalf of themselves and the Unified State Law Class, allege as

follows:

a.      Eversource, a Massachusetts voluntary association, maintains a
        headquarters in Boston and conducts substantial business in the
        Commonwealth of Massachusetts. During the class period, Eversource's
        unlawful conduct substantially affected Massachusetts commerce and
        consumers, and it had a substantial impact on the public interests of
        Massachusetts and its residents, as well as residents of other states within
        the ISO-NE market territory.

b.      As a direct and proximate result of Eversource's unlawful conduct, the
        plaintiffs and all members of the Unified State Law Class have been
        injured and are threatened with further injury.

c.      Eversource's unlawful conduct has constituted or included unfair methods
        of competition, and/or unfair or deceptive acts or practices in the conduct

of trade of commerce, including those within and affecting Massachusetts, in violation of the Massachusetts Consumer Protection Act.

d.  Accordingly, the plaintiffs, on behalf of themselves and the Unified State Law Class, seek all relief that is available and appropriate, including any relief available under the Massachusetts Consumer Protection Act.


## SECOND CLAIM FOR RELIEF
**(Plaintiffs' Alternative Claims against Eversource under Individual State Consumer Protection and Antitrust Laws)**

240.  The plaintiffs incorporate by reference all of the preceding allegations.

241.  In the event that Massachusetts law is not applied to the claims of all members of the Eversource State Law Class, Eversource's unlawful conduct has violated the individual state consumer protection and/or antitrust laws of Connecticut, Maine, Massachusetts, New Hampshire and Vermont, thereby giving rise to a cause or causes of action under those state laws.

242.  Eversource's unlawful conduct has violated Connecticut's Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a *et seq*. The plaintiffs, on behalf of themselves and the Connecticut State Law Class, allege as follows:

a.  During the class period, Eversource's unlawful conduct substantially affected Connecticut commerce and consumers, and it had a substantial impact on the public interests of Connecticut and its residents.

b.  As a direct and proximate result of Eversource's unlawful conduct, the plaintiffs and all members of the Connecticut State Law Class have been injured and are threatened with further injury.

c.  Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Connecticut, in violation of the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110b.

d.  Accordingly, the plaintiffs, on behalf of themselves and the Connecticut State Law Class, seek all relief that is available and appropriate, including

any relief available under the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110g.

243.     Eversource's unlawful conduct has violated Maine's antitrust laws, ME. STAT. TIT. 10, § 1101 *et seq.* The plaintiffs, on behalf of themselves and the Maine State Law Class, allege as follows:

a.     During the class period, Eversource's unlawful conduct substantially affected Maine commerce and consumers, and it had a substantial impact on the public interests of Maine and its residents.

b.     As a direct and proximate result of Eversource's unlawful conduct, the plaintiffs and all members of the Maine State Law Class have been injured and are threatened with further injury to their property.

c.     Eversource's unlawful conduct has constituted or included monopolization and/or attempted monopolization, within and affecting Maine, in violation of the Maine antitrust laws, including ME. STAT. TIT. 10, § 1102.

d.     Accordingly, the plaintiffs, on behalf of themselves and the Maine State Law Class, seek all relief that is available and appropriate, including any relief available under the Maine antitrust laws, including ME. STAT. TIT. 10, § 1104.

244.     Eversource's unlawful conduct has violated the Maine Unfair Trade Practices Act, ME. STAT. TIT. 5, § 205-A *et seq.* The plaintiffs, on behalf of themselves and the Maine State Law Class, allege as follows:

a.     During the class period, Eversource's unlawful conduct substantially affected Maine commerce and consumers, and it had a substantial impact on the public interests of Maine and its residents.

b.     As a direct and proximate result of Eversource's unlawful conduct, Plaintiffs and all members of the Maine State Law Class have been injured and are threatened with further injury.

c.     On November 15, 2017, certain plaintiffs residing in Maine, on behalf of themselves and all members of the Maine State Law Class, mailed to Eversource a written demand for relief pursuant to the Maine Unfair Trade Practices Act. On November 30, counsel for Eversource provided a written response to plaintiffs' counsel stating that Eversource "does not intend to make a written tender of settlement" in response to the plaintiffs'

November 15, 2017, demand letter. More than 30 days have elapsed since the plaintiffs provided Eversource with a demand.

d.    Eversource's unlawful conduct has constituted or unfair methods of competition, and/or unfair or deceptive acts or practices in the conduct of trade of commerce, including those within and affecting Maine, in violation of the Maine Unfair Trade Practices Act.

e.    Accordingly, the plaintiffs, on behalf of themselves and the Maine State Law Class, seek all relief that is available and appropriate, including any relief available under the Maine Unfair Trade Practices Act.

245.    Eversource's unlawful conduct has violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS. ch. 93A, § 1 *et seq.* The plaintiffs, on behalf of themselves and the Massachusetts State Law Class, allege as follows:

a.    Eversource, a Massachusetts voluntary association, maintains a headquarters in Boston and conducts substantial business in the Commonwealth of Massachusetts. During the class period, Eversource's unlawful conduct substantially affected Massachusetts commerce and consumers, and it had a substantial impact on the public interests of Massachusetts and its residents.

b.    As a direct and proximate result of Eversource's unlawful conduct, the plaintiffs and all members of the Massachusetts State Law Class have been injured and are threatened with further injury.

c.    The plaintiffs residing in Massachusetts, on behalf of themselves and their respective classes, mailed to Eversource written demands for relief, pursuant to the Massachusetts Consumer Protection Act, on November 14, 2017, and January 8, 2018. On November 30, 2017, and February 2, 2018, counsel for Eversource provided written responses stating that Eversource "does not intend to make a written tender of settlement" in response to the plaintiffs' November 14, 2017, and January 8, 2018, demand letters. More than 30 days have elapsed since Plaintiffs provided Eversource with a demand.

d.    Eversource's unlawful conduct has constituted or included unfair methods of competition, and/or unfair or deceptive acts or practices in the conduct of trade of commerce, including those within and affecting Massachusetts, in violation of the Massachusetts Consumer Protection Act.

e.    Accordingly, the plaintiffs, on behalf of themselves and the Massachusetts State Law Class, seek all relief that is available and appropriate, including any relief available under the Massachusetts Consumer Protection Act.

246.     Eversource's unlawful conduct has violated New Hampshire's Consumer

Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq*. The plaintiffs, on behalf of the New

Hampshire State Law Class, allege as follows:

     a.    During the class period, Eversource's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

     b.    As a direct and proximate result of Eversource's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

     c.    Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

     d.    Accordingly, the plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

247.     Eversource's unlawful conduct has violated the Vermont Consumer Fraud Act,

VT. STAT. ANN. tit. 9, § 2451 *et seq*. The plaintiffs, on behalf of themselves and the Vermont

State Law Class, allege as follows:

     a.    During the class period, Eversource's unlawful conduct substantially affected Vermont commerce and customers, and it had a substantial impact on the public interests of Vermont and its residents.

     b.    As a direct and proximate result of Eversource's unlawful conduct, the plaintiffs and all members of the Vermont State Law Class have been injured in their business and property and are threatened with further injury.

     c.    Eversource's unlawful conduct has constituted or included unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, in violation of the Vermont Consumer Fraud Act, including VT. STAT. ANN. tit. 9, § 2453.

     d.    Accordingly, the plaintiffs, on behalf of themselves and the Vermont State Law Class, seek all relief that is available and appropriate, including any relief available under the Vermont Consumer Fraud Act.

## THIRD CLAIM FOR RELIEF
**(Plaintiffs' Claims against Avangrid under State Consumer Protection and Antitrust Laws)**

248.    The plaintiffs incorporate by reference all of the preceding allegations.

249.    Avangrid's unlawful conduct has violated the state consumer protection and/or antitrust laws of Connecticut, Maine, Massachusetts, New Hampshire and Vermont, thereby giving rise to a cause or causes of action under those state laws.

250.    Avangrid's unlawful conduct has violated Connecticut's Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a *et seq*. The plaintiffs, on behalf of themselves and the Connecticut State Law Class, allege as follows:

    a.    During the class period, Avangrid's unlawful conduct substantially affected Connecticut commerce and consumers, and it had a substantial impact on the public interests of Connecticut and its residents.

    b.    As a direct and proximate result of Avangrid's unlawful conduct, the plaintiffs and all members of the Connecticut State Law Class have been injured and are threatened with further injury.

    c.    Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting Connecticut, in violation of the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110b.

    d.    Accordingly, plaintiffs, on behalf of themselves and the Connecticut State Law Class, seek all relief that is available and appropriate, including any relief available under the Connecticut Unfair Trade Practices Act, including CONN. GEN. STAT. § 42-110g.

251.    Avangrid's unlawful conduct has violated Maine's antitrust laws, ME. STAT. TIT. 10, § 1101 *et seq.* The plaintiffs, on behalf of themselves and the Maine State Law Class, allege as follows:

    a.    During the class period, Avangrid's unlawful conduct substantially affected Maine commerce and consumers, and it had a substantial impact on the public interests of Maine and its residents.

b.     As a direct and proximate result of Avangrid's unlawful conduct, the plaintiffs and all members of the Maine State Law Class have been injured and are threatened with further injury to their property.

c.     Avangrid's unlawful conduct has constituted or included monopolization and/or attempted monopolization, within and affecting Maine, in violation of the Maine antitrust laws, including ME. STAT. TIT. 10, § 1102.

d.     Accordingly, the plaintiffs, on behalf of themselves and the Maine State Law Class, seek all relief that is available and appropriate, including any relief available under the Maine antitrust laws, including ME. STAT. TIT. 10, § 1104.

252.     Avangrid's unlawful conduct has violated the Maine Unfair Trade Practices Act, ME. STAT. TIT. 5, § 205-A *et seq.* The plaintiffs, on behalf of themselves and the Maine State Law Class, allege as follows:

a.     During the class period, Avangrid's unlawful conduct substantially affected Maine commerce and consumers, and it had a substantial impact on the public interests of Maine and its residents.

b.     As a direct and proximate result of Avangrid's unlawful conduct, the plaintiffs and all members of the Maine State Law Class have been injured and are threatened with further injury.

c.     On November 15, 2017, and January 8, 2018, the plaintiffs residing in Maine, on behalf of themselves and all members of the Maine State Law Class, mailed to Avangrid a written demand for relief pursuant to the Maine Unfair Trade Practices Act. On December 4, 2017, counsel for Avangrid notified the plaintiffs' counsel in writing that Avangrid does not intend to respond to the plaintiffs' November 15, 2017, demand letter. Avangrid did not respond to the plaintiffs' January 8, 2018 letter. More than 30 days have elapsed since the plaintiffs provided Avangrid with a demand.

d.     Avangrid's unlawful conduct has constituted or included unfair methods of competition, and/or unfair or deceptive acts or practices in the conduct of trade of commerce, including those within and affecting Maine, in violation of the Maine Unfair Trade Practices Act.

e.     Accordingly, the plaintiffs, on behalf of themselves and the Maine State Law Class, seek all relief that is available and appropriate, including any relief available under the Maine Unfair Trade Practices Act.

253.    Avangrid's unlawful conduct has violated the Massachusetts Consumer

Protection Act, MASS. GEN. LAWS. ch. 93A, § 1 *et seq*. The plaintiffs, on behalf of themselves

and the Massachusetts State Law Class, allege as follows:

   a.    During the class period, Avangrid's unlawful conduct substantially affected Massachusetts commerce and consumers, and it had a substantial impact on the public interests of Massachusetts and its residents.

   b.    As a direct and proximate result of Avangrid's unlawful conduct, the plaintiffs and all members of the Massachusetts State Law Class have been injured and are threatened with further injury.

   c.    On November 14, 2017, certain plaintiffs residing in Massachusetts, on behalf of themselves and all members of the Unified State Law Class, mailed to Avangrid written demands for relief pursuant to the Massachusetts Consumer Protection Act. On December 4, 2017, counsel for Avangrid notified the plaintiffs' counsel in writing that Avangrid does not intend to respond to the plaintiffs' November 14, 2017, demand letter. More than 30 days have elapsed since the plaintiffs provided Avangrid with a demand.

   d.    Avangrid's unlawful conduct has constituted or included unfair methods of competition, and/or unfair or deceptive acts or practices in the conduct of trade of commerce, including those within and affecting Massachusetts, in violation of the Massachusetts Consumer Protection Act.

   e.    Accordingly, the plaintiffs, on behalf of themselves and the Massachusetts State Law Class, seek all relief that is available and appropriate, including any relief available under the Massachusetts Consumer Protection Act.

254.    Avangrid's unlawful conduct has violated New Hampshire's Consumer

Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq*. Plaintiffs, on behalf of the New

Hampshire State Law Class, allege as follows:

   a.    During the class period, Avangrid's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

   b.    As a direct and proximate result of Avangrid's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

    c.      Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices, within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

    d.      Accordingly, the plaintiffs, on behalf of the New Hampshire State Law Class, seek all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

255.     Avangrid's unlawful conduct has violated the Vermont Consumer Fraud Act, VT. STAT. ANN. tit. 9, § 2451 *et seq*. The plaintiffs, on behalf of themselves and the Vermont State Law Class, allege as follows:

    a.      During the class period, Avangrid's unlawful conduct substantially affected Vermont commerce and customers, and it had a substantial impact on the public interests of Vermont and its residents.

    b.      As a direct and proximate result of Avangrid's unlawful conduct, the plaintiffs and all members of the Vermont State Law Class have been injured in their business and property and are threatened with further injury.

    c.      Avangrid's unlawful conduct has constituted or included unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, in violation of the Vermont Consumer Fraud Act, including VT. STAT. ANN. tit. 9, § 2453.

    d.      Accordingly, the plaintiffs, on behalf of themselves and the Vermont State Law Class, seek all relief that is available and appropriate, including any relief available under the Vermont Consumer Fraud Act.

**FOURTH CLAIM FOR RELIEF**
**(Eversource Plaintiffs' and Avangrid Plaintiffs' Claims for Damages and Other Relief under Federal Antitrust Laws)**

256.     The Eversource and Avangrid plaintiffs incorporate by reference all of the preceding allegations.

257.     The defendants regularly engage in interstate commerce within the ISO-NE market territory.

258.     During the class period, the defendants each unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

259.     The defendants' unlawful conduct in the New England electricity market involved artificially constraining natural gas transmission capacity, artificially restricting natural gas supplies available on the natural gas spot market, and artificially increasing the spot market price of natural gas available to electricity generators in the region. This unlawful conduct allowed defendants to covertly manipulate natural competitive forces in the New England electricity market, with the effect of artificially inflated wholesale and retail electricity prices throughout the ISO-NE market territory during the class period. The defendants' conduct caused the Eversource and Avangrid plaintiffs, and members of the Eversource and Avangrid Federal Law Classes, to pay artificially high prices for electricity sold by defendants and/or their subsidiaries.

260.     During the class period, the defendants' illegal conduct had a substantial effect on interstate commerce.

261.     As a direct and proximate result of the defendants' unlawful conduct, the Eversource and Avangrid plaintiffs, and members of the Eversource and Avangrid Federal Law Classes, have been injured in their business and property and are threatened with further injury.

262.     The defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control. As a result, there is no realistic possibility that the defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another. Because the Eversource and Avangrid plaintiffs' federal antitrust claims against defendants therefore do not pose a risk of

multiple recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal law.

263.     The Eversource and Avangrid plaintiffs, on behalf of themselves and members of the Eversource and Avangrid Federal Law Classes, seek all damages and other relief available under the Sherman and Clayton Acts, including but not limited to treble damages, attorneys' fees, and costs of suit, from both Eversource and Avangrid.

**FIFTH CLAIM FOR RELIEF**
**(Plaintiffs' Claim for Injunctive Relief under**
**Federal Antitrust Law)**

264.     The plaintiffs incorporate by reference all of the preceding allegations.

265.     The defendants regularly engage in interstate commerce within the ISO-NE market territory.

266.     During the class period, defendants unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

267.     The defendants' unlawful conduct in the New England electricity market involved artificially constraining natural gas transmission capacity, artificially restricting natural gas supplies available on the natural gas spot market, and artificially increasing the spot market price of natural gas available to electricity generators in the region. This unlawful conduct has allowed defendants to covertly manipulate natural competitive forces in the New England electricity market, with the effect of artificially inflated wholesale and retail electricity prices throughout the ISO-NE market territory during the class period. The defendants' conduct has caused and threatens to further cause the plaintiffs, and members of the Federal Law Injunctive Class, to pay artificially high prices for electricity sold by defendants and/or their subsidiaries.

268.     During the class period, defendants' illegal conduct has had a substantial effect on interstate commerce.

269.     As a direct and proximate result of defendants' unlawful conduct, the plaintiffs, and members of the Federal Law Injunctive Class, have been injured in their business and property and are threatened with further injury.

270.     The defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control. As a result, there is no realistic possibility that defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another. Because the plaintiffs' federal antitrust claims against defendants therefore do not pose a risk of multiple recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal law.

271.     The plaintiffs, on behalf of themselves and members of the Federal Law Injunctive Class, seek injunctive relief under the Clayton Act, 15 U.S.C. § 26, including but not limited to an order enjoining defendants from further engaging in the unlawful conduct described in this Complaint.

## IX.     DEMAND FOR RELIEF

As a result of defendants' unlawful conduct, as alleged in this Complaint, the plaintiffs demand that this Court enter a judgment and determination on their behalf, and on behalf of the classes they represent, that:

A.     This action may proceed as a class action, with the plaintiffs as the designated class representatives and their counsel as class counsel for their respective classes;

B.     The defendants' unlawful conduct has violated the consumer protection and/or antitrust laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont, resulting in injury to the plaintiffs and members of their respective classes;

C.      The defendants have monopolized and/or attempted to monopolize trade or commerce among the several states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that the plaintiffs and members of their respective classes have been injured in their businesses and property, and are threatened with further injury, as a result of the defendants' unlawful conduct;

D.      The plaintiffs and members of their respective classes are entitled to recover damages sustained by them, as well as restitution or disgorgement, as provided by the relevant federal and state antitrust and consumer protection laws, and that a joint and several judgment in favor of the plaintiffs and their respective classes be entered against the defendants in an amount to be trebled in accordance with such laws;

E.      The defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the monopolies and unfair business practices alleged herein;

F.      The plaintiffs and the members of their respective classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.      The plaintiffs and the members of their respective classes recover their costs of this suit, including reasonable attorneys' fees and costs as provided by law; and

H.      The plaintiffs and the members of their respective classes receive such other or further relief as may be just and proper.

## X.   JURY TRIAL DEMANDED

The plaintiffs demand a trial by jury on all issues so triable.

DATED: March 28, 2017                    Respectfully submitted,

By ____/s/ Thomas M. Sobol_____

Thomas M. Sobol (Bar No. 471770)
Kristie LaSalle (Bar No. 692891)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
kristiel@hbsslaw.com

Steve W. Berman (*Admitted Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jeff D. Friedman (*Admitted Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

David F. Sorensen (*pro hac vice* forthcoming)
Michael Dell'Angelo (*pro hac vice* forthcoming)
Glen L. Abramson (*pro hac vice* forthcoming)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
dsorensen@bm.net
mdellangelo@bm.net
gabramson@bm.net

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: March 28, 2018                          **/s/ Thomas M. Sobol**
                                     Thomas M. Sobol (BBO# 471770)