# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**SCOTT BREIDING, AMY POLLUTRO** )
**MIKAELA ORSTEIN-OTERO, BENJAMIN** )
**ROSE, MARGARET LEWIS AND RICHARD** )
**LEWIS, ERIC LONG, PETER STEERS, ERIK** )
**ALLEN, BRADFORD KEITH, JOHN ODUM,** )
**DAVID LEIGHTON, DONNA CORDEIRO,** )
**JANICE ANGELILLO, ANNA MARIA** )
**FORNINO, MICHELE CASETTA,** )
**JUDY CENNAMI, JANICE BRADY,** )
**OPAL ASH, MARK LEJEUNE, AND** )
**ROBERTO PRATS, on behalf of** )
**themselves and others similarly situated,** )
)
        **Plaintiffs,** )        **Civil Action No. 17-12274**
)
        **v.** )
)
)
**EVERSOURCE ENERGY** )
**and AVANGRID, INC.,** )
)
        **Defendants.** )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                 **September 11, 2018**

## I.    Introduction

A putative class of retail electricity consumers residing in New England (collectively,

"Plaintiffs") have filed this lawsuit against Eversource Energy ("Eversource") and Avangrid, Inc.

("Avangrid") (collectively, "Defendants"), alleging violations of the Sherman Act, 15 U.S.C. § 2,

and various state consumer protection and antitrust laws. D. 33. Plaintiffs assert that Defendants

restricted New England's supply of natural gas, a key component in the generation of over half the

electricity in New England, and, as a result, caused New Englanders to pay nearly $3.6 billion

dollars more for retail electricity.  D. 33 ¶¶ 1-2.  Plaintiffs seek damages and injunctive relief, including under the Clayton Act, 15 U.S.C. § 26.  Defendants have moved to dismiss the amended complaint.  D. 41; D. 42.  For the reasons set forth below, the Court ALLOWS Defendants' motions to dismiss.

## II.     Standard of Review

In considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court will dismiss a pleading that fails to allege plausible claims.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "This standard is 'not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Iqbal, 556 U.S. at 678).  A claim must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

There is no special pleading requirement for motions to dismiss in the context of an antitrust action.  In re Carbon Black Antitrust Litig., No. CIV.A.03-10191-DPW, 2005 WL 102966, at *5 (D. Mass. Jan. 18, 2005).  Nevertheless, "it is not enough merely to allege a[n] [antitrust] violation in conclusory terms."  E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 9 (1st Cir. 2004).  Instead, the "complaint must make out the rudiments of a valid claim."  Id.  Therefore, "[w]hen the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a

claim from the events related in the complaint." In re Carbon Black Antitrust Litig., 2005 WL 102966, at *5 (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)). "With that said, a complaint should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (internal quotation marks and citations omitted).

## III. Factual Background

Unless otherwise noted, the following facts are drawn from the amended complaint, D. 33, and are accepted as true for the consideration of the Defendants' motions to dismiss.

### A. Regulatory Framework for the Interstate Transmission and Sale of Natural Gas and Electricity

#### 1. FERC's Authority to Regulate the Transmission and Price of Natural Gas

Between the 1950s through the 1970s, the Federal Power Commission ("FPC") strictly regulated both the wellhead price[1] of natural gas and the interstate transmission of natural gas pursuant to the Natural Gas Act. D. 33 ¶ 72; see E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1036 (9th Cir. 2007) ("Gallo II"). Beginning in 1978, however, Congress enacted legislation to reduce regulatory oversight of the price of natural gas. Id. ¶ 74. Congress further deregulated the price of natural gas through the enactment of the Natural Gas Wellhead Decontrol Act of 1989, which prohibited FPC's successor, the Federal Energy Regulatory Commission ("FERC"), from imposing any price regulations on "first sales" of natural gas at the wellhead. Id. ¶¶ 74-75. "First sales" include sales by a natural gas producer to a pipeline or a direct purchaser. Id. ¶ 75. In 1992,

---

[1] The "wellhead" price is simply the price that gas producers charge for natural gas at the wellhead. Id. ¶ 72. Previously, the FPC imposed a "cost-plus" ratemaking system that allowed gas producers to factor the cost of natural gas production and a "fair" profit into the wellhead price. Id. The FPC determined what was considered "fair." Id.

3

FERC issued Order No. 636, which permanently severed the sale of natural gas as a commodity from the sale of natural gas transmission as a service. Id. ¶ 76. Following Order 636, FERC allowed "natural-gas companies subject to [its] jurisdiction to charge rates for gas determined by market demand." Gallo II, 503 F.3d at 1038. In short, FERC replaced regulated rates for natural gas with market-based rates. Id. at 1039.

FERC still retained authority to oversee rates charged for the transmission of natural gas. Id. ¶¶ 77, 80, 85. Because natural gas transmission is often a "natural monopoly," (*i.e.*, where a single pipeline infrastructure is the only source of natural gas transportation in a given area), FERC is charged with ensuring that the transmission monopoly is not abused and that prices are "just and reasonable." Id. ¶¶ 80, 85. FERC does not regulate the local, retail sale of natural gas after it leaves interstate pipelines. See id. ¶ 54.

1.    *FERC's Authority to Regulate the Transmission and Price of Electricity*

The Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, authorizes FERC to regulate the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." Id. ¶ 49 (quoting 16 U.S.C. § 824(b)(1)). In particular, the FPA obligates FERC to "oversee all prices for those interstate transactions and all rules and practices affecting such prices." F.E.R.C. v. Elec. Power Supply Ass'n, __U.S.__, 136 S. Ct. 760, 782 (2016). However, FPA places beyond FERC's power, leaving to the states alone, the regulation of any other electricity sale, including the retail sale of electricity. D. 33 ¶ 49 (citing Elec. Power Supply Ass'n., 136 S. Ct. at 768).

**B.    Natural Gas and Electricity Markets**

Plaintiffs allege that Defendants' anticompetitive conduct in the natural gas transmission market artificially inflated the commodity market price of natural gas and the wholesale price of

electricity, resulting in higher retail electricity prices for New Englanders.  See, e.g., D. 33 ¶ 165.

Defendants' conduct in the upstream natural gas transmission market allegedly impacted

downstream retail electricity prices due to the relationship and connection between the markets at

issue in this litigation.  For example, Plaintiffs assert that the price of natural gas is the most

significant factor in determining the price of wholesale electricity because natural gas-fired power

plants are the primary generators of electricity in New England.  Id. ¶ 68.  An increase in the price

of natural gas due to a shortage in natural gas supply, therefore, will directly impact the price of

wholesale electricity.  Id. ¶ 121.  In that same vein, artificially inflated wholesale electricity prices

result in artificially inflated retail electricity prices.  Id. ¶ 63.  Accordingly, where, as alleged here,

Defendants restricted the natural gas supply to New England, Defendants allegedly caused the

market price of natural gas to increase, resulting in an increase in wholesale and retail electricity

prices.  Id.

With the regulatory framework and Plaintiffs' allegations in mind, the Court now turns to

the New England energy markets at issue in this litigation:  (1) the commodity market for natural

gas, (2) the natural gas transmission market, (3) the wholesale electricity market and (4) the retail

electricity market.

### 1. *Natural Gas Commodity Market*

The natural gas market encompasses two transactions:  (1) the purchase of natural gas; and

(2) the transmission of natural gas from seller to purchaser.  Id. ¶ 76.  With respect to sales of the

commodity itself, natural gas is sold to consumers either directly from gas producers via contracts

called "gas futures" or through the "spot market."  Id. ¶ 86.  Futures contracts allow gas producers

to sell a specific quantify of gas at some predetermined future time.  Id. ¶ 87.  Purchasers with a

steady natural gas demand, such as load distribution companies ("LDCs"), which distribute gas to

retail customers, typically utilize futures contracts.  Id. ¶¶ 84, 87.  By contrast, entities with variable or less predictable natural gas demand, including natural gas-fired electricity generators, purchase gas on the "spot" market.  Id. ¶ 88.  The spot market allows LDCs and other direct purchasers to resell excess amounts of natural gas to which they hold title.  Id. ¶ 89.  According to Plaintiffs, the spot market price of natural gas is not regulated by FERC and is, instead, determined by supply and demand.  Id. ¶ 90.  Accordingly, the spot market price of natural gas increases when the amount of available natural gas decreases.  Id.

      2.    *Natural Gas Transmission Market*

In addition to purchasing natural gas directly from gas producers or indirectly via the spot market, gas purchasers must also pay for the transmission (or transportation) of natural gas to its final destination.  Id. ¶ 78.  In New England, a network of pipelines facilitates the transmission of natural gas from the wellhead to the purchaser (or a destination determined by the purchaser).  Id. As mentioned, as compared to the price of the commodity itself, which is determined by contract or by the market, FERC oversees the rates charged for transmission capacity.  Id. ¶ 79.

The process for reserving pipeline transmission capacity in New England differs depending on the purchaser.  See id. ¶ 99.  LDCs have the option to enter "no-notice" contracts, which give them the power to reserve transmission capacity on a pipeline for a given day and time, and to adjust that reservation "upward or downward" at any time without penalty.  Id.  By contrast, other purchasers may be penalized if they do not use the full capacity reserved on a given day or if they have to reserve additional transmission capacity.  Id.

Transmission capacity reservations play an important role in determining the supply of natural gas available to gas purchasers in New England because there is a fixed amount of pipeline capacity on any given day.  Id. ¶ 107.  In other words, the transmission capacity reserved by one

purchaser limits how much capacity is available for other purchasers' natural gas needs.  Id.  Even when LDCs adjust their capacity reservations downward or cancel a reservation, that capacity is not automatically released for others to use.  Id. ¶ 108.  For example, assume an LDC called Firm X reserved enough capacity on a pipeline to move a total of 2400 cubic feet of natural gas through a pipeline at a steady rate over the course of a 24-hour period (*i.e.*, 100 cubic feet per hour).  Id. ¶ 109.  If Firm X cancelled 20 hours of that reservation and did not affirmatively release the excess capacity it reserved, then the pipeline would, for 20 hours out of the day, flow at 100 cubic feet per hour under capacity.  Id.  In that example, other purchasers would not be able to take advantage of the excess units of natural gas capacity caused by Firm X's downward adjustment of its capacity reservation.  Id.

### 3. *Wholesale Electricity Market*

Wholesale electricity is typically sold by electricity generators or power plants to load serving entities ("LSEs"), which then deliver electricity to retail consumers.  Id. ¶ 52.  Some wholesale electricity is purchased via contracts pursuant to which LSEs agree to purchase a certain amount of electricity at a certain rate over a certain period of time.  Id. ¶ 53.  These fixed-rate, bilateral contracts are regulated by FERC, which may review the agreed-upon rate for reasonableness.  Id.  More often, however, wholesale electricity is purchased through auctions between electricity generators and LSEs.  Id. ¶ 54.  The auctions are administered and overseen by intermediaries called Independent System Operators ("ISOs") or Regional Transmission Organizations ("RTOs"), which are independent non-profit organizations that FERC has charged with facilitating an efficient market for wholesale electricity while also ensuring reliability for electricity consumers.  Id.  As part of their auction-related responsibilities, ISOs and RTOs must file with FERC a tariff that describes in detail the procedures for a given auction.  Id.  FERC may

review or approve the auction procedures.  Id.  In New England, auctions are conducted in accordance with the ISO New England Inc. Transmission, Markets, and Services Tariff ("ISO-NE Tariff"), which was approved by FERC and describes the rules that govern ISO-NE's facilitation of auctions for wholesale electricity in the region.  Id. ¶ 61 (citing ISO-NE, Day-Ahead and Real-Time Energy Markets, https://www.iso-ne.com/marketsoperations/markets/da-rt-energy-markets (last visited Sept. 10, 2018)).

There are two types of auctions:  (1) "same-day" auctions for immediate delivery of wholesale electricity to LSEs experiencing a spike in demand for retail electricity, and (2) "next-day" auctions to satisfy expected demand the following day.  Id. ¶ 54.  In both instances, the auction process is as follows.  First, an ISO (or RTO) obtains orders from LSEs indicating how much electric energy is needed over a given period of time.  Id. ¶ 55.  Second, the ISO obtains bids from electricity generators specifying how much electricity can be produced during the relevant time period and how much they propose to charge for it.  Id.  Finally, the ISO accepts the generators' bids in order of price (from lowest to highest) until the total LSE demand is satisfied.  Id.  The price of the last unit of electricity purchased is then paid to all generators whose bids were accepted, even if their offer was lower.  Id.

For example, suppose that LSEs inform their ISO that they require 275 units of electricity for the day.  Id. ¶ 56.  Also assume the ISO receives the following bids from electricity generators: Generator A offers 100 units of electricity for $10/unit; Generator B offers 100 units of electricity for $20/unit; Generator C offers 100 units of electricity for $30/unit; and Generator D offers 100 units of electricity for $40/unit.  Id.  The ISO will accept Generator A's $10/unit bid (and all 100 units offered); then Generator B's $20/unit bid (and all 100 units offered); and then Generator C's $30/unit bid (but only the first 75 units offered).  Id.  Given that the wholesale demand from the

LSEs was satisfied after the ISO accepted part of Generator C's bid, Generators A, B, and C will all be paid at a rate of $30/unit.  Id.  The total cost of the 275 units of electricity will be split proportionally amongst the LSEs, according to the units of electricity ordered by each.  Id.

        *4.    Retail Electricity Market*

The wholesale electricity prices paid by LSEs are passed on to retail customers.  Id. ¶ 63.  Accordingly, the price of wholesale electricity influences the cost of retail electricity.  Id. ¶ 60.

    **C.**    **Alleged Anticompetitive Conduct**

        *1.    Defendants' Alleged Market Power*

Plaintiffs allege a monopolization scheme in which Eversource and Avangrid each allegedly abused their power over the retail electricity market in New England through anticompetitive conduct in the upstream natural gas transmission market.  Id. ¶¶ 5-8; D. 48 at 39.  Plaintiffs contend that Defendants possess the power to raise the price of electricity in New England because they can restrict the amount of natural gas flowing into the region and, therefore, the amount of natural gas available to fuel natural-gas-fired electricity generators.  D. 33 ¶ 94.  Plaintiffs point to several aspects of Defendants' energy businesses to suggest that Defendants controlled New England's natural gas supply and, therefore, the price of retail electricity.  For example, New England's principal natural gas pipeline, the Algonquin Gas Transmission Pipeline, is owned, in part, by Defendant Eversource.  Id. ¶ 95.  Both Eversource and Avangrid also own and operate, through their subsidiaries, substantial "natural gas utilities" known as LDCs—which purchase natural gas directly from gas producers and, in turn, distribute natural gas to retail consumers.  Id. ¶ 97.  Of the eight largest LDCs in New England, half are owned by Eversource

or Avangrid.[2]  Id.  As a result of their LDC operations, Eversource and Avangrid possess a large number of "no-notice" contracts for natural gas transmission capacity along the Algonquin Pipeline.[3]  Id. ¶ 99.  As mentioned, no-notice contracts allow LDCs to adjust their transmission capacity reservations upward or downward at any time and without penalty.  Id.

In addition to their natural gas businesses, Defendants Eversource and Avangrid, through their respective subsidiaries, operate retail electric utilities or LSEs, which provide electricity to millions of residential, commercial and industrial customers in New England.  Id. ¶ 101.  The price of electricity sold by Defendants' retail utilities is driven, in large part, by the market-wide wholesale price of electricity established within the ISO-NE market.  Id. ¶ 104.  When the price of wholesale electricity established within the ISO-NE market increases the price of electricity sold by Eversource and Avangrid to their respective retail customers similarly increases.  Id.

Eversource and Avangrid also own and operate renewable electricity resources such as hydroelectric, wind and solar generating facilities.  Id. ¶ 105.  Plaintiffs allege that these facilities have low variable operating costs and, as a result, are more competitive than natural gas-fired electricity generators when the price of natural gas increases.  Id.

2.    Defendants' Alleged Monopolization Scheme

As previously explained, the New England electricity market sets a single price for wholesale electricity sold in a given auction.  Id. ¶ 165.  That price is determined by the highest accepted bid in the auction.  Id.  Plaintiffs allege that Defendants, by artificially restricting natural

---

[2] Eversource owns NSTAR Gas Co. and Yankee Gas Co. and Avangrid owns Connecticut Natural Gas Co. and Southern Connecticut Gas Co.  Id. ¶ 97.

[3] As previously explained, the sale of natural gas is separate from the sale of transmission capacity. Id. ¶ 77.  Transmission capacity is necessary to transport natural gas from seller to purchaser via a pipeline.

gas supply, raised wholesale natural gas prices on the spot market, which (in turn) raised the bids in electricity auctions, including the highest accepted bid. Id. Higher overall accepted bids resulted in an increase in the cost of wholesale electricity. And, finally, since increases in wholesale electricity prices are passed on to retail electricity consumers, Defendants' conduct caused the retail price of electricity to increase throughout New England. Id.

Defendants' purported systematic abuse of no-notice contracts for natural gas transmission capacity provided the catalyst for the alleged scheme. See, e.g., id. ¶ 107. No-notice contracts allow LDCs to reserve natural gas transmission capacity on the Algonquin Pipeline and to adjust such reservations at any time without penalty. Id. ¶ 99. Because there is a fixed amount of pipeline capacity on a given day, the volume reserved by LDCs, including those owned by Defendants, affects the transmission capacity available to meet the needs of other consumers, including natural gas-fired electricity generators. Id. ¶ 107. Moreover, to the extent Defendants adjust their capacity reservations downward "at the last minute," that capacity is not automatically released for use by other actors in the natural gas market. Id. ¶ 108. Accordingly, the nature and timing of Defendants' adjustments to their capacity reservations may prevent their previously reserved supply of natural gas from being released and used by others to satisfy demand in the natural gas market. Id. ¶ 110.

Plaintiffs assert that Defendants' conduct was unique. Id. ¶¶ 122-126. For example, industry research shows that, as compared to the utility company with the next highest "last-minute" cancellations, Eversource and Avangrid cancelled their natural gas capacity on approximately 40 and 184 more occasions, respectively. Id. ¶ 122. In addition, Defendants' "clear pattern of large downward adjustments at the very end of the gas day . . . is very different than the pattern" of their top competitors. Id. ¶ 125. Defendants also failed to take advantage of the "capacity release" mechanism authorized by FERC. Id. ¶ 128. The "capacity release" mechanism

allows holders of no-notice contracts to release excess capacity directly to the relevant pipeline, which then sells that capacity. Id. ¶ 145. Capacity release can occur on a seasonal, monthly and even intra-day basis. Id. ¶ 141. Accordingly, Defendants could have—but did not—release their excess capacity to be sold to other actors in the market. Id. ¶ 147.

3. *Market Advantages Stemming from Defendants' Alleged Anticompetitive Conduct*

Plaintiffs allege that Defendants benefitted from artificially inflating natural gas and electricity prices in at least two ways. First, by increasing the spot market price for natural gas and/or restricting available natural gas supplies, Defendants artificially increased demand for value attributed to and prices paid to non-natural gas-fired power plants, including power plants owned by Defendants. Id. ¶¶ 152, 156-60. Second, as a result of the artificially depressed natural gas supply and inflated electricity prices caused by Defendants, Defendants were able to advocate for the construction of "other multi-billion-dollar energy infrastructure." Id. ¶¶ 161-63.

4. *Plaintiffs' Alleged Injury*

Plaintiffs allege that Eversource and Avangrid consistently cancelled substantial volumes of transmission capacity in the last three hours of the day every day during the class period.[4] Id. ¶ 119. In so doing, they reduced the Algonquin Pipeline's daily effective capacity by 14% on average. Id. ¶ 118. The reduced gas supply caused by Defendants resulted in natural gas prices on the spot market that were, on average, 38% higher than they would otherwise have been. Id. ¶ 120. The increase in spot market natural gas prices impacted the wholesale price of electricity and, in turn, increased retail electricity prices by 20%. Id. ¶ 121. Plaintiffs estimate that over the

_____

[4] The class period began no later than August 1, 2013, continued through at least July 31, 2016 and ended or will end on the date the effects of the Defendants' anticompetitive conduct end. Id. ¶ 15.

course of at least three years, Defendants allegedly caused New Englanders to overpay for retail electricity by at least $3.6 billion.  Id. ¶ 121.

D.    **Class Definitions**

Plaintiffs assert state and federal law claims on behalf of themselves and similarly situated classes of persons pursuant to Fed. R. Civ. P. 23.  Id. ¶ 194.

*1.    Eversource Unified State Law Class*

Plaintiffs assert claims for damages and other relief under Massachusetts law against Eversource, on behalf of themselves and a class of similarly situated electricity consumers throughout New England (the "Unified State Law Class").  Id. ¶ 195.  The Unified State Law Class is defined as "all consumers who purchased electricity during the class period, for their own use and not for resale, in the six-state ISO-NE market territory of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont."  Id. ¶¶ 195, 197-203.

*2.    Eversource Separate State Law Classes*

To the extent the Court does not apply Massachusetts law to the state law claims of all members of the Unified State Law Class, regardless of where they reside, Plaintiffs alternatively bring state law claims against Eversource on behalf of themselves and state-specific subclasses, under the relevant laws of Connecticut, Maine, Massachusetts, New Hampshire and Vermont ("Eversource Separate State Law Classes").  Id. ¶¶ 196-203.

*3.    Avangrid State Law Classes*

Plaintiffs bring claims for damages and other relief against Avangrid, on behalf of themselves and state-specific subclasses, under the relevant laws of Connecticut, Maine, Massachusetts, New Hampshire, and Vermont ("Avangrid Separate State Law Classes").  Id. ¶¶ 204-11.

### 4. *Eversource and Avangrid Federal Law Classes*

Eversource Plaintiffs and Avangrid Plaintiffs separately bring claims for damages and other relief under federal antitrust law against Eversource and Avangrid, respectively, on behalf of themselves and a class of similarly situated electricity consumers in New England ("Eversource Federal Law Class" and "Avangrid Federal Law Class," respectively). <u>Id.</u> ¶¶ 212-27.

The Eversource Federal Law Class is defined as "all consumers who purchased electricity in the ISO-NE market territory from Eversource and/or its subsidiaries or affiliates, during the class period, for their own use and not for resale." <u>Id.</u> ¶ 212.

The Avangrid Federal Law Class is defined as "all consumers who purchased electricity in the ISO-NE market territory from Avangrid and/or its subsidiaries or affiliates, during the class period, for their own use and not for resale." <u>Id.</u> ¶ 220.

### 5. *Federal Law Injunctive Relief Class*

Plaintiffs bring claims for injunctive relief under federal antitrust law against defendants, on behalf of themselves and a class of all electricity consumers in New England ("Federal Law Injunctive Class"). The Federal Law Injunctive Class is defined as "all consumers who purchased electricity in the ISO-NE market territory of New England, during the class period, for their own use and not for resale." <u>Id.</u> ¶ 228.

## IV. Procedural History

On November 16, 2017, named Plaintiffs instituted this action against Defendants. D. 1. Shortly thereafter, a related class action complaint was filed against Defendants on February 6, 2018 and assigned to this Court. D. 32 at 2. On February 21, 2018, the Court consolidated the actions. D. 32 at 3. Plaintiffs subsequently filed a consolidated amended complaint. D. 33.

Defendants have now moved to dismiss.  D. 41; D. 42.  The Court heard the parties on the pending motions on August 1, 2018 and took these matters under advisement.  D. 57.

## V.    Discussion

### A.    The Filed Rate Doctrine Bars Plaintiffs Here from Seeking Damages for Purported Violations of Federal and State Law

Defendants contend that Plaintiffs' federal and state law claims are foreclosed by the filed rate doctrine.  The filed rate doctrine "revolve[s] around the notion that under statutes like the Federal Power Act, utility filings with [a federal agency] prevail over . . . other claims seeking different rates or terms than those reflected in the filings with the agency."  Town of Norwood, Mass. v. F.E.R.C., 217 F.3d 24, 28 (1st Cir. 2000).  It "has its origins in [Supreme Court cases] interpreting the Interstate Commerce Act . . . and has been extended across the spectrum of regulated utilities."  Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 (1981) ("Arkla") (internal citations omitted).  The filed rate doctrine is a "form of deference and preemption, which precludes interference with the rate setting authority of an administrative agency."  Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir. 2007).  Accordingly, "strict application of the rule is necessary to promote the congressional policy of preventing unjust discrimination in rates."  Town of Norwood v. New England Power Co., 23 F. Supp. 2d 109, 115-16 (D. Mass. 1998), aff'd in part, remanded in part sub nom., Town of Norwood, Mass. v. New England Power Co., 202 F.3d 408 (1st Cir. 2000) (internal quotation marks and citation omitted).

Under the filed rate doctrine, where FERC determines that a rate is "just and reasonable," courts cannot approve a departure from that rate.  See id. at 116 (indicating that "FERC's authority to determine whether wholesale rates filed by utilities are just and reasonable is exclusive") (internal quotation marks omitted); see also Arkla, 453 U.S. at 577-78 (stating that "[n]o court may substitute its own judgment on reasonableness for the judgment of [FERC]" nor can courts

"impose a different rate than the one approved by [FERC]"). Moreover, the filed rate doctrine applies even where, as here, FERC determines that certain wholesale rates are to be set by market forces. Town of Norwood, 202 F.3d at 419 (holding that the filed rate doctrine barred antitrust claims challenging wholesale electricity rates and rejecting the argument that the "filed rate doctrine should not apply where the 'regulated' rates have been left to the free market"). Accordingly, courts are not the forum to adjudicate claims based on the propriety of regulated rates. See, e.g., Arkla, 453 U.S. at 584 (explaining that "[p]ermitting the state court to award what amounts to a retroactive right to collect a rate in excess of the filed rate 'only accentuates the danger of conflict'"). Due to the preclusive effect of the filed rate doctrine, federal and state antitrust claims, as well as state tort actions, that require courts to set aside or second guess rates approved by FERC must fail as a matter of law. Wah Chang, 507 F.3d at 1225 (citation omitted); Town of Norwood, 202 F.3d at 418. "The question, then, is whether [Plaintiffs] can establish a pertinent limitation on or exception to the filed rate doctrine." Town of Norwood, 202 F.3d at 418.

> 1.     The Filed Rate Doctrine Prohibits the Court from Determining the Reasonableness of Rates or Tariffs Approved by FERC

Plaintiffs first argue that the filed rate doctrine does not apply to their claims because they do not seek to alter the terms of tariffs or rates approved by FERC. D. 48 at 25-32. Instead, Plaintiffs allegedly seek relief in accord with FERC's tariffs and only challenge Defendants' purported manipulation of retail natural gas and electricity rates outside of FERC's jurisdiction. Id. Defendants, on the other hand, assert that the filed rate doctrine applies because Plaintiffs cannot escape the fact that their claims challenge the propriety of wholesale electricity rates approved by FERC and that Plaintiffs' requested relief requires the Court to set such rates aside. D. 43 at 19; D. 52 at 7; D. 55 at 6. Thus, the threshold question before this Court is whether

Plaintiffs' claims depend upon the Court's determination that tariffs or rates approved by FERC are unjust or unreasonable. See Arkla, 453 U.S. at 477-78.

Here, Plaintiffs allege that Defendants restricted New England's natural gas supply and artificially inflated wholesale natural gas prices, which increased the price of wholesale and retail electricity in New England. See, e.g., D. 33 ¶ 165. Although the parties disagree as to whether FERC regulates sales of natural gas on the spot market, there is no dispute that (pursuant to the ISO-NE Tariff) FERC exclusively regulates the region's wholesale electricity market, including ISO-NE's wholesale electricity auctions and the resulting prices.[5] Id. ¶¶ 49-51, 54; see D. 43 at 10; D. 52 at 3; D. 55 at 1. The parties also agree that the "price of natural gas is the single most significant factor in determining wholesale electricity prices," D. 33 ¶ 68 and, in turn, the price of wholesale electricity is the "largest factor in determining the overall electricity price paid by consumers throughout the ISO-NE regional electricity market," id. ¶ 66. Given the relationship between the markets at issue in this case, the Court cannot determine Defendants' liability for alleged retail electricity market manipulation without first deciding the reasonableness of wholesale electricity rates approved by FERC as part of the ISO-NE Tariff and auction process.[6]

---

[5] In Town of Norwood, the First Circuit held that the filed rate doctrine applied with equal force to market-based wholesale electricity rates. Town of Norwood, 202 F.3d at 419 (explaining that "FERC is still responsible for ensuring 'just and reasonable' rates and, to that end, wholesale power rates continue to be filed and subject to agency review, 16 U.S.C. § 824d"). As a result, the Court does not distinguish between market-based rates and rates formally filed with FERC for the purpose of determining whether the filed rate doctrine bars Plaintiffs' claims.

[6] In support of the argument that Plaintiffs only challenge conduct outside of FERC's jurisdiction, Plaintiffs rely on cases that are inapposite here, including F.E.R.C. v. Elec. Power Supply Ass'n, __U.S.__, 136 S. Ct. 760 (2016), as revised (Jan. 28, 2016) ("E.P.S.A."). See, e.g., D. 48 at 28. In E.P.S.A., the Supreme Court did not consider whether the filed rate doctrine bars claims challenging retail rates that would require courts to determine the reasonableness of wholesale rates filed with FERC. Rather, the court held that that FERC may regulate "what takes place on

In cases spawned by the California energy crisis between 2000 and 2001, the Ninth Circuit dismissed claims requiring the court to evaluate the reasonableness of rates squarely within FERC's jurisdiction. See, e.g., Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg., Inc., 384 F.3d 756, 761 (9th Cir. 2004) ("Snohomish"). In Snohomish, for example, the Ninth Circuit considered whether the filed rate doctrine barred state antitrust and consumer protection claims alleging that actors in the wholesale electricity market "manipulated the market and restricted electricity supplies in order to cause artificially high prices." Id. at 758. Similar to Plaintiffs here, Snohomish alleged that "the defendants withheld supply, waited until . . . prices rose, and then offered their supply at the higher prices." Id. at 759. The plaintiff there also argued that the defendants' anticompetitive conduct in the wholesale electricity market "caused [the plaintiff] to pay prices for electricity in excess of rates that would have been achieved in a competitive market." Id. (internal quotation marks omitted). According to the Ninth Circuit, the plaintiff's requested relief would require the court to determine a "fair price" for wholesale electricity absent the defendants' conduct. Id. at 761. The Ninth Circuit, therefore, held that the filed rate doctrine barred Snohomish's claims to the extent they would require the court to "interfere with FERC's exclusive jurisdiction to set wholesale rates." Id. A few years later, in Gallo II, the Ninth Circuit applied similar reasoning in dismissing claims challenging the propriety of wholesale natural gas rates approved by FERC. Gallo II, 503 F.3d at 1039 n.11. In that case, the Ninth Circuit determined that the filed rate doctrine prohibits courts from considering whether "FERC-authorized rates are just and reasonable." Id. "Rather, under the principles of the [f]iled [r]ate [d]octrine, they are just and reasonable as a matter of law," even where the rates at issue are

the wholesale market," even if such regulations influence retail rates. E.P.S.A., __ U.S.__, 136 S. Ct. at 776.

"market-based." Id. Most recently, the Ninth Circuit considered whether the filed rate doctrine barred a retail electricity consumer's antitrust claims alleging that local electricity utilities "artificially increased" the price of wholesale electricity "through their anticompetitive and fraudulent manipulation of the wholesale markets." Wah Chang, 507 F.3d at 1224. There, the Ninth Circuit held that the filed rate doctrine barred any claims that require "the courts [to] determine what rates [utility companies] should have charged instead of the rates they did charge." Id. at 1226. As was the case in the aforementioned disputes, Plaintiffs' theory of liability requires the Court to determine the reasonableness of wholesale electricity prices exclusively regulated by FERC.[7]

Moreover, to award monetary relief to retail electricity consumers, the Court would be required to determine the difference between wholesale electricity rates during the class period and hypothetical rates that would have been charged but for Defendants' purported anticompetitive conduct. This is exactly the analysis the filed rate doctrine prohibits. See Wah Chang, 507 F.3d at 1226 (holding that the filed rate doctrine "turns away attempts [like plaintiff's] . . . which necessarily hinge on a claim that the FERC approved rate was too high and would, therefore, undermine FERC's tariff authority through the medium of direct court actions"); see also Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 930 (9th Cir. 2002)

---

[7] Plaintiffs rely on Verizon Del., Inc. v. Covad Commc'ns Co., 377 F.3d 1081 (9th Cir. 2004) for the proposition that the filed rate doctrine does not bar claims that "seek[] repayment in accord with the criteria in the filed rate[]" doctrine. Verizon, 377 F.3d at 1090; see D. 48 at 25. That case is inapplicable. There, the court determined that the plaintiff was entitled to recoup funds the defendant would have owed the plaintiff pursuant to filed rates but for defendant's alleged anticompetitive scheme to reduce its service costs. See Verizon, 377 F.3d at 1090 (stating that the plaintiff may "recoup overpayments . . . to enforce the filed rates"). Where, as here, the plaintiff also sought damages in excess of filed rates, the Ninth Circuit concluded that the filed rate doctrine bars such recovery. Id. (explaining that the plaintiff may not, however collect overpayments that "would be in addition to the filed rate").

(noting that courts may not "assum[e] a hypothetical rate different from that actually set by FERC"); <u>Cnty. of Stanislaus v. Pac. Gas & Elec. Co.</u>, 114 F.3d 858, 863 (9th Cir. 1997) (quoting <u>Cost Mgmt. Servs. V. Wash. Natural Gas Co.</u>, 99 F.3d 937, 944 (9th Cir. 1996) (explaining that an antitrust "claim for damages based on a filed rate would be too speculative, because it: 'would require a showing that a hypothetical lower rate should and would have been adopted by [FERC],'" which is a question "best left to the agency itself, rather than the courts")).

The Supreme Court has recognized a limited exception to the filed rate doctrine for injunctive relief.  <u>See</u> <u>State of Georgia v. Pa. Ry. Co.</u>, 324 U.S. 439, 454-62 (1945) (holding that plaintiff could bring antitrust action to enjoin alleged "coercive and collusive influences" in rate-marking); <u>Square D Co. v. Niagara Frontier Tariff Bureau, Inc.</u>, 476 U.S. 409, 422 n. 28 (1922) (explaining that the filed rate doctrine does not preclude injunctive antitrust actions).  In <u>Town of Norwood</u>, for example, the First Circuit considered whether <u>Georgia</u> and <u>Square D Co.</u> required the court to allow the plaintiff's claims seeking injunctive relief where the court had dismissed similar claims for damages.  <u>Town of Norwood</u>, 202 F.3d at 419-20.  In affirming the district court's dismissal of the antitrust claims at issue, the First Circuit cautioned that the filed rate doctrine prohibits an injunction where "any meaningful relief . . . would require the *alteration* of tariffs."  <u>Town of Norwood</u>, 202 F.3d at 420 (emphasis in the original).[8]  Although the amended complaint in the instant dispute does not specify what exactly Plaintiffs seek to enjoin Defendants from doing, the Court concludes that any meaningful relief would, at a minimum, require the Court to enjoin conduct authorized by the tariff governing Defendants' no-notice contracts.  Specifically,

---

[8] By contrast to the relief sought in <u>Town of Norwood</u>, "<u>Georgia</u> and <u>Square D Co.</u> . . . concerned . . . possible price-fixing conspiracies that conceivably could have been enjoined without tampering with the tariffed rates themselves."  <u>Town of Norwood</u>, 202 F.3d at 419-20.

Plaintiffs assert that Defendants' anticompetitive conduct began in the upstream natural gas transmission market pursuant to which Defendants allegedly manipulated or abused provisions of no-notice contracts that allow their subsidiaries to adjust natural gas capacity reservations along the Algonquin Pipeline at any time without penalty. D. 33 ¶ 8. Plaintiffs concede that FERC maintains authority to regulate the interstate transmission of natural gas, id. ¶ 77, and approved the no-notice contracts at issue. D. 48 at 34. In addition, Plaintiffs cannot dispute that the filed rate doctrine protects not only agency authority over tariffed rates but also "ancillary conditions and terms included in the tariff," including, for example, no-notice contracts and relevant provisions allowing LDCs to cancel capacity reservations at any time without penalty. Town Norwood, 202 F.3d at 416; see D. 48 at 16 (acknowledging that FERC granted LDCs authority to enter no-notice contracts and adjust capacity reservations pursuant to a tariff governing interstate transportation of natural gas along the Algonquin Pipeline). Accordingly, to the extent Plaintiffs seek to enjoin Defendants from exercising rights pursuant to contracts subject to a filed tariff, Plaintiffs ask the Court do exactly what the First Circuit has declared it cannot, i.e., to alter the terms of tariffs approved by FERC. See Town of Norwood, 202 F.3d at 420.

2.    *Plaintiffs Have Not Established an Applicable Exception to the Filed Rate Doctrine*

Alternatively, Plaintiffs argue that, "even if the filed rate doctrine could be assumed to apply here as a general matter, courts have consistently carved out an exception to the filed rate doctrine where plaintiffs challenge conduct not required by the regulations." D. 48 at 32. Plaintiffs contend that such an exception is appropriate here because Plaintiffs are not challenging tariffs or rates filed with FERC; rather, they are only challenging Defendants' "business choices" with respect to no-notice contracts. Id. Even if this argument was not rendered moot by the Court's

conclusion that Plaintiffs' requested damages and injunctive relief run afoul of the filed rate doctrine, the Court nonetheless concludes that any such exception is inapplicable here.

Plaintiffs claim that Defendants' artificial restriction of natural gas through the alleged abuse of no-notice contracts constitutes an improper business decision that "will not be 'immunized from antitrust liability.'" Id. at 35 (quoting City of Mishawaka, Ind. v. Ind. & Mich. Elec. Co., 560 F.2d 1314, 1320 (7th Cir. 1977)). For support, Plaintiffs primarily rely upon Otter Tail Power Co. v. United States, 410 U.S. 366 (1973), Brown v. Ticor Title Ins. Co., 982 F.2d 386 (9th Cir. 1992) and Composite Co., Inc. v. Am. Int'l Grp., Inc., 988 F. Supp. 2d 61 (D. Mass. 2013). Having reviewed these cases, the Court concludes that they are readily distinguishable from the instant case.

First, Otter Tail neither concerns the filed rate doctrine's preclusive effect on antitrust challenges to tariffed rates or ancillary matters exclusively governed by a federal regulatory agency nor supports the purported exception to the filed rate doctrine that Plaintiffs suggest is applicable in this case. See Otter Tail, 410 U.S. at 373-77. Otter Tail involved an electric company's refusal to wheel electric power over its transmissions lines to municipal consumers as part of an alleged monopolization scheme. Id. at 373. In Otter Tail, the government brought an action to enjoin the electric company's anticompetitive conduct, and the Supreme Court concluded that Congress did not displace the applicability of federal antitrust law to the conduct at issue so there was no conflict between antitrust law and the FPC's "limited authority" to order interconnection of transmission lines. Otter Tail, 410 U.S. at 373-77. As other courts have recognized, however, there is a critical distinction between Otter Tail and cases concerning anticompetitive conduct in markets that Congress entrusted exclusively to FERC. See In re Enron Corp., 326 B.R. 257, 264 (Bankr. S.D.N.Y. 2005) (distinguishing Otter Tail in holding that the filed rate doctrine precluded federal

22

and state antitrust claims alleging that wholesale energy suppliers manipulated energy markets and overcharged for energy through anticompetitive acts during California's energy crisis); see also California ex rel. Lockyer v. Dynegy, Inc., 375 F. 3d 831, 852 (9th Cir. 2004) (noting FERC's exclusive authority "both to enforce and to seek remedy" regarding violation of tariff provisions); AEP Tex. N. Co. v. Tex. Indus. Energy Consumers, 473 F.3d 581, 585 (5th Cir. 2006) (FERC "is the appropriate arbiter of any disputes involving a tariff's interpretation"); Town of Norwood, 202 F.3d at 420 (explaining that "the rationale for the filed rate doctrine is to protect the exclusive authority of the agency to accept or challenge [its] tariffs") (citing Arkla, 453 U.S. at 571, 577-78).

Second, Brown is an outlier case that various courts, including the First Circuit, have declined to extend to cases concerning the filed rate doctrine's protection of rates and tariffs approved by federal agencies. See, e.g., McCray v. Fid. Nat'l Title Ins. Co., 636 F. Supp. 2d 322, 329 (D. Del. 2009) (explaining that "[o]ther than the Ninth Circuit in Brown, no other court has taken such a narrow view of the applicability of the filed rate doctrine"). In Brown, the Ninth Circuit held that the filed rate doctrine did not apply to title insurance rates submitted to state insurance agencies that were not subjected to "meaningful review by the state." Brown, 982 F.2d at 394. However, the Supreme Court "has never indicated that the filed rate doctrine requires a certain type of agency approval or level of regulatory review" to preclude challenges to filed rates or tariffs. McCray v. Fid. Nat. Title Ins. Co., 682 F.3d 229, 238 (3d Cir. 2012). In Square D Co., the Supreme Court held that the filed rate doctrine applied to rates that were filed with but never "investigated and approved by the ICC." Square D. Co., 476 U.S. at 417 n.19. The First Circuit has similarly rejected the notion that rates or tariffs approved by FERC must receive a "meaningful review" before the filed rate doctrine can apply. See Town of Norwood, 202 F. 3d at 419 (holding

23

that "[i]t is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine") (emphasis in the original).  Moreover, even the Ninth Circuit has acknowledged that <u>Brown</u> does not make "meaningful review a *sine qua non* for the applicability of the filed rate doctrine."  <u>Carlin v. DairyAmerica, Inc.</u>, 705 F.3d 856, 871-72 (9th Cir. 2013) (noting the filed rate doctrine applies to FERC-approved rates); <u>see</u> <u>Wah Chang</u>, 507 F.3d at 1227 (stating that although "Wah Chang ululates about FERC's lax oversight . . . laxness does not indicate, much less establish, that Wah Chang can turn directly to the courts for rate relief").

Finally, Plaintiffs' reliance on <u>Composite Co.</u> to carve out an exception to the filed rate doctrine is also inapposite because, as the court makes clear, that decision did not concern a filed rate.  <u>Composite Co.</u>, 988 F. Supp. 2d at 77 (holding that the filed rate doctrine did not apply because "the experience-modifier at issue in this case is not a filed rate").  The court explained that the "focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determines."  <u>Id.</u> at 78 (quoting <u>H.J., Inc. v. Northwestern Bell Tel. Co.</u>, 954 F.2d 485, 489 (8th Cir. 1992)) (internal quotation marks omitted).  Pursuant to this reasoning, the court in <u>Composite Co.</u> held that the filed rate doctrine did not bar plaintiff's claims because a "decision in favor of plaintiff would not discredit any decision of an administrative agency."  <u>Id.</u>  The same cannot be said for Plaintiffs' requested relief which, even when packaged as a request to enjoin or award damages for anticompetitive business choices, requires the Court to determine the reasonableness of rates and tariffs approved by FERC. [9]

---

[9] Plaintiffs' reliance on <u>City of Kirkwood v. Union Elec. Co.</u>, 671 F.2d 1173 (8th Cir. 1982) and <u>Mishawaka v. Ind. & Mich. Elec. Co.</u>, 560 F.2d 1314 (7th Cir. 1977) to carve out an exception to the filed rate doctrine is similarly unpersuasive.  <u>See, e.g.</u>, D. 48 at 30.  The holdings of these cases turn on the analysis of price squeeze claims that are irrelevant here.  Moreover, in the context of price squeeze claims, the First Circuit has declined to follow the reasoning in these cases.  <u>See</u> <u>Town of Concord, Mass. v. Boston Edison Co.</u>, 915 F.2d 17, 28-29 (1st Cir. 1990).

In sum, the cases Plaintiffs cite in support of the purported exception to the filed rate doctrine for alleged anticompetitive business decisions are inapplicable here. In lieu of an applicable exception, Plaintiffs cannot escape the fact that FERC authorized the business choices that allegedly caused Plaintiffs' injury. See D. 33 ¶ 99 (explaining that "no-notice contracts, which are only available to LDCs, give them power to reserve space, or transmission capacity on the pipeline for a given day and time, then adjust that reservation upward or downward at the last minute without penalty"); see id. ¶ 110 (noting that "capacity cancellations under no-notice contracts do not allow the pipeline to release that capacity to other buyers and sellers wishing to fulfill demand in the market"). Because Plaintiffs' requested relief would require the Court to determine the reasonableness of rates and tariffs approved by FERC and because Plaintiffs have failed to "establish a pertinent limitation on or exception to the filed rate doctrine," the Court holds that the doctrine bars the federal and state law claims in the amended complaint.[10]

**B.** **Plaintiffs Have Not Stated a Cognizable Antitrust Claim**

Even if the filed rate doctrine did not bar Plaintiffs' antitrust claims, those claims would not survive Defendants' motions to dismiss because Plaintiffs lack standing to bring their claims

---

[10] Plaintiffs also allege that if they cannot pursue their claims in this Court, they lack an adequate remedy. D. 59 at 50-51. Although it is true that retail consumers do not have standing to file complaints with FERC, id., courts have consistently held that lack of a remedy does not create an exception to the filed rate doctrine. D. 44 at 26 (citing Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 128 (1990) (explaining that "[d]espite the harsh effects of the filed rate doctrine, we have consistently adhered to it")); see Wah Chang, 507 F.3d at 1226-27 (observing that Plaintiff "will not have a separate right of action for damages if it does not have this one, but lack of a damage remedy is not determinative"); Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir. 1998) (concluding that "[a]pplication of the filed rate doctrine in any particular case is not determined by . . . the possibility of inequitable results")). Nonetheless, even if Plaintiffs' claims were not barred by the filed rate doctrine, they would still fail for the reasons mentioned herein.

and for the additional reason that Plaintiffs have failed to state a cognizable antitrust monopolization claim.

### 1. *Plaintiffs Lack Antitrust Standing*

As an initial matter, Defendants contend that Plaintiffs do not have standing to bring their antitrust claims. D. 43 at 27; D. 44 at 28. Federal courts are constitutionally limited to deciding cases or controversies. Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 52 (1st Cir. 2014). Accordingly, a plaintiff must establish that it has standing in federal court by demonstrating that her complaint alleges a case or controversy recognized under Article III of the Constitution. See Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). To do so, "a plaintiff must establish . . . injury, causation, and redressability." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). At the pleading stage, "[a]n antitrust plaintiff must show both constitutional standing and antitrust standing." In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157 (2d Cir. 2016). To determine whether a plaintiff has standing to bring an antitrust cause of action, the Court conducts "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." RSA Media, Inc. v. AK Media Grp., Inc., 260 F.3d 10, 13 (1st Cir. 2001) (quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 9-10 (1st Cir. 1999)) (internal quotation marks omitted). The Court considers:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws . . . ; (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

Id. at 14 (citation omitted). Although courts weigh each of the six factors, lack of injury, in particular, will generally defeat standing. See Sterling Merch., Inc. v. Nestlé, S.A., 656 F.3d 112,

121 (1st Cir. 2011). The Court will, therefore, address Defendants' arguments with respect to antitrust injury first.

"The Supreme Court has defined 'antitrust injury' as an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Serpa Corp., 199 F.3d at 10 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). To establish antitrust injury, a "proper plaintiff 'must prove more than injury causally linked to an illegal presence in the market.'" Serpa, 199 F.3d at 10 (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125 (1969). The First Circuit has explained that "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." Serpa, 199 F.3d at 10-11.

Defendants assert that Plaintiffs, who are retail electricity consumers, cannot establish "antitrust injury" because they are not competitors or customers in the natural gas transmission market allegedly restrained by Defendants' anticompetitive conduct. D. 43 at 28-20; D. 44 at 28-30. Specifically, Defendants argue that Plaintiffs have alleged that market manipulation occurred in the natural gas transmission market through Defendants' alleged suppression of New England's natural gas supply, while Plaintiffs' alleged injury occurred in the retail electricity market. According to Defendants, it is not enough that Plaintiffs participated in the retail electricity market, which was indirectly affected by Defendants' antitrust conduct; rather, Plaintiffs must have directly participated in the market in which Defendants' alleged anticompetitive conduct occurred to have standing. D. 44 at 29. Defendants cite Aluminum Warehousing for the proposition that a "putative plaintiff must be a participant in the very market that is directly restrained" to suffer antitrust injury. Aluminum Warehousing, 833 F.3d at 161. In Aluminum Warehousing, aluminum purchasers alleged that futures traders and aluminum warehouse owners conspired to artificially

inflate the price of storing aluminum in London Metal Exchange ("LME") Warehouses. Id. at 155. The plaintiffs in that case were not participants in any of the markets in which the defendants operated, however, they alleged that they suffered antitrust injury because their role in the physical aluminum market was "inextricably intertwined" with the defendants' alleged anticompetitive scheme in the aluminum storage market. Id. at 162. The plaintiffs in Aluminum Warehousing asserted that the increase in storage costs caused by the defendants' anticompetitive conduct also increased the price the plaintiffs' paid for aluminum. Id. at 156. The Second Circuit nevertheless held there was no cognizable antitrust injury because "the injury [the plaintiffs] claim was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." Id. at 162. Consistent with the Second Circuit's decision in Aluminum Warehousing, Defendants here urge the Court to dismiss Plaintiffs' claims because they similarly do not participate in the market in which Defendants' alleged unlawful conduct occurred. D. 44 at 29.

By contrast to the plaintiffs in Aluminum Warehousing, Plaintiffs do not affirmatively allege that they are "proper" plaintiffs for the purpose of establishing antitrust injury. D. 48 at 42-44. Instead, Plaintiffs argue that standing is appropriate where, as here, there is "no one else 'with the incentive or ability to sue.'" D. 48 at 42 (quoting SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 45 (1st Cir. 1995)). In SAS, the First Circuit explained that "[t]he most obvious reason for conferring standing on a second-best plaintiff is that, in some general category of cases, there may be no first best with the incentive or ability to sue." SAS, 48 F.3d at 45 (denying standing where actors directly threatened by the market had "ample incentive and ability" to challenge antitrust violations); cf. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 542 (1983) (concluding that the "existence of an identifiable class of persons whose self-

interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to exercise standing). In the instant litigation, Plaintiffs assert that actors in the natural gas transmission market, including Defendants' subsidiaries and competitors, are unlikely to bring suit given that they benefited from Defendants' anticompetitive conduct in the form of inflated prices for natural gas on the spot market. However, Plaintiffs' pleadings undermine the persuasiveness of their argument. The amended complaint alleges that Defendants, through their manipulation of no-notice contracts, did not release their excess natural gas capacity so that other actors in the market could use that capacity. D. 33 ¶ 147. If Defendants had released excess capacity, other companies—such as generators looking to jump into the real-time auction at the last minute—could have purchased it. Id. Surely, at least one gas seller or purchaser that was consistently deprived the benefits of excess natural gas transmission capacity due to Defendants' alleged anticompetitive conduct possessed the requisite incentive or ability to sue Defendants for direct injury in the natural gas transmission market.[11]

Plaintiffs also attempt to invoke the Supreme Court's decision in Blue Shield of Va. v. McCready, 457 U.S. 465 (1982), which allowed antitrust claims to proceed where the plaintiff's injury was "inextricably intertwined" with the injury the defendant's conduct sought to inflict upon the relevant market or participants. D. 44 at 21. In McCready, the Supreme Court considered whether a plaintiff, who received health care coverage under a Blue Shield of Virginia ("Blue

---

[11] Plaintiffs' argument that Defendants' competitors in the natural gas transmission market have no incentive to sue Defendants does not require the Court to reach a different result. D. 48 at 42. Plaintiffs rely on a paragraph of their amended complaint regarding the wholesale and retail electricity markets in New England. D. 33 ¶ 164. In addition, Plaintiffs have not alleged that every competitor and customer in the natural gas transmission market benefited from Defendants' alleged anticompetitive conduct such that there is not a direct market actor with the incentive or capacity to sue Defendants, as required to satisfy the exceptional circumstances under which courts confer standing on a "second-best plaintiff." See SAS, 48 F.3d at 45.

Shield") health plan, could sue under antitrust laws for an alleged conspiracy between Blue Shield

and Virginia psychiatrists to exclude psychologists from the market by refusing to reimburse health

plan subscribers like the plaintiff for their services. McCready, 457 U.S. at 467-68. Although the

plaintiff in McCready was not a psychologist (and therefore not the immediate target of the alleged

conspiracy), the Supreme Court allowed the plaintiff's claims to proceed because her injury "was

inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the

psychotherapy market." Id. at 484. The court explained further that McCready's injury was a

"necessary step in effecting the ends of the alleged illegal conspiracy" and "the very means by

which it is alleged that [the defendants] sought to achieve its illegal ends." Id. at 479. The First

Circuit has explained that McCready "may be an instance in which standing was extended to a

plaintiff who was only derivatively injured" or it "can also be read as a case in which the plaintiff

was a purchaser in the very market directly distorted by the antitrust violation." SAS, 48 F.3d at

45-46. The First Circuit also cast doubt on whether "this [inextricably intertwined] language—if

taken as physical image—was ever intended as a legal test of standing." Id. at 46. Accordingly,

employing a narrow reading of McCready based on the facts at issue in that case, the Court

concludes that Plaintiffs have not established antitrust standing. See Winters v. Ocean Spray

Cranberries, Inc., 296 F. Supp. 3d 311, 320 (D. Mass. 2017), reconsideration denied, motion to

certify appeal granted, No. CV 12-12016-RWZ, 2018 WL 1627442 (D. Mass. Jan. 2, 2018)

(applying McCready to antitrust claims in view of the First Circuit's analysis in SAS). The

objective of the alleged anticompetitive scheme in McCready was to exclude psychologists from

Virginia's market for psychotherapy, and the mechanism by which that scheme was accomplished

required plaintiff and others similarly situated to pay out of pocket for psychologists' services,

which were not reimbursable under the Blue Shield plan at issue. McCready, 457 U.S. at 467-68.

As such, the plaintiff's injury was integral to the injury the conspirators sought to inflict upon psychologists.  Id. at 484.  Plaintiffs here allege that Defendants sought to increase the profits of their natural-gas generated electricity plants and the value of their non-natural gas electricity generating assets by suppressing natural gas supply and, in turn, artificially inflating the wholesale price of electricity paid to power generators in New England.  D. 33 ¶¶ 150-163.  By contrast to the plaintiffs in McCready, the increased cost of retail electricity borne by Plaintiffs here was merely incidental even to Defendants' scheme, as alleged by Plaintiffs.  That is, Plaintiffs' injury was not the "very means" by which Defendants sought to achieve their "illegal ends."  McCready, 457 U.S. at 479.  The Court, therefore, concludes that Plaintiffs have not suffered an antitrust injury.  See SAS, 48 F.3d at 43 (explaining that "even where a violation exists and a plaintiff has been damaged by it, the courts—for reasons of prudence—have sought to limit the right of private parties to sue for damages or injunctions").

Assuming arguendo that Plaintiffs did in fact suffer an antitrust injury, the Court would still have to determine whether Plaintiffs' injury is sufficiently connected to Defendants' alleged anticompetitive conduct.  See Winters, 296 F. Supp. 3d at 322.  This task is guided by the first and fourth factors of the standing analysis, which require examination of the "causal connection between the alleged antitrust violation and harm to the plaintiff" and "the directness with which the alleged market restraint caused the asserted injury."  RSA, 260 F.3d at 14 (citation omitted).  The causal connection between Defendants' alleged suppression of the supply of natural gas and Plaintiffs' injury as retail electricity consumers is attenuated at best.  Plaintiffs' injury allegedly stems from Defendants' anticompetitive conduct in the natural gas transmission market, which is at least three markets removed from the retail electricity market.  See, e.g., D. 33 ¶ 8.  Accordingly, for Plaintiffs to suffer any injury, the anticompetitive effect of Defendants' conduct must pass

through the natural gas supply transmission market, to the spot market for consumers with "variable and less predictable" natural gas needs, id. ¶ 88, to the wholesale electricity auction, which involves a complicated bidding process designed to discourage competitors from offering prices well above the competition, id. ¶ 57, and finally to retail electricity consumers. In addition, the lack of directness between the alleged restraint and injury counsels in favor of dismissal because Plaintiffs' injury was merely an offshoot of the injuries suffered by buyers in the spot market for natural gas and the wholesale electricity market. See Associated Gen., 459 U.S. at 540-41 (concluding that the plaintiff lacked antitrust standing where "the chain of causation between [the plaintiff's] injury and the alleged restraint . . . contains several somewhat vaguely defined links" and where "[i]t is obvious that any such injuries were only an indirect result of whatever harm may have been suffered" by more immediate victims); see also Sullivan v. Tagliabue, 828 F. Supp. 114, 118 (D. Mass. 1993), aff'd, 25 F.3d 43 (1st Cir. 1994) (dismissing one plaintiff's antitrust claims for lack of standing where "[i]t is obvious that any injury suffered . . . was only an indirect result of the alleged injury inflicted" upon another plaintiff). For similar reasons, a district court in this Circuit dismissed antitrust claims involving an alleged restraint in one market that impacted prices in a second market. Winters, 296 F. Supp. 3d at 322 (dismissing antitrust claims where "the harm [plaintiffs'] allege is indirect" given that defendant Ocean Spray "first influences independent handlers, who in turn, lower the prices they pay independent growers"). The Court concludes that Plaintiffs' injury is indirect and only remotely connected to Defendants' alleged anticompetitive conduct.

Further, even as alleged, the nature of any damages is attenuated and the risk of duplicative recovery is real. As Defendant Eversource indicates, determining damages in this case would require speculation. D. 43 at 29. For example, for each day during the class period, the factfinder

would first be required to determine whether Defendants adjusted their natural gas capacity reservations. Then, the factfinder would have to distinguish between the anticompetitive suppression of natural gas supply and Defendants' legitimate need to adjust reservation capacity for the benefit of natural gas customers. Subsequently, the factfinder would need to determine whether Defendants' alleged suppression of New England's natural gas supply impacted the market price of natural gas in the spot market that day, whether the clearing price for wholesale electricity was artificially inflated because of the price of natural gas that same day and, finally, the extent to which the resulting artificial inflation of wholesale electricity prices was passed on to retail electricity consumers. In other words, to determine Plaintiffs' damages based upon Plaintiffs' allegations, the factfinder would be required to engage in an analysis of how multiple markets functioned on a given day, including evaluation of the inputs and outputs for each market, factors that influenced prices offered and accepted by actors in each market and the effectiveness of an auction process regulated by FERC. There is a risk that resulting damages calculations (if they could be fairly determined) would be speculative and would present significant concerns regarding apportionment of damages and the risk of duplicative recovery. Any damages award would need to be correctly apportioned amongst hundreds of thousands of retail electricity customers of Avangrid and Eversource's subsidiaries. In addition, allowing the Plaintiffs, as retail electricity consumers, to move forward with their claims, opens the door for duplicative recovery in contravention of well settled antitrust law since Plaintiffs' injuries are the indirect result of harm allegedly suffered by actors in the spot market for natural gas or the wholesale electricity market. See Associated Gen., 459 U.S. at 545 (reversing lower court's holding in favor of antitrust plaintiffs where "the [d]istrict [c]ourt would face problems of identifying damages and apportioning them among directly victimized . . . and indirectly affected . . . entities"); Ill. Brick

Co. v. State of Illinois, 431 U.S. 720, 737 (1977) (stating that "[p]ermitting the use of pass-on theories . . . would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers").

Although Plaintiffs allege that Defendants maintained an improper motive for artificially restricting New England's natural gas supply, the Court concludes that Plaintiffs' allegations are insufficient as a matter of law. The remaining factors for antitrust standing—including the nature of Plaintiffs' injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and Plaintiffs' injury and the potential for duplicative recovery or complex apportionment of damages—weigh heavily against judicial enforcement of Plaintiffs' antitrust claims.

## 2. *Plaintiffs Have Not Sufficiently Alleged Monopoly Power*

Even if Plaintiffs' federal antitrust claims were not barred by the filed rate doctrine or foreclosed by Plaintiffs' lack of antitrust standing, the Court would conclude that they do not state plausible antitrust claims. Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce" among several states. Díaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (quoting 15 U.S.C. § 2) (internal quotation marks omitted). "To prove a violation of this statute, a plaintiff must demonstrate (1) that the defendant possesses 'monopoly power in the relevant market' and (2) that the defendant has acquired or maintained that power by improper means." Town of Concord, Mass. v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir. 1990) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). To prove attempted monopolization, a plaintiff must demonstrate "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

The thrust of Defendants' arguments on the plausibility of Plaintiffs' claims concern the first prong of the monopolization analysis, *i.e.*, whether Defendants possess monopoly power in the relevant market. As an initial matter, Defendant Avangrid contends that Plaintiffs have failed to allege a relevant geographic market. See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 197 (1st Cir. 1996) (explaining that "[b]efore determining market share, however, the relevant geographic market must be defined"). "The plaintiff carries the burden of describing a well-defined relevant market, both geographically and by product, which the defendants monopolized." Id. (quoting H.J., Inc. v. Int'l Tel. & Tel. Corp., 867 F.2d 1531, 1537 (8th Cir. 1989)). Although the question of market definition is usually one of fact for the jury, "a plaintiff must present sufficient evidence from which a reasonable jury could find the existence of the proposed relevant market." Coastal Fuels, 79 F.3d at 197. Defendant Avangrid alleges that "New England" is not a plausible relevant geographic market because Plaintiffs have not "pled facts to support the notion that a residential retail electricity consumer in one town, county, city or state in New England can turn to supplies in any other town, county, city or state." D. 44 at 33. This is not the test for determining whether a relevant geographic market has been defined. To the contrary, the First Circuit has determined that the relevant geographic market consists of "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." Coastal Fuels, 79 F.3d at 196. Plaintiffs have sufficiently alleged that the six states that constitute New England are organized into a single electricity market in which Defendants participate, D. 33 ¶¶ 59, 102-3, and alternatives to Defendants' retail electricity companies exist in that geographic market.

35

Defendants also contend that the amended complaint fails to establish either through direct or circumstantial evidence that their respective shares of the retail electricity market are substantial enough to infer market power for a monopolization claim. Courts define "[m]onopoly power . . . as 'the power to raise prices and exclude competition.'" Hewlett-Packard Co. v. Bos. Sci. Corp., 77 F. Supp. 2d 189, 195 (D. Mass. 1999) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)). "Market power can be shown through two types of proof," either through "direct evidence of market power," such as "actual supracompetitive prices and restricted output," or "circumstantial evidence of market power." Coastal Fuels, 79 F.3d at 196-97. The amended complaint asserts that Eversource, through subsidiaries that provide retail electricity to residents in Massachusetts, Connecticut and New Hampshire, services more than 3.1 million electricity customers in 500 New England communities. D. 33 ¶ 102. Avangrid also owns subsidiaries that provide retail electricity to more than 950,000 electricity customers located in Connecticut and Maine. D. 33 ¶ 103. The amended complaint does not, however, provide details regarding Eversource's or Avangrid's alleged share of the retail electricity market. Defendants claim this omission is fatal to Plaintiffs' complaint. See D. 43 at 31 n.19. Moreover, Defendant Avangrid argues that even assuming that only Eversource and Avangrid provide retail electricity in New England, Plaintiffs' allegations indicate that Avangrid has 23% share of the market, which is insufficient to support a monopolization claim. D. 44 at 31-32. By comparison, courts in the First Circuit determined that "[f]or pleading purposes, an allegation of market share of 70 percent has been held to be an adequate basis for an inference of power in a relevant market." Cal. Ass'n of Realtors, Inc. v. PDFfiller, Inc., No. CV 16-11021-IT, 2018 WL 1403330, at *10 (D. Mass. Mar. 2, 2018), report and recommendation adopted, No. 16-CV-11021-IT, 2018 WL 1399296 (D. Mass. Mar. 19, 2018) (quoting Hewlett-Packard, 77 F.2d at 195-96).

In response, Plaintiffs contend that they have sufficiently alleged direct evidence of monopoly power by pointing to Defendants' collective control over other markets, other than the retail electricity market, that allegedly determine retail electricity prices. See, e.g., D. 33 ¶¶ 94, 99, 113, 118; see also D. 48 at 39. Specifically, Plaintiffs allege that Defendant Eversource partially owns New England's principal natural gas pipeline. D. 33 ¶ 95. Both Eversource and Avangrid own and operate multiple LDCs. Id. ¶ 97. Of the eight largest LDCs in New England, half are owned by Eversource or Avangrid. Id. As a result of their LDC operations, Eversource and Avangrid possess a large number of "no-notice" contracts for natural gas transmission capacity, which allow Defendants' LDCs to reserve large quantities of natural gas transmission capacity. Id. ¶ 127. In addition, LDCs can adjust their transmission capacity reservations upward or downward at any time and without penalty and, as a result, LDCs control the supply of natural gas transmitted to New England. Id. ¶ 99. Finally, Defendants' combined ability to suppress natural gas supply grants them control over the price of wholesale electricity, which, in turn, impacts the price of retail electricity for the reasons previously explained. Nonetheless, as Defendants correctly note, Plaintiffs have failed to allege any facts indicating that Avangrid and Eversource each separately have the power to control or raise prices of any product in any market. At bottom, a claim for monopolization requires that Plaintiffs allege facts sufficient to establish that Defendants separately possessed monopoly power in the relevant market. Accordingly, courts in the First Circuit and elsewhere have rejected monopolization claims based on a "shared monopoly" theory of liability. See PSW, Inc. v. VISA U.S.A., Inc., No. C.A. 04-347T, 2006 WL 519670, at *11 (D.R.I. Feb. 28, 2006) (explaining that "to state any claim under Section Two's actual or attempted monopoly clauses, a claimant is required to assert that the *individual* market power of a defendant is sufficient to constitute a monopoly, in this analysis, the combined monopoly power

of competitors is irrelevant and insufficient") (emphasis in the original); see also RxUSA Wholesale, Inc. v. Alcon Labs., Inc., 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009), aff'd sub nom. RxUSA Wholesale Inc. v. Alcon Labs., 391 F. App'x 59 (2d Cir. 2010) (explaining that courts in the Second Circuit "have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act") (internal citations and quotation marks omitted); Sun Dun, Inc. of Wash. v. Coca-Cola Co., 740 F. Supp. 381, 391 (D. Md. 1990) (dismissing monopolization and attempted monopolization claims alleging a shared monopoly theory of liability). Where the allegations here do not allege Defendants' individual capacity to control the retail electricity market, the Plaintiffs have not met their burden under the elements of either monopolization or attempted monopolization. Accordingly, the Plaintiffs have not stated cognizable antitrust claims.[12]

## C. State Law Claims

Plaintiffs bring claims for damages and injunctive relief under various state antitrust, consumer protection and unfair trade statutes. Although the filed rate doctrine applies with equal force to Plaintiffs' state law claims, see Snohomish, 384 F.3d at 761 (explaining that the filed rate doctrine preempted antitrust and unfair competition claims grounded in state law where such claims required the court to determine rates that "would have been achieved in a competitive market") (internal quotation marks omitted), the Court concludes that Plaintiffs' state law claims also fail for the reasons stated below.

---

[12] Because Plaintiffs have not stated cognizable antitrust claims for monopolization, the Court does not reach Defendant Avangrid's argument that Plaintiffs' antitrust claims are grounded in a "refusal to deal" theory of antitrust liability that runs afoul of well-settled Supreme Court precedent. D. 43 at 25 (citing Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438 (2009) and Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004)).

First, Plaintiffs' inability to demonstrate antitrust standing, as discussed above, forecloses Plaintiffs' state antitrust claims under Maine's antitrust laws, 10 Me. Rev. Stat. Ann. §§ 1101 *et seq.* See <u>Knowles v. Visa U.S.A. Inc.</u>, No. CIV.A. CV-03-707, 2004 WL 2475284, at *3-9 (Me. Super. Oct. 20, 2004) (applying the factors for determining federal antitrust standing in evaluating claims brought under Maine's antitrust statute). Second, Plaintiffs fail to state a claim under state consumer protection and unfair competition statutes, which each require allegations regarding (1) an unfair or deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the wrongful conduct and the consumer's injury. See <u>Shaulis v. Nordstrom, Inc.</u>, 865 F.3d 1, 6 (1st Cir. 2017) (explaining that "[t]o state a viable claim [under the Massachusetts Consumer Protection Act], the plaintiff must allege that she has suffered an 'identifiable harm' caused by the unfair or deceptive act that is separate from the violation itself") (quoting <u>Tyler v. Michaels Stores, Inc.</u>, 464 Mass. 492, 503 (2013)); <u>Edwards v. N. Am. Power & Gas, LLC</u>, 120 F. Supp. 3d 132, 141 (D. Conn. 2015) (outlining requirements for violation of Conn. Gen. Stat. § 42-110 *et seq.*); <u>McKinnon v. Honeywell Int'l, Inc.</u>, 977 A.2d 420, 427 (Me. 2009) (explaining that establishing a violation of Maine's Unfair Trade Practices Act requires, at a minimum, that plaintiff show a loss of money or property and substantial injury caused by the alleged deceptive or unfair practice); <u>State v. Moran</u>, 151 N.H. 450, 452 (2004) (explaining that courts should consider whether defendant's conduct caused "substantial injury to consumers" in determining whether such conduct constitutes a violation of the New Hampshire Consumer Protection Act); <u>Carter v. Gugliuzzi</u>, 716 A.2d 17, 21 (Vt. 1998) (explaining that the Vermont Consumer Fraud Act "provides a remedy for any consumer who contracts for goods or services and, in reliance upon false or fraudulent representations or promises, sustains damages or injury" caused by the defendant).

For the reasons previously stated, *supra* at 31-32, the Court concludes that Plaintiffs' injury is too remote to satisfy the causation prongs of the various state law claims.  See, e.g., Empire Today, LLC v. Nat'l Floors Direct, Inc., 788 F. Supp. 2d 7, 30 (D. Mass. 2011) (explaining that the relationship between defendant's allegedly unlawful conduct and plaintiff's injury "only proves a correlation, not a causation"); In re Hannaford Bros. Co. Customer Data Sec. Breach Litig., 660 F. Supp. 2d 94, 100 (D. Me. 2009) (explaining that under Maine law it is well settled that "a plaintiff may not recover damages if the causal relation between a defendant's tortious act . . . and the harm suffered is 'too attenuated'") (quoting Stubbs v. Bartlett, 478 A.2d 690, 693 (Me. 1984)); Vacco v. Microsoft Corp., 793 A.2d 1048, 1050 (Conn. 2002) (concluding that "plaintiff's claimed injuries are too indirect and remote with respect to the defendant's allegedly anticompetitive conduct for the plaintiff to recover under CUTPA").  Nevertheless, the Court, for the reasons previously mentioned, has dismissed all of Plaintiffs' federal claims and declines to exercise jurisdiction over the remaining state law claims.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27 (1966) (explaining that if the "federal claims are dismissed before trial . . . the state claims should be dismissed as well" and "if it appears that the state issues substantially predominate . . . the state claims may be dismissed . . . and left for resolution to state tribunals").

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motions to dismiss, D. 41; D. 42.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge